**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR DEMOCRACY & TECHNOLOGY,<br>    1401 K Street NW<br>    Suite 200<br>    Washington, DC 20005<br><br>                     Plaintiff,<br><br>          v.<br><br>DONALD J. TRUMP, in his official capacity as<br>President of the United States of America,<br><br>Serve:  Donald J. Trump<br>          President of the United States<br>          1600 Pennsylvania Avenue NW<br>          Washington, DC 20500<br><br>                     Defendant. | Case No. ____20-1456_____<br><br><br>**COMPLAINT** |

## INTRODUCTION

1.      President Trump's May 28, 2020 "Executive Order on Preventing Online Censorship" ("Executive Order")[1] violates the First Amendment in two fundamental respects:  First, the Order is plainly retaliatory: it attacks a private company, Twitter, for exercising its First Amendment right to comment on the President's statements.  Second, and more fundamentally, the Order seeks to curtail and chill the constitutionally protected speech of all online platforms and individuals— by demonstrating the willingness to use government authority to retaliate against those who criticize the government.

---

[1]    Executive Order on Preventing Online Censorship (May 28, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/.

2.      Plaintiff—an organization that promotes and protects free expression on the Internet—brings this lawsuit to invalidate that unconstitutional act and prevent the chilling of Americans' essential free speech rights.

3.      The First Amendment embodies "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *New York Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964).  "The right of citizens to inquire, to hear, to speak, and to use information to reach consensus is a precondition to enlightened self-government and a necessary means to protect it." *Citizens United v. FEC*, 558 U.S. 310, 339 (2010).

4.      Commentary about the statements and actions of public officials lies at the very core of the speech protected by the First Amendment.  Indeed, the Supreme Court has explained that the First Amendment's protection extends even to "vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *Sullivan*, 376 U.S. at 270.

5.      The Sedition Act of 1798 made it a crime to "write, print, utter or publish . . . any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress. . . , or the President. . . , with intent to defame . . . or to bring them, or either of them, into contempt or disrepute; or to excite against them, or either or any of them, the hatred of the good people of the United States."  James Madison—speaking against the Act—said that in our constitutional system, "the censorial power is in the people over the Government, and not in the Government over the people (4 Annals of Congress at 934 (1794))"; "[t]he right of free public discussion of the stewardship of public officials was thus, in Madison's view, a fundamental principle of the American form of government." *Sullivan*, 376 U.S. at 274-75.  In both Congress and the Supreme Court, there was a "broad consensus that the Act, because of the restraint it

imposed upon criticism of government and public officials, was inconsistent with the First Amendment." *Id*. at 276.

6.  The First Amendment prohibits government officials from using government power to retaliate against an individual or entity for engaging in protected speech. As the Supreme Court has explained, "[o]fficial reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right,' and the law is settled that as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." *Hartman v. Moore*, 547 U.S. 250, 256 (2006) (internal citations omitted).

7.  The First Amendment also prohibits the use of government power to *chill* individuals or entities from engaging in protected speech. "Generally speaking, government action which chills constitutionally protected speech or expression contravenes the First Amendment." *Wolford v. Lasater*, 78 F.3d 484, 488 (10th Cir. 1996) (citing *Riley v. Nat'l Fed'n of the Blind of North Carolina*, 487 U.S. 781, 794 (1988)).

8.  Finally, the First Amendment bars the government from trying to censor lawful speech—such as the online speech of ordinary Americans—through the threat of liability or reprisals directed at intermediaries, the companies that provide the platform for Americans' online speech. *See Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) ("[T]he threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" constitutes "informal censorship" that violates the First Amendment).

9.  The Executive Order violates all of these well-established First Amendment principles.

10.  Twitter appended the President's tweets on California's plans for voting by mail with a tag stating that viewers could "get the facts" about California's mail-in ballot plans by clicking

on the addendum.  In immediate retaliation, the President issued the Executive Order.  In addition, President Trump—by publicly attacking Twitter and issuing the Order—sought to chill future online speech by other speakers.

11. The processes prescribed by the Order would circumvent the role of Congress and of the courts in enacting and interpreting 47 U.S.C. § 230 ("Section 230")—a critical protection for online speech—and purport to empower multiple government agencies to pass judgment on companies' content moderation practices. The Order clouds the legal landscape in which the hosts of third-party content operate and puts them all on notice that content moderation decisions with which the government disagrees could produce penalties and retributive actions, including stripping them of Section 230's protections.  It invokes government authority to set in motion processes to limit legal protections applicable to private actors and to coordinate legal actions by State Attorneys General against online service providers, and threatens withdrawal of government advertising funds.  The effect of the Order will be to reduce Americans' ability to speak freely online and access the wide range of information and views that are available today.

12. President Trump's retaliatory motivation and his goal of chilling future protected speech that is inconsistent with his views render the Executive Order violative of the First Amendment.

13. This Court should therefore declare that the Executive Order violates the First Amendment and is therefore invalid, and issue an order prohibiting government officials from engaging in the acts specified in the Order.

## JURISDICTION AND VENUE

14.     Pursuant to 28 U.S.C. § 1331, this Court has subject matter jurisdiction over Plaintiff's claim, which raises questions under the First Amendment to the United States Constitution.  The Court has additional remedial authority under 28. U.S.C. §§ 2201-02.

15.     Venue is proper under 28 U.S.C. § 1391(e) because (i) this is a civil action in which Defendant is the President of the United States, (ii) a substantial part of the events or omissions giving rise to the claim occurred in the District of Columbia, and (iii) Defendant resides in this district at the White House.

## PARTIES

16.     Plaintiff Center for Democracy & Technology ("CDT") is a federally tax-exempt, nonprofit organization headquartered in Washington, District of Columbia, whose mission is to strengthen individual rights and freedoms by defining, promoting, and influencing technology policy and the architecture of the Internet that impacts people's daily lives.  For more than 25 years, CDT has put democracy and individual rights at the center of the digital revolution, and ensured that the constitutional and democratic values of free expression and privacy are protected in the digital age. CDT consistently urges courts to defend Americans' rights to express themselves online.

17.     Defendant Donald J. Trump is the President of the United States.  He is sued in his official capacity.  In that capacity, he issued the Executive Order challenged in this lawsuit.

## FACTUAL ALLEGATIONS

### *Threats Aimed at Internet Intermediaries Jeopardize Individuals' Free Speech Online*

18.     The Internet enables billions of people around the world to access and contribute to the enormous wealth of information and ideas it sustains. It is transforming every aspect of our

societies, large and small, from how our economies function and our elected officials govern, to how we acquire information about deeply sensitive issues and express our most intimate thoughts.

19.     Internet users depend on the interconnected network of technical intermediaries, including backbone network operators, Internet service providers (ISPs) and telecommunications carriers, content delivery networks, and remote hosting providers to exchange and store data.  They also rely on the millions of websites, social media services, and applications that run on this infrastructure to access forums for searching for and sharing information and ideas, and for connecting with other Internet users around the world.  These intermediaries facilitate access to content predominantly created by others.

20.     Individuals' ability to engage freely in online communication is vulnerable to censorship through threats directed at Internet intermediaries,  Internet intermediaries face pressure to control or police user content and activity in a wide range of circumstances, including in response to claims of defamation, obscenity, intellectual property infringement, invasion of privacy, or because content is critical of the government.[2] Due to the sheer scale of user-generated content that intermediaries host or transmit, and intermediaries' concerns about their own reputational risk, Internet intermediaries may lack the resources and/or incentives to defend the free speech interests of the users or to defend particular posts.

21.     Recognizing the threat to free expression posed by a system treating intermediaries as gatekeepers, Congress in 1996 enacted an amendment to the Communications Act of 1934.  That amendment, Section 230, shields intermediaries from liability for third-party content and enables interactive service providers, such as social media companies, to moderate the content they host

---

[2] *See* Seth Kreimer, Censorship by Proxy: The First Amendment, Internet Intermediaries, and the Problem of the Weakest Link, 155 U. Penn. L. Rev. 11, 31-32 (2006).

without fear of liability.  Section 230 expressly exempts an interactive computer service from publisher liability for the exercise of its editorial and self-regulatory functions.  This provision ensures that "[i]nteractive computer services like Facebook, YouTube, and Twitter can, for example, 'perform some editing on user-generated content without thereby becoming liable for all defamatory or otherwise unlawful messages that they didn't edit or delete.'"[3]

22.     This shield from the threat of litigation enables social media companies to combat misinformation and disinformation, and remove or flag content that violates their policies without fear of reprisal.[4] Section 230 has been described as "the most important law protecting internet speech" and "perhaps the most influential law to protect the kind of innovation that has allowed the Internet to thrive."[5]

### President Trump's Retaliation Against Internet Content Providers

23.     In August 2019, the White House announced it was working on a potential Executive Order that would reduce liability protections for online platforms.  It also announced that it was investigating potential anticonservative bias on social media platforms.[6]

---

[3] *Am. Freedom Def. Initiative v. Lynch*, 217 F. Supp. 3d 100, 105 (D.D.C. 2016) (citing *Fair Hous. Council of San Fernando Valley v. Roommates.Com, LLC*, 521 F.3d 1157, 1163 (9th Cir. 2008)).

[4] Press Release, CDT, Reported Executive Order Again Threatens First Amendment and Empowers Government Censorship (May 28, 2020), https://cdt.org/press/reported-executive-order-again-threatens-first-amendment-and-empowers-government-censorship/

[5] *See* Electronic Frontier Foundation, *Section 230 of the Communications Decency Act,* https://www.eff.org/issues/cda230.

[6] *See* Margaret Harding McGill and Daniel Lippman*, White House Drafting Executive Order to Tackle Silicon Valley's Alleged Anti-Conservative Bias,* Politico, Aug. 7, 2019, https://www.politico.com/story/2019/08/07/white-house-tech-censorship-1639051.

24.     After significant negative public response, the White House in August 2019 shelved its draft Executive Order to restrain the free speech of online platforms.[7]  Opposition to the potential Executive Order included groups from across the political spectrum.[8]

25.     On May 11, 2020, Twitter announced that it would begin applying labels and warning messages to disputed or misleading tweets about the COVID-19 coronavirus pandemic, with links to further context and factual information.  That announcement did not mention tweets about

---

[7] *Id.*

[8] *See, e.g.,* CDT (Press Release, CDT, CDT Condemns Reported Executive Order to Empower Government Censorship (Aug. 9, 2019), https://cdt.org/press/cdt-condemns-reported-executive-order-to-empower-government-censorship/); Public Knowledge (Harold Feld, Could the FCC Regulate Social Media Under Section 230? No, Aug. 14, 2019, https://www.publicknowledge.org/blog/could-the-fcc-regulate-social-media-under-section-230-no); NetChoice (Carl Szabo, Trump Seeks Powers to Rein In Alleged Social Media Bias, Aug. 9, 2019, https://netchoice.org/media-press/trump-seeks-powers-to-rein-in-alleged-social-media-bias/); CCIA (Heather Greenfield, Administration Should Not Embrace Censorship Nor Hamstring Efforts To Fight Online Extremism, Says CCIA, Aug. 9, 2019, https://www.ccianet.org/2019/08/administration-should-not-embrace-censorship-nor-hamstring-efforts-to-fight-online-extremism-says-ccia/); TechFreedom (TechFreedom, *Draft Social Media Bias Executive Order Would Create Real Internet Speech Police,* Aug. 9, 2019, https://techfreedom.org/draft-social-media-bias-executive-order-would-create-real-internet-speech-police/); Gab (Andrew Torba, *Don't Get Excited About The White House's Social Media Censorship Executive Order,* Gab News, May 28, 2019, https://news.gab.com/2019/05/28/dont-get-excited-about-the-white-houses-social-media-censorship-executive-order); FreedomWorks (@FreedomWorks, Twitter (Aug. 12, 2019, 10:02 AM), https://twitter.com/FreedomWorks/status/1160959638671679489; Senator Ron Wyden (Brian Fung, *White House Proposal Would Have FCC and FTC Police Alleged Social Media Censorship,* CNN Business, Aug. 10, 2019, https://www.cnn.com/2019/08/09/tech/white-house-social-media-executive-order-fcc-ftc/index.html); Fight for the Future (*URGENT: Leaked Documents Show White House Is Planning Executive Order to Censor the Internet* (last visited June 1, 2020), https://actionnetwork.org/petitions/censor-the-internet/); Jared Schroeder (Jared Schroeder, *Efforts to Compel Social Media 'Fairness' Go Afoul On Freedom Of Expression*, The Hill, Aug. 13, 2019, https://thehill.com/opinion/civil-rights/457297-efforts-to-compel-social-media-fairness-go-afoul-on-freedom-of); and Congressman Ro Khanna (Ro Khanna (@RoKhanna), Twitter, https://twitter.com/RoKhanna/status/1162519156970754049 (Aug. 16, 2019, 5:19 PM).

elections, but it stated, "We will continue to introduce new labels to provide context around different types of unverified claims and rumors as needed."[9]

26.    Since April 2019 it has been against Twitter's policy—and its terms of use—to employ the platform to interfere with elections:

> "You may not use Twitter's services for the purpose of manipulating or interfering in elections. This includes but is not limited to: Misleading information about how to vote or register to vote (for example, that you can vote by Tweet, text message, email, or phone call)"[10]

27.    The COVID-19 pandemic has raised significant concerns about the safety of in-person voting.  In the April 7, 2020, Wisconsin primary, 67 people tested positive for COVID-19 after visiting the polls, and their exposure may have resulted from the lack of any broadly available mail voting alternative.[11]

28.    Michigan Secretary of State Jocelyn Benson has stated that, because of the threat of COVID-19 spreading through in-person voting, Michigan voters this year will receive absentee ballot applications allowing them to vote from home.  Nearly 7.7 million registered voters in the state will have the option to mail in their ballots for August and November elections.[12]

---

[9] *See* Yoel Roth and Nick Pickles, *Updating Our Approach to Misleading Information,* Twitter (May 11, 2020), https://blog.twitter.com/en_us/topics/product/2020/updating-our-approach-to-misleading-information.html.

[10] *See* Twitter Safety, *Strengthening Our Approach to Deliberate Attempts to Mislead Voters,* Twitter (Apr. 24, 2019) https://blog.twitter.com/en_us/topics/company/2019/strengthening-our-approach-to-deliberate-attempts-to-mislead-vot.html.

[11] *See* David Wahlberg, *67 Got COVID-19 After Visiting Polls In State's April 7 Election But Tie To Voting Unclear,* Wisconsin State Journal, May 8, 2020, https://madison.com/wsj/news/local/health-med-fit/67-got-covid-19-after-visiting-polls-in-states-april-7-election-but-tie-to/article_49a42a7e-45d8-50cc-bd76-3a583842de39.html.

[12] *See* Governor Gretchen Whitmer, Executive Order 2020-27 (COVID-19), *Conducting Elections on May 5, 2020 Using Absent Voter Ballots*, Mar. 27, 2020, https://www.michigan.gov/whitmer/0,9309,7-387-90499_90705-523400--,00.html; *see also* Public Interest, *Michigan Polls Quiet As Absentee Voting Booms to Record Levels Amid*

29.     In response to these health and safety concerns, a number of other states have taken steps to modify their voting protocols, including expanded mail-in voting options.[13]

30.     President Trump has repeatedly expressed concern about mail-in voting.  For example, during a Fox & Friends appearance on March 30, 2020, he opposed funding for mail-in voting, saying "they have things, levels of voting, that if you ever agreed to it, you'd never have a Republican elected in this country again."[14]

31.      Similarly, on April 8, 2020, the President tweeted: "Republicans should fight very hard when it comes to state wide mail-in voting.  Democrats are clamoring for it.  Tremendous potential for voter fraud, and for whatever reason, doesn't work out well for Republicans."[15]

32.     On May 26, 2020, the President tweeted: "There is NO WAY (ZERO!) that Mail-In Ballots will be anything less than substantially fraudulent.  Mail boxes will be robbed, ballots will be forged & even illegally printed out & fraudulently signed."[16]

33.     He continued in a second tweet: "The Governor of California is sending Ballots to millions of people, anyone . . . living in the state, no matter who they are or how they got there, will get one.  That will be followed up with professionals telling all of these people, many of whom

---

*Coronavirus Outbreak,* May 5, 2020, https://www.mlive.com/public-interest/2020/05/michigan-polls-quiet-as-absentee-voting-booms-to-record-levels-amid-coronavirus-outbreak.html.

[13] *See* Nat'l Conference of State Legislatures, *COVID-19 And Elections* (May 21, 2020), https://www.ncsl.org/research/elections-and-campaigns/state-action-on-covid-19-and-elections.aspx.

[14] *See* Aaron Rupar (@atrupar), Twitter (Apr. 8, 2020, 5:40 AM), https://twitter.com/atrupar/status/1247866822252277760.

[15] Donald J. Trump (@realDonaldTrump), Twitter (Apr. 8, 2020, 5:20 AM), https://twitter.com/realDonaldTrump/status/1247861952736526336.

[16] Donald J. Trump (@realDonaldTrump), Twitter (May 26, 2020, 5:17 AM), https://twitter.com/realDonaldTrump/status/1265255835124539392.

have never even thought of voting before, how, and for whom, to vote.  This will be a Rigged Election.  No way!"[17]

34.     Later that same day, May 26, 2020, Twitter appended the following addendum to the President's tweets, stating that viewers could "Get the facts" about California's mail-in ballot plans and providing a link if they chose to do so:[18]



The link leads to a series of news articles regarding President Trump's claim that mail-in ballots will lead to voter fraud and "a [r]igged [e]lection."

35.     Twitter did not remove the President's tweets about mail-in voting.  Those tweets remain available to the public.  Instead, Twitter provided more information regarding the subject matter of the President's tweet.

36.     In response, on May 26, 2020, the President tweeted "@Twitter is now interfering in the 2020 Presidential Election.  They are saying my statement on Mail-In Ballots, which will lead to massive corruption and fraud, is incorrect, based on fact-checking by Fake News CNN and the

---

[17] Twitter, Politics, *Trump Makes Unsubstantiated Claim That Mail-In Ballots Will Lead to Voter Fraud* (May 26, 2020), https://twitter.com/i/events/1265330601034256384; Donald J. Trump (@realDonaldTrump), Twitter (May 26, 2020, 5:17 AM), https://twitter.com/realDonaldTrump/status/1265255845358645254;

[18] *See* Twitter, Politics, *Trump Makes Unsubstantiated Claim That Mail-In Ballots Will Lead to Voter Fraud* (May 26, 2020), https://twitter.com/i/events/1265330601034256384.

Amazon Washington Post . . . ."[19] "Twitter is completely stifling FREE SPEECH, and I, as President, will not allow it to happen!"[20]

37.    Twitter posted the following explanation for its label.



38.    On May 27, 2020, the President tweeted at 7:11 a.m., "Republicans feel that Social Media Platforms totally silence conservatives voices.  We will strongly regulate, or close them down, before we can ever allow this to happen.  We saw what they attempted to do, and failed, in 2016.  We can't let a more sophisticated version of that . . . happen again." [21]  "Just like we can't let large scale Mail-In Ballots take root in our Country.  It would be a free for all on cheating,

---

[19]    Donald  J.  Trump  (@realDonaldTrump),  Twitter  (May  26,  2020,  4:40  PM), https://twitter.com/realDonaldTrump/status/1265427538140188676.

[20]    Donald  J.  Trump  (@realDonaldTrump),  Twitter  (May  26,  2020,  4:40  PM), https://twitter.com/realDonaldTrump/status/1265427539008380928.

[21]    Donald  J.  Trump  (@realDonaldTrump),  Twitter  (May  27,  2020,  4:11  AM), https://twitter.com/realDonaldTrump/status/1265601611310739456.

forgery and the theft of Ballots.  Whoever cheated the most would win.  Likewise, Social Media.  Clean up your act, NOW!!!!"[22]

39.     The President continued his targeted attacks by tweeting at 10:22 a.m., "Twitter has now shown that everything we have been saying about them (and their other compatriots) is correct.  Big action to follow!"[23] At 9:36 p.m., he followed up by tweeting, "Big Tech is doing everything in their very considerable power to CENSOR in advance of the 2020 Election.  If that happens, we no longer have our freedom.  I will never let it happen!  They tried hard in 2016, and lost.  Now they are going absolutely CRAZY.  Stay Tuned!!!"[24]

40.     On May 27, 2020, White House adviser Kellyanne Conway, appearing on "Fox & Friends," spelled out the Twitter handle for Twitter's head of Site Integrity (a "handle" is the means of identifying a specific individual via Twitter) and said, "somebody in San Francisco will wake him up and tell him he's about to get more followers.  This guy is constantly attacking Trump voters, Trump, Mitch McConnell, you name it."[25] The handle for Twitter's head of Site Integrity is "@[y*****]."

---

[22]   Donald   J.   Trump   (@realDonaldTrump),   Twitter   (May   27,   2020,   4:11   AM), https://twitter.com/realDonaldTrump/status/1265601615261827072.

[23]   Donald   J.   Trump   (@realDonaldTrump),   Twitter   (May   27,   2020,   10:22   AM), https://twitter.com/realDonaldTrump/status/1265649545410744321.

[24]   Donald   J.   Trump   (@realDonaldTrump),   Twitter   (May   27,   2020,   9:36   PM), https://twitter.com/realDonaldTrump/status/1265819308699070464.

[25] *See* Justine Coleman, *Kellyanne Conway: Trump's Twitter Fact Checks Done By 'People Who Attack   Him   All   Day   Long*,   The   Hill,   May   27,   2020, https://thehill.com/homenews/administration/499730-conway-trumps-twitter-fact-checks-done-by-people-who-attack-him-all.

41.     At 10:47 p.m. on May 27, 2020, Twitter's CEO Jack Dorsey stated on Twitter that he personally took responsibility for the decision to add a label to Trump's tweets, adding, "Please leave our employees out of this."[26]

42.     On May 28, 2020, the President retweeted Rep. Elise Stefanik's tweet: "Thanks for the clarification @jack[.]  This makes YOU accountable for allowing the Chinese Communist Party to abuse this site with mis-information & propaganda spread across the globe - all while the CCP bans and suppresses their own people from using Twitter!"[27]

43.     Later that morning, at 8:37 a.m., President Trump tweeted, "This will be a Big Day for Social Media and FAIRNESS!"[28]  At 12:44 p.m. he continued, "So ridiculous to see Twitter trying to make the case that Mail-In Ballots are not subject to FRAUD.  How stupid, there are examples, & cases, all over the place.  Our election process will become badly tainted & a laughingstock all over the World.  Tell that to your hater "@[y*****]."[29]

### The "Executive Order on Preventing Online Censorship"

44.     The President swiftly took retaliatory action.  At 4:28 p.m. on May 28, 2020, the White House Twitter account released a video of the President issuing an "Executive Order on Preventing Online Censorship" ("Executive Order")  pertaining to "online platforms," which the order defines as "any website or application that allows users to create and share content or engage in social

---

[26]    Jack    Dorsey    (@jack),    Twitter    (May    27,    2020,    10:47    PM), https://twitter.com/jack/status/1265837138114830336?s=20.

[27]    Elise    Stefanik    (@EliseStefanik),    Twitter,    May    27,    2020,    11:18    PM), https://twitter.com/EliseStefanik/status/1265844947653197824.

[28]    Donald    J.    Trump    (@realDonaldTrump),    Twitter    (May    28    2020,    8:37    AM), https://twitter.com/realDonaldTrump/status/1265985660898459655.

[29]    Donald    J.    Trump    (@realDonaldTrump),    Twitter    (May    28,    2020,    12:44    PM), https://twitter.com/realDonaldTrump/status/1266047584038256640.

networking, or any general search engine." [30]  The Order attempts to inhibit the exercise of free speech rights by online content hosts; directs the government to review media advertising spent on those platforms; directs the Department of Justice to evaluate the editorial practices of those platforms; and orders the Federal Trade Commission, Federal Communications Commission, and Department of Justice to investigate or regulate the platforms.[31]

45.     The Order will interfere significantly with the freedom of speech of all Americans. Intermediaries that host content online will be forced to shape and apply their content moderation policies according to government officials' desires, depriving Americans of access to online forums free from government interference with their constitutionally protected speech.  And those intermediaries will be chilled in exercising their own First Amendment right to comment upon and to moderate the online content that they host.

46.     First, the Order's text confirms that it was issued to retaliate against constitutionally protected speech. The Order expressly discusses Twitter's speech responding to President Trump's May 26, 2020, tweet and states President Trump's view that his tweets are being selectively targeted:

> Twitter now selectively decides to place a warning label on certain tweets in a manner that clearly reflects political bias.  As has been reported, Twitter seems never to have placed such a label on another politician's tweet.  As recently as last week, Representative Adam Schiff was continuing to mislead his followers by peddling the long-disproved Russian Collusion Hoax, and Twitter did not flag those tweets.  Unsurprisingly, its officer in charge of so-called 'Site Integrity' has flaunted his political bias in his own tweets.

---

[30]     *See*     @WhiteHouse     Twitter     (May     28,     2020,     1:28     p.m.), https://twitter.com/WhiteHouse/status/1266104188112601089; *see also* Exec. Order (May 28, 2020),     https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/.

[31] *See* Exec. Order (May 28, 2020), https://www.whitehouse.gov/presidential-actions/executive-order-preventing-online-censorship/.

The Order explicitly mentions Twitter by name six times and contains numerous implicit references to Twitter's free speech actions.  President Trump also references other constitutionally protected speech by online content platforms who are "flagging content as inappropriate."

47.     Second, the Order seeks to circumvent the roles of Congress and the courts by dictating a new interpretation of a federal statute that is contrary to established law.  Under longstanding precedent, Section 230 protects online content providers from liability for making decisions about what content may be published on their platforms.  The Order nevertheless directs the "Secretary of Commerce in consultation with the Attorney General, acting through the National Telecommunications and Information Administration (NTIA)" to file with the Federal Communications Commission a rulemaking petition urging the FCC to issue a rule that would restrict significantly Section 230's liability protection by imposing new limitations on that protection.  The Order further directs "all executive departments and agencies" to "ensure that their application of [S]ection 230(c) properly reflects the narrow purpose of the section and take all appropriate actions in this regard."

48.     Third, the Order encourages officials in the Executive Branch to allocate taxpayer funds to online platforms based on those officials' assessment of the free speech practices of those platforms.  It directs "each executive department and agency" to review its "spending on advertising and marketing paid to online platforms" and their statutory authority to "restrict [those online platforms] receipt of advertising dollars" and provide a report to the Office of Management and Budget.  And the Order directs the Department of Justice to "review the viewpoint-based speech restrictions imposed by each online platform identified in [those reports] and assess whether any online platforms are problematic vehicles for government speech due to viewpoint discrimination, deception to consumers, or other bad practices."

49.     Fourth, the Order provides that the White House "will submit" reports of purported "online censorship" received through its "Tech Bias Reporting Tool" to the Department of Justice, and the FTC so it can "consider taking action" under applicable law, including under 15 U.S.C § 45, which makes unfair methods of competition unlawful.

50.     Fifth, the Order directs the Attorney General to establish a working group "regarding the potential enforcement of State statutes that prohibit online platforms from engaging in unfair or deceptive acts or practices" and to "develop model legislation," if needed, for states to address online platforms' actions of moderating and posting content on their own platforms as "unfair and deceptive acts and practices." It further orders the Attorney General to "develop a proposal for Federal legislation."

51.     The effect of the actions directed by the Executive Order will be to dramatically limit and chill free speech on the Internet. The Order calls into question essential liability protection that makes it possible for companies to host third-party content at scale, and creates several punitive mechanisms if those intermediaries step out of line, including withdrawal of federal advertising funds, prosecution by state attorneys general, and adverse action by the FTC. It will burden the freedom of speech of all Americans by requiring intermediaries to moderate according to the government's preferences.  It will require intermediaries to refrain from taking actions, including addressing hateful speech or inaccurate information about voting, that would displease the government—chilling social media services themselves from exercising their protected First Amendment rights through fact-checking, labeling, or other editorial activity.

52.     In addition, this Order will increase the chance that social media services decide not to address hateful or harassing speech, combat disinformation, or correct inaccurate information about where and how to vote, which in turn will have a chilling effect on the ability for vulnerable

groups to participate on these services and potentially to exercise their right to vote.  Finally, the Order will discourage social media companies from engaging in fact-checking partnerships with third parties and groups that combat voter suppression, directly burdening the speech of those organizations.

### *Announcement of the Executive Order Confirms President Trump's Retaliatory Motive*

53.     During an Oval Office press conference on May 28, 2020, announcing the Executive Order, President Trump further revealed his retaliatory motive against online platforms, stating they have "points of view" and are "taking over the airwaves."  He then expressly targeted Twitter's May 26, 2020, exercise of free speech on its own platform, labeling it "inappropriate" and calling out by name the company's "Head of Site Integrity":

> The choices that Twitter makes when it chooses to suppress, edit, blacklist, shadow, ban are editorial decisions, pure and simple.  They're editorial decisions.  In those moments, Twitter ceases to be a neutral public platform, and they become an editor with a viewpoint.  And I think we can say that about others also, whether you're looking at Google, whether you're looking at Facebook and perhaps others.

> One egregious example is when they try to silence views that they disagree with by selectively applying a "fact check" — a fact check — F-A-C-T.  Fact check.  What they choose to fact check and what they choose to ignore or even promote is nothing more than a political activism group or political activism.  And it's inappropriate.

> . . .

> This is our — this is the arbiter.  This guy is the arbiter of what's supposed to go on Twitter.  He's the one.  He thought that — he thought — and he used CNN as a guide — CNN, which is fake news.  He uses CNN as a guide.  His name is [Y***] [R***].

> . . .

> So here's your — here's your man, and that's on Twitter.

> . . .

> If Twitter were not honorable — if you're going to have a guy like this be your judge and jury, I think just shut it down, as far as I'm concerned, but I'd have to go

through a legal process to do that. . . . [I]f it were able to be legally shut down, I would do it.

Commenting further on online platforms' free speech actions, President Trump stated "[W]e're fed up with it, and it's unfair, and it's been very unfair.  And we'll see what happens."[32]

54.     In the same press conference, the President threatened to eliminate or restrict government funding to online platforms, which provides free educational content to the world, by directing his administration to "develop policies and procedures to ensure taxpayer dollars are not going into any social media company" that engages in protected speech like that of Twitter.  In regard to such funding, Trump said: "So we're going to be doing none of it or a very little of it."

55.     FCC Commissioner Brendan Carr confirmed President Trump's retaliatory motivation. In an appearance on Fox News, he declared that "Twitter made the decision to take on the president of the United States" and accused Twitter of "punishing speakers based on whether it approves or disapproves of their politics."[33]  Commissioner Carr's statement differs from views he expressed last year, when he criticized a social media company's request for government assistance in moderating content and declared that "[o]utsourcing censorship to the government is not just a bad idea, it would violate the First Amendment."[34]

---

[32] Remarks by President Trump Announcing an Executive Order on Preventing Online Censorship (May 28, 2020, 3:47 p.m.), https://www.whitehouse.gov/briefings-statements/remarks-president-trump-announcing-executive-order-preventing-online-censorship/

[33] Press Release, FCC, FCC Commissioner Carr Welcomes Executive Order on Online Censorship (May 28, 2020), https://docs.fcc.gov/public/attachments/DOC-364629A1.pdf;  @BrendanCarr, Twitter (May 29, 2020, 1:14 p.m.), https://twitter.com/BrendanCarrFCC/status/1266462927936278529?s=20

[34] Brendan Carr (@BrendanCarrFCC), Twitter (Mar. 30, 2019, 5:31 PM) https://twitter.com/brendancarrfcc/status/1112150281066819584?lang=en

***President Trump Further Confirms His Retaliatory Motivation Through A Series of Tweets***

56.     Following the death of George Floyd on May 25, 2020, demonstrations took place protesting the actions of the Minneapolis police. Some of those demonstrations led to violence.

57.     Just after midnight on May 29, 2020, the President tweeted: "These THUGS are dishonoring the memory of George Floyd, and I won't let that happen.  Just spoke to Governor Tim Walz and told him that the Military is with him all the way.  Any difficulty and we will assume control but, when the looting starts, the shooting starts.  Thank you!"

58.     Twitter appended a label to the President's tweet: "This Tweet violated the Twitter Rules about glorifying violence.  However, Twitter has determined that it may be in the public's interest for the Tweet to remain accessible."[35] The tweet remains accessible to the public.

59.     At 7:10 a.m. on May 29, 2020, the President claimed, "Twitter is doing nothing about all of the lies & propaganda being put out by China or the Radical Left Democrat Party.  They have targeted Republicans, Conservatives & the President of the United States.  Section 230 should be revoked by Congress.  Until then, it will be regulated!"[36]  At 8:44 a.m. on May 29, 2020, the President tweeted: "'Regulate Twitter if they are going to start regulating free speech.' @JudgeJeanine @foxandfriends Well, as they have just proven conclusively, that's what they are doing.  Repeal Section 230!!!"[37]

60.     On the morning of May 29, 2020, White House deputy chief of staff Dan Scavino tweeted: "Twitter is targeting the President of the United States 24/7, while turning their heads to

---

[35]   Donald   J.   Trump   (@realDonaldTrump),   Twitter   (May   28,   2020,   9:53   PM), https://twitter.com/realDonaldTrump/status/1266231100780744704.

[36]   Donald   J.   Trump   (@realDonaldTrump),   Twitter   (May   29,   2020,   7:10   AM), https://twitter.com/realDonaldTrump/status/1266326065833824257.

[37]   Donald   J.   Trump   (@realDonaldTrump),   Twitter   (May   29,   2020,   8:44   AM), https://twitter.com/realDonaldTrump/status/1266349790507515905.

protest organizers who are planning, plotting, and communicating their next moves daily on this very platform.  Twitter is full of shit - more and more people are beginning to get it."[38]

### President Trump's Demonstrated Capacity to Influence Private Actors

61.     Targeting by President Trump often causes companies to reverse course on policy and corporate conduct.  For example, air conditioning manufacturer Carrier reversed its plans to move some jobs abroad after being targeted by the President.[39]  On January 3, 2017, President-elect Trump tweeted: "General Motors is sending Mexican made model of Chevy Cruze to U.S. car dealers-tax free across border.  Make in U.S.A. or pay big border tax!"[40] Two weeks later, GM said it would invest at least $1 billion in US factories, and committed to creating or retaining about 7,000 jobs in coming years.[41]

62.     The President's tweets about a company can have immediate impact.  "In almost every case, when the president unleashes his Twitter fury, the share price of the affected company drops—in some cases fairly significantly.  Lockheed Martin's stock, for example, plunged by more

---

[38]    Dan     Scavino     Jr.     (@scavino45),     Twitter,     (May     29,     2020,     5:18     AM), https://twitter.com/Scavino45/status/1266343153466060803; *see also* Adam Shaw, *White House hits back after Twitter cracks down on Trump's Minneapolis tweet, reposts censored message*, Fox News,     https://www.foxnews.com/politics/white-house-twitter-trump-mineapolis-tweet    (last visited June 1, 2020).

[39] *See* Ylan Q. Mui, Matea Gold & Max Ehrenfreund, *Trump threatens 'consequences' for U.S. firms     that     relocate     offshore*,     Wash.     Post,     Dec.     1,     2016, https://www.washingtonpost.com/politics/trump-threatens-consequences-for-us-firms-that-relocate-offshore/2016/12/01/a2429330-b7e4-11e6-959c-172c82123976_story.html

[40]    Donald     J.     Trump     (@realDonaldTrump),     Twitter     (Jan     3,     2017,     4:30     AM), https://twitter.com/realDonaldTrump/status/816260343391514624?ref_src=twsrc%5Etfw.

[41] *See* David Shepardson, *General Motors says to invest additional $1 billion in U.S.,* Reuters (Jan. 16, 2017, 9:58 PM), https://www.reuters.com/article/us-gm-jobs-trump/general-motors-says-to-invest-additional-1-billion-in-u-s-idUSKBN15107B.

than 5% in December, after Trump criticized the company by saying the cost of its F-35 jet aircraft contract was 'out of control.'"[42]

63.     As a result of this long record of President Trump's direct and forceful attacks on individuals and companies who have taken actions with which he disagrees, organizations may be reluctant to challenge President Trump's right to issue the Executive Order given the possibility that his ire and the power of the White House may be directed against them.[43]

64.     In light of President Trump's history of retaliatory action, which often causes companies to reverse course on policy and corporate conduct, operators of online content platforms, social networks, or search engines will almost certainly be deterred or hindered in protecting their own free speech rights through a lawsuit.  *See Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003) (noting "the possibility that instituting litigation on [one's] own behalf may only incur further retribution").  That is particularly true for those operators who benefit from the constant publicity of the President using their services or who receive government funding.

### *The First Amendment Prohibits the President from Retaliating Based on Speech*

65.     "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions" for engaging in protected speech.  *Hartman v. Moore*, 547 U.S. 250, 256 (2006).  "[A]ny governmental action that . . . results in a chilling effect upon an individual's right of free speech may violate the First Amendment.  *McBride v. Vill. of Michiana*, 30 F.3d 133 (6th

---

[42] *See* Mathew Ingram, *Here's What a Trump Tweet Does to a Company's Share Price*, Fortune (Feb. 24, 2017, 11:26 AM), https://fortune.com/2017/02/24/trump-tweet-stocks/.

[43] *See* Jamie L. Lareau, *President Trump's shots at GM have left company insiders deeply troubled,* Detroit Free Press (Apr. 1, 2020, 5:01 PM), https://www.freep.com/story/money/cars/general-motors/2020/04/01/coronavirus-covid-19-donald-trump-mary-barra-tweets-gm/5088449002/; *see also* Ben White & Lorraine Woellert, *Trump's tweet shaming startles corporate America*, Politico (Dec. 6, 2016, 5:42 PM), https://www.politico.com/story/2016/12/trumps-tweet-shaming-corporate-america-232274.

Cir. 1994) (table) (*citing Laird v. Tatum*, 408 U.S. 1, 11 (1972)); *Wolford v. Lasater*, 78 F.3d 484, 488 (10th Cir. 1996) ("Generally speaking, government action which chills constitutionally protected speech or expression contravenes the First Amendment." (citing *Riley v. Nat'l Fed'n of the Blind of N. Carolina,* 487 U.S. 781, 794 (1988))).

66.     Courts have recognized that retaliatory conduct chills a person or entity from exercising their First Amendment rights in the future.  Even informal measures such as an investigation, coercion, persuasion, and intimidation can chill First Amendment activities. *Am. Commc'ns Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 402 (1950) ("[I]ndirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions or taxes."); *White v. Lee*, 227 F.3d 1214, 1228 (9th Cir. 2000); *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963) ("[T]he threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation" constitutes "informal censorship" that violates the First Amendment).

67.     A court will "strike down executive and administrative action on the basis of what it determines to be improper motives or purposes."  L. Tribe, American Constitutional Law § 12-5, at 816. In so doing, courts "look through forms to the substance" of government conduct. *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 67 (1963).

### *The Executive Order's Impact on Plaintiff*

68.     CDT is a nonprofit advocacy organization that works to ensure that the human rights people enjoy in the physical world, like freedom of speech, are realized online and that technology continues to serve as an empowering force for people worldwide.  Integral to this work is CDT's representation of the public interest in the creation of an open, innovative, and decentralized

Internet that promotes the constitutional and democratic values of free expression, privacy, and individual liberty.

69.     Critical to CDT's mission is advocating in favor of First Amendment protection for speech on the Internet. To that end, among other things, CDT has participated in a number of cases addressing First Amendment rights and the Internet, including as litigants in *CDT v. Pappert*, 337 F. Supp. 2d 606, 646, 649-63 (E.D. Pa. 2004) (striking down as unconstitutional a statute that imposed criminal liability on Internet service providers who failed to comply with requests issued by the Pennsylvania Attorney General to block access to websites containing child pornography); challenging, as part of a broad coalition, key portions of the Communications Decency Act (CDA) in *Reno v. ACLU*, 521 U.S. 844 (1997) (striking down portions of the CDA prohibiting transmission of obscene or indecent communications to persons under Age 18 as a content-based blanket restrictions on speech and facially overbroad in violation of the First Amendment); and as amicus curiae in First Amendment challenges including *Backpage.com, L.L.C., v. Dart*, 807 F.3d 229 (7th Cir. 2016) (holding campaign by sheriff's office to pressure pressuring financial intermediaries to cease payment processing for online classified advertising website to be an unconstitutional prior restraint) (*See* ECF Nos. 29, 34, 35, and 37, No. 15-3047 (7th Cir.)).

70.     CDT has been deeply engaged in law and policy advocacy regarding intermediary liability frameworks, free speech, and content moderation since the organization was founded in 1994.

71.     The organization devotes significant resources to advocating in favor of individuals' online free expression rights and the legal frameworks that support them, [44] including evaluating

---

[44] *See, e.g.,* Emma Llansó, *Clearing Up Misinformation About Section 230*, CDT (July 11, 2019), https://cdt.org/insights/clearing-up-misinformation-about-section-230/.

proposals to amend the proposed laws on free speech online and challenging legislation that burdens individuals' fundamental rights, holding public events, and communicating with policy makers in the Executive and Legislative Branches.

72.    The Executive Order injures Plaintiff CDT by infringing on its interests, including its interests in enhancing freedom of expression, preserving the unique nature of the Internet, and limiting government surveillance, and by causing Plaintiff CDT to divert resources to safeguarding the principles underlying the First Amendment, 47 U.S.C. § 230, and the free speech rights of online content platforms  and individuals that the Executive Order places under attack.

73.    As a result of the Executive Order, CDT will be required to devote substantial resources to (a) participating in the planned FCC rulemaking proceeding; (b) monitoring federal agencies' reports regarding and any action by the Department of Justice; (c) tracking any FTC action with respect to online speech, and participating in any proceedings that the Commission institutes; (d) engaging with federal and state policymakers with respect to the development of proposed legislation—as well as informing the public about all of these activities and the potential consequences for protection of free speech online. These activities will be time-consuming and resource-intensive, and will require CDT to reallocate resources that it planned to use for other activities furthering its mission.

**CLAIM FOR RELIEF**

**FIRST CAUSE OF ACTION**
***Ultra Vires* Action in Violation of the First Amendment**

74.    The foregoing allegations are repeated and incorporated as though fully set forth herein.

75.    Plaintiff has a cause of action in equity and under the All Writs Act, 28 U.S.C. § 1651, to declare unlawful and to enjoin a Presidential Executive Order or other Presidential action that is *ultra vires. See generally Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015)

("The ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history of judicial review of illegal executive action, tracing back to England.").

76.     A Presidential Executive Order issued in violation of the U.S. Constitution is *ultra vires* and therefore void ab initio.

77.     President Trump's May 28, 2020, "Executive Order on Preventing Online Censorship" constitutes retaliatory action by a government official, in violation of the U.S. Constitution's First Amendment's protection of free speech.  *See generally Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . .").

78.     A private company engaged in constitutionally protected speech on its own online platform by including a label on President Trump's tweets on May 26, 2020, and linking to information regarding the subject matter of President Trump's tweet, thereby expressing its viewpoint and adding to the discourse on its platform regarding the subject matter of the President's tweets.

79.     Two days later and after a series of public attacks directly focused on the company's exercise of free speech, President Trump retaliated on May 28, 2020, by issuing the "Executive Order on Preventing Online Censorship," expressly mentioning the company by name six times. The company's constitutionally protected speech was the proximate or "but for" cause of President Trump issuance of the Executive Order.  President Trump also issued the Executive Order to pressure the company into removing its constitutionally protected speech from its online platform and to coerce other Internet intermediaries into refraining from similar constitutionally protected speech on their own platforms, and into prohibiting such speech by their users, in the future.

80.     President Trump's retaliatory acts would deter a person of ordinary firmness from engaging in First Amendment speech and activity.

81.     The Executive Order was intended to have, and is having or is likely to have, the effect of chilling the constitutionally protected speech of online content platforms, including Twitter, Facebook, Instagram, and YouTube that were explicitly named in the Executive Order.  *See generally Hartman v. Moore*, 547 U.S. 250, 256 (2006) ("Official reprisal for protected speech 'offends the Constitution [because] it threatens to inhibit exercise of the protected right' . . . ." (alteration in original) (quoting *Crawford–El v. Britton*, 523 U.S. 574, 588, n. 10 (1998)).  The Executive Order seeks to curtail and chill the constitutionally protected speech of all online platforms and individuals—by demonstrating the willingness to use government authority to retaliate against those who criticize the government.

82.     As noted, the Executive Order injures Plaintiff CDT's First Amendment interest and causes it to divert resources to safeguarding the First Amendment rights of individuals and Internet intermediaries that the Executive Order places under attack.

83.     Plaintiff has been and will be irreparably injured by President Trump's *ultra vires* Executive Order issued in violation of the First Amendment, and have no adequate remedy at law.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for the following relief:

A.     A declaration pursuant to 28 U.S.C. § 2201 that the Executive Order is unlawful and invalid.

B.     A preliminary and permanent injunction enjoining Defendant, his officials, agents, employees, assigns, and all persons acting in concert or participating with them from implementing or enforcing any part of the Executive Order;

C.     An order awarding Plaintiff cost of suit, and reasonable attorneys' fees and expenses

pursuant to any applicable law; and

D.      Such other relief as this Court deems equitable, just, and proper.

Dated: June 2, 2020                                    Respectfully Submitted,

                                                       MAYER BROWN LLP


                                                       By:  /s/ Andrew J. Pincus

Avery Gardiner (D.C. Bar No. 481404,             Andrew J. Pincus (D.D.C. Bar No. 370762)
*D.D.C. admission application forthcoming*)       MAYER BROWN LLP
Center for Democracy & Technology                1999 K St., NW
1401 K Street NW, Suite 200                      Washington, DC 20006
Washington, DC 20005                             Telephone: (202) 263-3000
Telephone: (202) 407-8811                        apincus@mayerbrown.com
agardiner@cdt.org
                                                 Lauren R. Goldman (*pro hac vice forthcoming*)
                                                 MAYER BROWN LLP
                                                 1221 Ave. of the Americas
                                                 New York, New York 1002
                                                 Telephone: (212) 506-2500
                                                 lgoldman@mayerbrown.com

                                                 John Nadolenco (*pro hac vice forthcoming*)
                                                 Douglas A. Smith (*pro hac vice forthcoming*)
                                                 Sandor A. Callahan (*pro hac vice forthcoming*)
                                                 MAYER BROWN LLP
                                                 350 S. Grand Ave.
                                                 Los Angeles, CA 90017
                                                 Telephone: (213) 229-9500
                                                 jnadolenco@mayerbrown.com
                                                 dougsmith@mayerbrown.com
                                                 scallahan@mayerbrown.com

                                                 *Attorneys for Center for Democracy & Technology*