# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CENTER FOR DEMOCRACY & TECHNOLOGY, | ) ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | No. 1:20-cv-1456 (TNM) |
| DONALD J. TRUMP, | ) ) | |
| *Defendant*. | ) ) ) ) | |

## DEFENDANT'S MOTION TO DISMISS

Defendant respectfully moves under Federal Rule of Civil Procedure 12(b)(1) to dismiss Plaintiff's Complaint for lack of subject-matter jurisdiction.  The grounds for this Motion are set forth in the accompanying Memorandum of Points and Authorities in Support of Defendant's Motion to Dismiss.  A proposed order is also attached.[*]

---

[*]   This motion is timely because it is filed within 60 days after service on the United States Attorney (Fed. R. Civ. P. 12(a)(2)),where that "period continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday" (Fed. R. Civ. P. 6(a)(1)(C)).

Dated: August 3, 2020

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

ERIC WOMACK
Assistant Director

 _/s/  INDRANEEL SUR_
INDRANEEL SUR
Trial Attorney
(D.C. Bar No. 978017)
Federal Programs Branch,
Civil Division
United States Department of Justice
P.O. Box 883
Washington, D.C. 20044
Telephone:  (202) 616-8448
E-mail:       Indraneel.Sur@usdoj.gov

*Counsel for Defendant*

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CENTER FOR DEMOCRACY & TECHNOLOGY, | ) ) ) ) | |
| *Plaintiff*, | ) ) | |
| v. | ) ) | No. 1:20-cv-1456 (TNM) |
| DONALD J. TRUMP, | ) ) | |
| *Defendant*. | ) ) ) ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF
DEFENDANT'S MOTION TO DISMISS**

Dated: August 3, 2020

ETHAN P. DAVIS
Acting Assistant Attorney General

ERIC WOMACK
Assistant Director

INDRANEEL SUR
Trial Attorney

Federal Programs Branch,
Civil Division
United States Department of Justice
P.O. Box 883
Washington, D.C. 20044
Telephone:  (202) 616-8448
E-mail:      Indraneel.Sur@usdoj.gov

*Counsel for Defendant*

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................. 1

BACKGROUND ................................................................................................................. 4

1.  EXECUTIVE ORDER NO. 13925 OF MAY 28, 2020 ................................................. 4

2.  PLAINTIFF AND ITS COMPLAINT................................................................................ 8

LEGAL STANDARD............................................................................................................. 10

ARGUMENT ......................................................................................................................... 11

I.  ARTICLE III INJURY-IN-FACT CANNOT BE PREDICATED ON ALLEGED
    ORGANIZATIONAL RESOURCE ALLOCATION BASED ON
    SPECULATION ABOUT HOW IMPLEMENTATION OF THE EXECUTIVE
    ORDER COULD AFFECT NONPARTY ONLINE PLATFORMS ............................... 11

    A.  Plaintiff's Forecasted Expenditure Of Resources On Issue Advocacy Cannot
        Establish Organizational Injury-in-Fact..................................................................... 13

    B.  Plaintiff's Speculative Future Harm Based On Conjecture About Actions Not
        Yet Taken By Nonparty Government Agencies Is Not "Certainly Impending" ........ 18

    C.  Plaintiff Lacks Standing To Assert Purported Injuries-in-Fact Allegedly
        Sustained By Nonparty Online Platforms.................................................................... 21

II.  ARTICLE III REDRESSABILITY IS LACKING BECAUSE INJUNCTIVE
     AND DECLARATORY RELIEF AGAINST THE PRESIDENT IS
     UNAVAILABLE. ............................................................................................................ 25

III.  THE ASSERTED CLAIM IS UNRIPE BECAUSE THE EXECUTIVE ORDER
      DOES NOT IMPOSE ANY OBLIGATIONS ON PLAINTIFF AND HAS NOT
      BEEN APPLIED TO, NOR COULD ITSELF BE APPLIED TO, ANY PRIVATE
      PARTY ........................................................................................................................... 29

CONCLUSION....................................................................................................................... 32

## TABLE OF AUTHORITIES

### CASES

*Abbott Laboratories v. Gardner*,
387 U.S. 136 (1967), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977) ........................ 29

*Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*,
469 F.3d 129 (D.C. Cir. 2006) ............................................................................................. 14

*Allen v. Wright*,
468 U.S. 737 (1984) ............................................................................................................. 25

*Al-Owhali v. Ashcroft*,
279 F. Supp. 2d 13 (D.D.C. 2003) ......................................................................................... 9

*Am. Immigration Lawyers Ass'n v. Reno*,
199 F.3d 1352 (D.C. Cir. 2000) ........................................................................................... 24

*Am. Petroleum Inst. v. EPA*,
683 F.3d 382 (D.C. Cir. 2012) ............................................................................................. 31

*Armstrong v. Exceptional Child Ctr., Inc.*,
575 U.S. 320 (2015) ............................................................................................................. 26

*Arpaio v. Obama*,
797 F.3d 11 (D.C. Cir. 2015) ........................................................................................... 3, 10

*Bennett v. Google, LLC*,
882 F.3d 1163 (D.C. Cir. 2018) ............................................................................................. 5

*Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*,
369 F. Supp. 3d 141 (D.D.C. 2019) ..................................................................................... 21

*Center for Biological Diversity v. U.S. Department of Interior*,
563 F.3d 466 (D.C. Cir. 2009) ............................................................................................. 31

*Center for Responsible Science v. Hahn*,
809 F. App'x 10 (D.C. Cir. Apr. 10, 2020) ................................................................. 13-14, 16

* *Clapper v. Amnesty Int'l USA*,
568 U.S. 398 (2013) ....................................................................................... 11, 18, 18, 21

*Cmty. Fin. Servs. Ass'n of Am. v. FDIC*,
No. 14-CV-953, 2016 WL 7376847 (D.D.C. Dec. 19, 2016) .................................................. 17

*Conference of State Bank Supervisors v. OCC,*
    313 F. Supp. 3d 285 (D.D.C. 2018) ...................................................... 31

*Ctr. for Law & Educ. v. Dep't of Educ.,*
    396 F.3d 1152 (D.C. Cir. 2005) ........................................................ 16

*DaimlerChrysler Corp. v. Cuno,*
    547 U.S. 332 (2006) .......................................................... 11, 22, 25

*\* Defs. of Wildlife v. Perciasepe,*
    714 F.3d 1317 (D.C. Cir. 2013) .................................................... 13, 19

*Doe 2 v. Trump,*
    319 F. Supp. 3d 539, 541 (D.D.C. 2018) ............................................... 27

*Duran v. City of Corpus Christi,*
    240 F. App'x 639 (5th Cir. 2007) .................................................... 24

*Elec. Privacy Info. Ctr. v. FAA,*
    892 F.3d 1249 (D.C. Cir. 2018) ...................................................... 14

*Elk Grove Unified Sch. Dist. v. Newdow,*
    542 U.S. 1 (2004) ................................................................... 23

*Envtl. Working Grp. v. U.S. FDA,*
    301 F. Supp. 3d 165 (D.D.C. 2018) ................................................ 13, 16

*Equal Rights Ctr. v. Post Properties, Inc.,*
    633 F.3d 1136 (D.C. Cir. 2011) .................................................... 13, 14

*\* Franklin v. Massachusetts,*
    505 U.S. 788 (1992) ........................................................... 26, 28, 31

*Fund Democracy, LLC v. SEC,*
    278 F.3d 21 (D.C. Cir. 2002) ........................................................ 13

*Gill v. Whitford,*
    138 S. Ct. 1916 (2018) ........................................................... 12, 22

*Grand Lodge of the Fraternal Order of Police v. Ashcroft,*
    185 F. Supp. 2d 9 (D.D.C. 2001) ..................................................... 10

*Grupo Mexicano De Desarrollo S.A. v. All. Bond Fund,*
    527 U.S. 308 (1999) ................................................................. 26

*Hodak v. City of St. Peters,*
  535 F.3d 899 (8th Cir. 2008) ................................................................................ 24

*Hollingsworth v. Perry,*
  570 U.S. 693 (2013) ................................................................................... 12, 23

*Huth v. Haslun,*
  598 F.3d 70 (2d Cir. 2010) ..................................................................................... 24

*In re Navy Chaplaincy,*
  534 F.3d 756 (D.C. Cir. 2008) ................................................................................. 3

* *Kowalski v. Tesmer,*
  543 U.S. 125 (2004) ............................................................................... 23, 24, 25

*Laird v. Tatum,*
  408 U.S. 1 (1972) ...................................................................................................... 21

*Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray,*
  424 F. Supp. 3d 26 (D.D.C. 2020) ........................................................................ 10

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ...................................................................................... 11, 12, 13

*Mississippi v. Johnson,*
  71 U.S. (4 Wall.) 475 (1866) ........................................................................... 26, 28

*Moody v. Mich. Gaming Control Bd.,*
  847 F.3d 399 (6th Cir. 2017) ................................................................................. 23

*Nat'l Ass'n of Home Builders v. EPA,*
  667 F.3d 6 (D.C. Cir. 2011) ............................................................................ 20, 21

*Nat'l Consumers League v. Gen. Mills, Inc.,*
  680 F. Supp. 2d 132 (D.D.C. 2010) ..................................................................... 17

*Nat'l Park Hospitality Ass'n v. U.S. Dep't of Interior,*
  538 U.S. 803 (2003) ......................................................................................... 29, 30

*Nat'l Treasury Emps. Union v. Nixon,*
  492 F.2d 587 (D.C. Cir. 1974) .............................................................................. 28

*Nat'l Treasury Emps. Union (NTEU) v. United States,*
  101 F.3d 1423 (D.C. Cir. 1996) ............................................................................. 29

*Newdow v. Roberts,*
    603 F.3d 1002 (D.C. Cir. 2010) ........................................................................... 26, 28

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ............................................................................................... 27

*Office of Commc'n of United Church of Christ v. FCC,*
    911 F.2d 813 (D.C. Cir. 1990) ............................................................................... 19

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
    523 U.S. 726 (1998) ............................................................................................... 30

*O'Shea v. Littleton,*
    414 U.S. 488 (1974) ............................................................................................... 25

*People for the Ethical Treatment of Animals (PETA) v. Dep't of Agric.,*
    797 F.3d 1087 (D.C. Cir. 2015) ........................................................................... 13, 14

*Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC,*
    962 F.2d 27 (D.C. Cir. 1992) ................................................................................. 19

*Privacy Info. Ctr. v. U.S. Dep't of Educ.,*
    48 F. Supp. 3d 1 (D.D.C. 2014) ........................................................................... 16, 17

*Pub. Citizen, Inc. v. Nat'l Hwy. Traffic Safety Admin.,*
    489 F.3d 1279 (D.C. Cir. 2007) ........................................................................... 13, 18

*Renne v. Geary,*
    501 U.S. 312 (1991) ............................................................................................... 24, 29

*Reno v. Catholic Social Servs., Inc.,*
    509 U.S. 43 (1993) ................................................................................................. 32

*Rizzo v. Goode,*
    423 U.S. 362 (1976) ............................................................................................... 18, 25

*Sierra Club v. U.S. Dep't of Energy,*
    825 F. Supp. 2d 142 (D.D.C. 2011) ..................................................................... 10

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 1540 (2016) ........................................................................................... 13

*Steel Co. v. Citizens for a Better Environment,*
    523 U.S. 83 (1998) ................................................................................................. 11

*Summers v. Earth Island Inst.*,
 555 U.S. 488 (2009) ........................................................................ 11, 12, 18, 20

*Susan B. Anthony List v. Driehaus*,
 134 S. Ct. 2334 (2014) ................................................................................... 18

*Swan v. Clinton*,
 100 F.3d 973 (D.C. Cir. 1996) ....................................................................... 27

*Tenet v. Doe*,
 544 U.S. 1 (2005) ........................................................................................... 26

*Texas v. United States*,
 523 U.S. 296 (1998) ................................................................................. 29, 30

*Thole v. U.S. Bank N.A.*,
 140 S. Ct. 1615 (2020) ....................................................................... 11, 17, 23

*Tileston v. Ullman*,
 318 U.S. 44 (1943) ......................................................................................... 23

*Toilet Goods Ass'n., Inc. v. Gardner*,
 387 U.S. 158 (1967) ....................................................................................... 32

*Totten v. United States*,
 92 U.S. 105 (1876) ......................................................................................... 26

* *Turlock Irr. Dist. v. FERC*,
 786 F.3d 18 (D.C. Cir. 2015) ................................................................... 14, 16

*U.S. ex rel. McLennan v. Wilbur*,
 283 U.S. 414 (1931) ....................................................................................... 28

*United States v. TDC Mgmt. Corp.*,
 263 F. Supp. 3d 257 (D.D.C. 2017) ............................................................... 24

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*,
 454 U.S. 464 (1982) ....................................................................................... 12

*Warth v. Seldin*,
 422 U.S. 490 (1976) ................................................................................... 3, 23

*Wasson v. Sonoma Cty. Junior College*,
 203 F.3d 659 (9th Cir. 2000) ......................................................................... 24

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990)...................................................................................... 18

*Wilbur v. U.S. ex rel. Kadrie*,
  281 U.S. 206 (1930).................................................................................... 28

### STATUTES

5 U.S.C. § 704 ................................................................................................. 30

15 U.S.C. § 45 ........................................................................................ 7, 19, 31

33 U.S.C. § 1251 ............................................................................................. 20

43 U.S.C. §§ 1331-1356a .............................................................................. 31

47 U.S.C. § 230 ...................................................................................... 2, 5, 9, 15

Communications Decency Act,
  Pub. L. No. 104-104, 110 Stat. 56, 138-39 (codified at 47 U.S.C. 230(c)) ............................ 5

## FEDERAL RULES

Fed. R. Civ. P. 12(b)(1).................................................................................. *passim*

### ADMINISTRATIVE AND EXECUTIVE MATERIALS

Preventing Censorship,
  Exec. Order No. 13925 (May 28, 2020) 85 Fed. Reg. 34,079 ("EO") ............................ *passim*

### OTHER AUTHORITIES

U.S. Dep't of Justice, *Section 230—Nurturing Innovation or Fostering Unaccountability?* 8
  (Feb. 19, 2020), *at* https://www.justice.gov/file/1286211/download (last visited July 31, 2020)
  ...................................................................................................................... 9

Ending Support for Internet Censorship Act,
  S. 1914, 116th Cong. (2019).......................................................................... 4

Limiting Section 230 Immunity to Good Samaritans Act,
  S. 3983, 116th Cong. (2020).......................................................................... 4

Stopping Big Tech's Censorship Act,
  S. 4062, 116th Cong. (2020).......................................................................... 5

Platform Accountability & Consumer Transparency Act,
  S. 4066, 116th Cong. (2020).........................................................................................................5

## INTRODUCTION

Plaintiff attempts to raise a facial constitutional challenge to Executive Order No. 13925 of May 28, 2020, 85 Fed. Reg. 34,079 ("EO").  But Plaintiff fails to identify any concrete application of the EO by any Executive official giving rise to an Article III case or controversy. Plaintiff commenced this action less than a week after the President issued the EO, well before any Executive official could implement the EO, let alone concretely apply the EO to Plaintiff or any other private party.  The proper course is to dismiss the Complaint under Fed. R. Civ. P. 12(b)(1).

Plaintiff's facial challenge is predicated on a profound misunderstanding of the EO.  The President's exclusive authority to supervise the Executive Branch under Article II of the Constitution necessitates that the President exercise broad discretion to issue Executive Orders, through which he directs his subordinates how to carry out Executive Branch functions.  By its terms, the EO challenged here imposes no obligations on *any* private party (including Plaintiff). Nor does the EO require any government official to impose legal obligations on any private party (including Plaintiff).  Rather, the EO directs Executive officials to take steps that *could* lead various agencies to examine, and potentially address through future agency proceedings, allegations that large social media "online platforms" have displayed political bias in moderating content posted on online platforms, contrary to the values secured by the First Amendment and to the President's desire to advance policies consistent with his "commitment to free and open debate on the internet."  Complaint ¶ 1 ("Compl.").[1]

---

[1]    Section 7 of the EO explains that "[f]or purposes of this order, the term 'online platform' means any website or application that allows users to create and share content or engage in social networking, or any general search engine."  85 Fed. Reg. at 34,082.  This memorandum adopts that definition of the term "online platform."

Among other instructions to Executive officials, the EO requires the Secretary of Commerce to petition the Federal Communications Commission ("FCC") for a rulemaking that would clarify the application of Section 230(c) of the Communications Decency Act (47 U.S.C. § 230) ("Section 230") in disputes where, for example, the user of an online platform contends that the online platform engaged in bad faith removal or editing of the user's content, contrary to the online platform's terms of service.  The Secretary of Commerce filed that petition on July 27, 2020.  The FCC may (or may not) grant that petition.  If the FCC commenced notice-and-comment rulemaking, that process would provide Plaintiff with the opportunity to participate.  It is Plaintiff's comment in such a hypothetical rulemaking—not this action—that would be a permissible vehicle for Plaintiff to express its views regarding the proper conduct of online platforms and the President's policies.

The EO's other instructions to Executive officials also do not direct those officials to take any particular action against Plaintiff or any other private party.  Section 5 of the EO, for example, simply requires formation of a working group to research model legislation for state legislatures to consider.  Similarly, Section 6 of the EO requires the Attorney General to develop a proposal for federal legislation.  Neither those nor any other provision of the EO is a restriction on private speech.  Any legislation, at the state or federal level, would have to be passed by legislative bodies whose conduct the EO does not purport to guide.  The plain text of the EO therefore refutes Plaintiff's mischaracterization of the EO as a violation of the Speech Clause of the First Amendment.

Nevertheless, the occasion for disposing of Plaintiff's claim on the merits has not arrived, because Plaintiff fails to establish at least three requirements of an Article III "case" or "controversy."[2]

**First**, Plaintiff is an advocacy organization and not an online platform, and it has not alleged Article III injury-in-fact.  Plaintiff's allegations of future harm from the potential implementation of the EO are impermissibly speculative.  Moreover, Plaintiff has not alleged an organizational injury because the EO has not impaired Plaintiff's ability to provide services or undertake any identified activities.  Indeed, well before the EO, Plaintiff was and continues to be a willing and active participant in the current broader debate over the conduct of online platforms and the appropriate interpretation and future scope of Section 230.  Any voluntary efforts Plaintiff makes to respond to the policy issues raised by EO are part of its ordinary advocacy, and cannot create an injury-in-fact.  Nor can Plaintiff meet its burden of establishing standing by speculating about harms to online platforms not before the Court.  Indeed, if Plaintiff's allegations of speculative harm and organizational injury based on voluntary budgetary choices regarding ordinary operations were accepted, advocacy organizations such as Plaintiff would be able maintain suit over virtually any government decision, which would violate the separation of powers.

---

[2]    Dismissing the Complaint for lack of an Article III "case" or "controversy," such as for lack for lack of Article III standing, "in no way depends on the merits" of Plaintiff's claim. *Warth v. Seldin*, 422 U.S. 490, 500 (1976); *see In re Navy Chaplaincy*, 534 F.3d 756, 760 (D.C. Cir. 2008) ("in reviewing the standing question, [this Court] must be careful not to decide the questions on the merits *for or against* the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims") (emphasis added; internal quotation omitted).  At the same time, under Rule 12(b)(1), the court will not "assume the truth of legal conclusions."  *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015) (citation omitted).  Accordingly, deciding this Rule 12(b)(1) motion does not entail assuming the truth of Plaintiff's legal conclusion that the EO is a "retaliatory action" in violation of the Speech Clause.  Compl. ¶¶ 6, 44, 65, 77.  To the contrary, that legal conclusion is incorrect.

**Second**, Plaintiff also fails to allege Article III redressability, because equitable or declaratory relief is not available directly against the President for his official conduct.

**Third**, Plaintiff's claim is unripe, given that any potential agency action that results from the EO would only be taken after considerable agency proceedings whose outcomes cannot be known at this time.

On any of those alternative grounds, the Complaint should be dismissed in full under Rule 12(b)(1).

## **BACKGROUND**

## 1.  **Executive Order No. 13925 of May 28, 2020**

The President issued Executive Order 13925 on May 28, 2020.  "Preventing Online Censorship," 85 Fed. Reg. 34,079 (published June 2, 2020) ("EO").  Section 1 of the EO (captioned "Policy") observes that the "growth of online platforms in recent years raises important questions about applying the ideals of the First Amendment to modern communications technology," and states that "[o]nline platforms are engaging in selective censorship that is harming our national discourse."  Section 1 further states that "[w]e must seek transparency and accountability from online platforms, and encourage standards and tools to protect and preserve the integrity and openness of American discourse and freedom of expression."  85 Fed. Reg. at 34,079.

Proposed legislation both before and after issuance of the EO has explored concerns about online platforms' "selective censorship" and lack of transparency in moderating content.[3]  The

---

[3]   *Compare* Ending Support for Internet Censorship Act, S. 1914, 116th Cong. (2019) (proposed legislation before EO issued that would amend Section 230 to "encourage" online platforms "to provide content moderation that is politically neutral"), *with* Limiting Section 230 Immunity to Good Samaritans Act, S. 3983, 116th Cong. (2020) (proposed legislation after EO issued that would amend Section 230 to "provide accountability for bad actors who abuse the Good Samaritan

operative provisions of the EO seek assessment of those sorts of concerns, and instruct Executive officials, such as the Attorney General and the Secretary of Commerce, to explore potential solutions to any problems identified.  In particular:

Section 2 of the EO (captioned "Protections Against Online Censorship") describes confusion that has arisen regarding Section 230(c) of the Communications Decency Act.  Pub. L. No. 104-104, 110 Stat. 56, 138-39 (codified at 47 U.S.C. § 230(c)).  In particular, a provision of Section 230 reads:  "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  47 U.S.C. § 230(c)(1).  Also, under the statute, "[n]o provider or user of an interactive computer service shall be held liable on account of . . . any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."  *Id.*, § 230(c)(2). "To give these provisions teeth, [S]ection 230 provides that '[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.'" *Bennett v. Google, LLC*, 882 F.3d 1163, 1165-66 (D.C. Cir. 2018) (quoting 47 U.S.C. § 230(e)(3)).

Section 2(a) of the EO responds to concerns that have arisen about certain applications of the statute to circumstances contrary to legislative expectations when the statute was enacted in 1996, when online platforms had barely begun to emerge.  Section 2(a) accordingly describes the importance of adherence to the statute's text and purpose.  In particular, Section 2(a) states:  "It is the policy of the United States that the scope of that immunity" in Section 230(c) "should be

---

protections provided under that Act"); Stopping Big Tech's Censorship Act, S. 4062, 116th Cong. (2020) (proposed legislation after EO issued that would amend Section 230 to "require" that online platforms "meet certain standards to qualify for liability protections"); Platform Accountability & Consumer Transparency Act, S. 4066, 116th Cong. (2020) (proposed legislation after EO issued that would "require transparency, accountability, and protections for consumers online," including by amending Section 230).

clarified," in that "the immunity should not extend beyond its text and purpose to provide protection for those who purport to provide users a forum for free and open speech, but in reality use their power over a vital means of communication to engage in deceptive or pretextual actions stifling free and open debate by censoring certain viewpoints." 85 Fed. Reg. at 34,080. Section 2(a) also states that "the policy of the United States" is "to ensure that, to the maximum extent permissible under the law," Section 230(c) "is not distorted to provide liability protection for online platforms that—far from acting in 'good faith'' to remove objectionable content—instead engage in deceptive or pretextual actions (often contrary to their stated terms of service) to stifle viewpoints with which they disagree." *Id.*

To further those policies, Subsection 2(b) directs the Secretary of Commerce—in consultation with the Attorney General, and acting through the National Telecommunications and Information Administration (NTIA)—within 60 days of the Executive Order's issuance, to "file a petition for rule-making with the Federal Communications Commission (FCC)." That petition is to "*request*[] that the FCC expeditiously *propose* regulations to clarify" the operation of Section 230, including to "clarify" the "conditions under which an action restricting access to or availability of material is not 'taken in good faith' within the meaning of" Section 230(c)(2)(A), "particularly whether actions can be 'taken in good faith' if they are: (A) deceptive, pretextual, or inconsistent with a provider's terms of service." 85 Fed. Reg. at 34,081 (emphasis added). The NTIA implemented Subsection (b) by filing a rulemaking petition with the FCC on July 27, 2020. That petition is now pending before the FCC. The EO does not purport to instruct the FCC to take up the petition or to propose any particular regulation.

The EO's additional operative provisions direct Executive officials to explore and craft potential responses to additional aspects of the problem of politically-biased removal or editing of user content by online platforms.

Section 3 (captioned "Protecting Federal Taxpayer Dollars from Financing Online Platforms That Restrict Free Speech") directs agencies to report to the Office of Management and Budget on the advertising and marketing funds they "pa[y] to online platforms," and directs the Department of Justice to "assess whether any online platforms are problematic vehicles for government speech due to viewpoint discrimination, deception to consumers, or other bad practices." 85 Fed. Reg. at 34,081.

Section 4 (captioned "Federal Review of Unfair or Deceptive Acts or Practices") observes, in Subsection (a), that "large online platforms, such as Twitter and Facebook" are "providing an important forum to the public for others to engage in free expression and debate." 85 Fed. Reg. at 34,081. Subsection (b) notes that the White House "launched a Tech Bias Reporting tool" in May 2019 "to allow Americans to report incidents of online censorship," and that the White House will "submit" to the Department of Justice and the Federal Trade Commission (FTC) the "over 16,000 complaints" received through the tool regarding "online platforms censoring or otherwise taking action against users based on their political viewpoints." 85 Fed. Reg. at 34,081-82. Subsection (c) directs the FTC to "consider taking action, as appropriate and consistent with applicable law, to prohibit unfair or deceptive acts or practices in or affecting commerce, pursuant to" 15 U.S.C. § 45, adding that "unfair or deceptive acts or practice may include practices by entities covered by [S]ection 230 that restrict speech in ways that do not align with those entities' public representations about those practices." 85 Fed. Reg. at 34,082.

Sections 5 and 6 provide additional directions to the Attorney General.  Section 5 (captioned "State Review of Unfair or Deceptive Acts or Practices and Anti-Discrimination Laws") directs the Attorney General to "establish a working group" that will "invite State Attorneys General" to "discuss[]" and "consult[]" with the working group, "as appropriate and consistent with applicable law," on "potential enforcement of State statutes that prohibit online platforms from engaging in unfair or deceptive acts or practices," and related "model legislation" for State "consideration."  85 Fed. Reg. at 34,082.  Section 6 (captioned "Legislation") directs the Attorney General to "develop a proposal for Federal legislation that would be useful to promote the policy objectives of this order."  *Id.*

The general provisions in Section 8 of the EO require that the EO "shall be implemented consistent with applicable law," which necessarily includes the First Amendment of the U.S. Constitution.  85 Fed. Reg. at 34,082.  Section 8 also states that the EO "does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States…"  *Id.* at 34083.

## 2.  Plaintiff and its Complaint

Plaintiff is a nonprofit organization "whose mission is to strengthen individual rights and freedoms by defining, promoting, and influencing technology policy and the architecture of the Internet that impacts people's daily lives."  Compl. ¶ 16.  Plaintiff alleges that it "has been deeply engaged in law and policy advocacy regarding intermediary liability frameworks, free speech, and content moderation since the organization was founded in 1994."  Compl. ¶ 70.  Plaintiff's

legislative and litigation advocacy regarding the Communications Decency Act in general and Section 230 in particular well predate the EO. *See* Compl. ¶ 69.[4]

Five days after the President issued the EO, Plaintiff commenced this action. The Complaint alleges that the EO constitutes "retaliatory action" that the President "swiftly took" (Compl. ¶ 44) after a dispute between the President and Twitter that unfolded on May 26 and May 27, 2020 (Compl. ¶¶ 32-44).[5] Plaintiffs avers that the EO "infring[es]" on Plaintiff's "interests in enhancing freedom of expression, preserving the unique nature of the Internet, and limiting government surveillance," and that the EO will "caus[e]" Plaintiff "to divert resources to safeguarding the principles underlying the First Amendment, 47 U.S.C. § 230, and the free speech rights of online content platforms and individuals that the Executive Order places under attack." Compl. ¶ 72. Also "[a]s a result of" the EO, Plaintiff avers it "will be required to devote substantial

---

[4]  For example, participants at the Department of Justice's roundtable discussions in February 2020 regarding legal and policy questions surrounding Section 230 included the Director of Plaintiff's "Free Expression Project," whose biography describes her as "lead[ing]" Plaintiff's "legislative advocacy and amicus activity in the U.S. and the E.U. focused on protecting fundamental rights to freedom of expression," and describes Plaintiff as "work[ing] to promote law and policy" to "support Internet users' free expression rights in the United States and around the world. This work spans many subjects, including human trafficking, privacy, counter-terrorism, online child safety, and online harassment." U.S. Dep't of Justice, *Section 230— Nurturing Innovation or Fostering Unaccountability?* 8 (Feb. 19, 2020), *at* https://www.justice.gov/file/1286211/download (last visited July 31, 2020); *cf. Al-Owhali v. Ashcroft*, 279 F.Supp.2d 13, 21 (D.D.C. 2003) (under Rule 12(b)(1), court "may consider documents outside the pleadings to assure itself that it has jurisdiction").

[5]  In that regard, the Complaint alleges that after the President tweeted (in part) on May 26, 2020 that "Mail-in Ballots" in California "will be . . . substantially fraudulent" and lead to "a Rigged Election" (Compl. ¶¶ 32-33), Twitter "appended" an "addendum to the President's tweets," containing a large blue exclamation mark set in a circle, and  "stating that" readers "could 'Get the facts'" about the California mail-in ballot process from materials to which Twitter provided a link (see Compl. ¶ 34). The next day, the Complaint avers, the President tweeted (in part) that "@Twitter is now interfering in the 2020 Presidential Election," prompting Twitter to post an "explanation" for its "label" of the President's Tweet. Compl. ¶¶ 36-37. The Complaint avers that the President tweeted (in part) on May 27, 2020:  "Republicans feel that Social Media Platforms totally silence conservatives voices. We will strongly regulate, or close them down, before we can ever allow this to happen."  Compl. ¶ 38.

resources" to "activities" that "will be time-consuming and resource-intensive, and will require" Plaintiff "to reallocate resources that it planned to use for other activities furthering its mission." Compl. ¶ 73.

Asserting that the EO is a "retaliatory action[]" in violation of the Speech Clause of the First Amendment and therefore outside the authority of the President to issue (Compl. ¶¶ 6, 44, 65, 77), Plaintiff seeks equitable relief against the President, who is the sole named Defendant, including an injunction against implementation of "any part of" the EO, and a declaration that the EO "is unlawful and invalid."  *See* Compl. pp. 26-27 ("Prayer for Relief").

## LEGAL STANDARD

"Lack of standing is a basis for dismissal under Federal Rule of Civil Procedure 12(b)(1)." *Lawyers' Comm. for 9/11 Inquiry, Inc. v. Wray*, 424 F. Supp. 3d 26, 29 (D.D.C. 2020).  Lack of ripeness similarly requires Rule 12(b)(1) dismissal.  *Sierra Club v. U.S. Dep't of Energy*, 825 F. Supp. 2d 142, 154 (D.D.C. 2011).  Under Rule 12(b)(1), the court will "draw all reasonable inferences from [the Plaintiff's] allegations in [its] favor," but it will not "accept inferences that are unsupported by the facts," "assume the truth of legal conclusions," or rely on "threadbare recitals of the elements of standing, supported by mere conclusory statements."  *Arpaio*, 797 F.3d at 19 (brackets omitted).  "Because subject-matter jurisdiction focuses on the court's power to hear the plaintiff's claim, a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority.  For this reason, 'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim."  *Grand Lodge of the Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13-14 (D.D.C. 2001) (quoting 5A Charles A. Wright & Arthur R. Miller, *Fed. Prac. & Proc. Civ.* 2d § 1350)).

**ARGUMENT**

I.   **ARTICLE III INJURY-IN-FACT CANNOT BE PREDICATED ON ALLEGED ORGANIZATIONAL RESOURCE ALLOCATION BASED ON SPECULATION ABOUT HOW IMPLEMENTATION OF THE EXECUTIVE ORDER COULD AFFECT NONPARTY ONLINE PLATFORMS**

Plaintiff styles itself a "technology policy" nonprofit organization, but Plaintiff is not regulated by the EO in any fashion.  The EO does not impose obligations on any private party. Plaintiff nevertheless attempts to portray itself as suffering harm based primarily on the potential costs to the organization should it decide to participate in the future administrative proceedings that could result from implementation of the EO.  Allegations of that sort fail to meet Plaintiff's "burden of establishing" Article III standing.  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 342 (2006) (citation omitted); *see Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 94-95, 102-04 (1998).

"To establish standing under Article III of the Constitution, a plaintiff must demonstrate (1) that he or she suffered an injury in fact that is concrete, particularized, and actual or imminent, (2) that the injury was caused by the defendant, and (3) that the injury would likely be redressed by the requested judicial relief."  *Thole v. U.S. Bank N.A.*, 140 S. Ct. 1615, 1618 (2020) (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992)); *see Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013); *Summers v. Earth Island Inst.*, 555 U.S. 488, 494-97 (2009).

Because its "[r]elaxation … is directly related to the expansion of judicial power," the standing inquiry is "especially rigorous" when reaching the merits would force the judiciary "to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional."  *Clapper*, 568 U.S. at 408-09 (citations omitted).  Examination of the Complaint's allegations of Article III standing also requires bearing in mind that the EO under challenge here "neither require[s] nor forbid[s] any action on the part of" the Plaintiff or of any

11

other private party.  *Summers*, 555 U.S. at 493.  Instead, Plaintiff challenges an Executive Order, an instrument through which the President, consistent with his responsibilities under Article II of the Constitution, directs Executive officials to undertake specified tasks.  That is, here, Plaintiff seeks to invalidate the directives from the President in the EO, but those directives "govern only the conduct of" the Attorney General, the Secretary of Commerce, and other Executive officials "engaged in" administering federal law, including by requesting but not requiring certain governmental agencies, namely the FCC and the FTC, to act in the future (in ways yet to be decided).  *See id.*  So, because "the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish."  *Id.*, 555 U.S. at 493-94 (quoting *Lujan*, 504 U.S. at 562).

The Complaint does not make that "substantially more difficult" showing of standing, let alone under the "especially rigorous" standard that applies here.  The "threshold requirement" of Article III standing, of course, "ensures that" federal judges "act as judges, and do not engage in policymaking properly left to elected representatives."  *Gill v. Whitford*, 138 S. Ct. 1916, 1923 (2018) (quoting *Hollingsworth v. Perry*, 570 U.S. 693, 700 (2013)).  Article III standing thus guarantees that "the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action."  *Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S. 464, 472 (1982).  Plaintiff's failure to meet the Article III standing requirement, described below, exposes this action as an attempt to have this Court decide an abstract debate over "policymaking" that could result from the EO, which is not a justiciable "case" or "controversy" under Article III.

### A. Plaintiff's Forecasted Expenditure Of Resources On Issue Advocacy Cannot Establish Organizational Injury-in-Fact

*First*, Plaintiff's allegations are insufficient to show a "particularized" injury-in-fact under Article III. For "an injury to be 'particularized,' it 'must affect the plaintiff in a personal and individual way.'" *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016) (quoting *Lujan*, 504 U.S., at 560 n.1, and citing, *inter alia*, *Pub. Citizen, Inc. v. Nat'l Hwy. Traffic Safety Admin.*, 489 F.3d 1279, 1292-93 (D.C. Cir. 2007)). Plaintiff is as an organization attempting to allege injury-in-fact on its own behalf. Compl. ¶¶ 16, 68-73. When an organization seeks to sue on its own behalf, it must establish standing in the same manner as a private individual. *See People for the Ethical Treatment of Animals v. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) *(PETA)* (describing test when challenger "asserts organizational standing only"). The organization must show that it "has suffered a 'concrete and demonstrable injury to [its] activities,' mindful that, . . . 'a mere setback to its abstract social interests is not sufficient.'" *Envtl. Working Grp. v. U.S. FDA*, 301 F. Supp. 3d 165, 170-71 (D.D.C. 2018) (quoting *PETA*, 797 F.3d at 1093 (in turn quoting *Equal Rights Ctr. v. Post Properties, Inc.*, 633 F.3d 1136, 1138 (D.C. Cir. 2011)).[6]

Organizational standing can be examined using a two-part inquiry. *See PETA,* 797 F.3d at 1094 ("ask[ing] first, whether the agency's action or omission to act 'injured the [organization's] interest' and, second, whether the organization 'used its resources to counteract that harm'") (quoting *Equal Rights Ctr.*, 633 F.3d at 1140). Here, Plaintiff fails the first part of the test, so it cannot reach the second part, as in decisions such as *Environmental Working Group*, 301 F. Supp. 3d at 171-73, and *Center for Responsible Science v. Hahn*, 809 F. App'x 10, 12 (D.C. Cir. Apr.

---

[6]     The Complaint does not assert that Plaintiff has "representational standing," which is distinct from organizational standing, and which requires examining whether an association "has standing to bring suit on behalf of its members." *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1323 (D.C. Cir. 2013) (quoting *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002)).

10, 2020).  *Cf. Elec. Privacy Info. Ctr. v. FAA*, 892 F.3d 1249, 1255-56 (D.C. Cir. 2018) (organizational standing failed where agency had "not impaired or injured" organization's "activities").  To satisfy the test's first part, an organization must allege not only that there is a "a direct conflict between the defendant's conduct and the organization's mission" (*PETA*, 797 F.3d at 1095 (quoting *Abigail Alliance for Better Access to Developmental Drugs v. Eschenbach*, 469 F.3d 129, 133 (D.C. Cir. 2006)), but also that the challenged conduct "'perceptibly impaired' the organization's ability to provide services," a requirement the organization fails if it "does not allege impairment of its ability to provide services, only impairment of its advocacy" (*Turlock Irr. Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (quoting *Equal Rights Ctr.*, 633 F.3d at 1138-39)).

To begin with, there is no "direct conflict" here between the EO and Plaintiff's mission. *See PETA*, 797 F.3d at 1095.  The alleged "mission" of Plaintiff is "to strengthen individual rights and freedoms by defining, promoting, and influencing technology policy and the architecture of the Internet that impacts people's daily lives."  Compl. ¶ 16.  That is, Plaintiff describes itself as an organization that advocates "in favor of First Amendment protection for speech on the Internet." Compl. ¶ 69.  But the EO is not in "direct conflict" with any individual rights or freedoms, because the EO does not impose any obligations on any private entities.  By its terms, the EO repeatedly describes the importance of free speech, including online.  *See* 85 Fed. Reg. at 34,079-81. Certainly, no provision of the EO restricts the speech of any private party.  Rather, the EO simply assigns identified tasks to various Executive officials.  (To argue otherwise, Plaintiff assumes the outcome of various government proceedings that could result from the EO, but that fails the "actual or imminent" requirement for an Article III injury-in-fact, as explained in Point I.B., *infra*.).

Moreover, the EO simply has not "perceptibly impaired the organization's *ability* to provide services."  *Turlock*, 786 F.3d at 24.  Plaintiff avers the legal conclusions that the EO

"injures" Plaintiff "by causing Plaintiff CDT to *divert resources* to safeguarding the principles underlying the First Amendment" and 47 U.S.C. § 230.  Compl. ¶ 72 (emphasis added).  In particular, it avers that the organization

> *will be required to* devote substantial resources to (a) participating in the planned FCC rulemaking proceeding [described in Section 2(b) of the EO]; (b) monitoring federal agencies' reports regarding and any action by the Department of Justice [described in Section 3] ; (c) tracking any FTC action with respect to online speech, and participating in any proceedings that the Commission institutes [described in Section 4(b) through (d)]; (d) engaging with federal and state policymakers with respect to the development of proposed legislation [described in Sections 5(a) (state) and 6 (federal)]—as well as informing the public about all of these activities and the potential consequences for protection of free speech online.  These activities *will be* time-consuming and resource-intensive, and will require [Plaintiff] to reallocate resources that it planned to use for other activities furthering its mission.

Compl. ¶ 73 (emphases added).

The alleged "activities" Plaintiff purportedly will undertake include "evaluating proposals to amend the proposed laws on free speech online and challenging legislation that burdens individuals' fundamental rights, holding public events, and communicating with policy makers in the Executive and Legislative Branches."  Compl. ¶ 71.  Plaintiff allegedly fears those activities "will be time-consuming and resource-intensive," "and will require" Plaintiff "to reallocate resources that it planned to use for other activities furthering its mission."  Compl. ¶ 73.  But Plaintiff does not describe the resources it will voluntarily "divert" (Compl. ¶ 72), and does not describe the "other activities" that it would otherwise have funded.  *See also* Compl. ¶ 82 (averring EO "causes" Plaintiff "to *divert resources* to safeguarding the First Amendment rights of individuals and Internet intermediaries that the Executive Order places under attack.") (emphasis added).  In short, the expenditure of resources Plaintiff anticipates are chiefly based on participation in administrative proceedings (whose scope and duration, of course, is only conjectural at this point), including "the planned FCC rulemaking proceeding" that could result

from Section 2(b) of the EO, "any FTC action" resulting from Section 4, and "development of proposed legislation" under Sections 5 and 6.  *See* Compl. ¶ 73.  But those allegations do not meet the "perceptible impairment" requirement.

Crucially, in the organizational standing context, "expenditure of resources on advocacy is not a cognizable Article III injury" regardless "whether the advocacy takes place through *litigation or administrative proceedings*"—including the alleged expenditures Plaintiff fears it will have to make to participate in the anticipated FCC or FTC proceedings.  *See Turlock*, 786 F.3d at 24 (emphasis added).  That is, an expenditure on "the organization's lobbying activities," or on "pure issue-advocacy" would not qualify as an expenditure on which organizational standing can be predicated.  *Envtl. Working Grp.*, 301 F. Supp. 3d at 171 (quoting *Ctr. for Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161-62 (D.C. Cir. 2005)) (cleaned up); *see also Ctr. for Responsible Sci.*, 809 F. App'x at 12 (dismissal affirmed where organization failed first prong of organizational standing test because it "does not identify the kind of harm to an organization's 'services,' 'daily operations,' or 'activities,' that we have recognized as injury in fact") (citations omitted).  If mere increased expense "to an organization's government lobbying and issue advocacy programs" were allowed to "be used to manufacture standing," then "lobbyists on either side of virtually any issue" would be able "to take the Government to court," contrary to Article III's bedrock principles. *Envtl. Working Grp.*, 301 F. Supp. 3d at 172.

Indeed, Plaintiff's feared "expenditure of funds to promote" the organization's "legislative agenda through research, education, outreach to the public and the media, submission of administrative comments, and litigation is a *normal and critical* part of its mission and operations," and that expenditure therefore cannot constitute an injury-in-fact.  *See Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1, 23-24 (D.D.C. 2014) (emphasis added).  Importantly,

Plaintiff here has expended efforts on issue advocacy and litigation over the Communications Decency and Act in general and Section 230 in particular well before issuance of the EO. *See* Compl. ¶ 69; *supra* p. 8 & note 4. And concerns about Section 230 have spurred proposed legislation both before and after issuance of the EO. *Supra* note 3. Even apart from the EO, therefore, Plaintiff's own descriptions of its mission indicate that Plaintiff will dedicate resources to advocacy about Section 230. So "[w]inning or losing this suit" will not meaningfully change Plaintiff's mission or operations. *Cf. Thole*, 140 S. Ct. at 1622.

To the contrary, this case appears to be one where, as in several recent cases in this District, the "government actions" alleged to "hinder the policy objectives of an organization may help, rather than harm, the organization as an institution, by energizing its members or by giving it new opportunities to carry out its mission." *Cmty. Fin. Servs. Ass'n of Am. v. FDIC*, No. 14-CV-953, 2016 WL 7376847, at *11 n.10 (D.D.C. Dec. 19, 2016); *Elec. Privacy Info. Ctr.*, 48 F. Supp. 3d at 23 ("the expenditures that [organization] has made in response to [challenged rule] have not kept it from pursuing its true purpose as an organization but have contributed to its pursuit of its purpose"); *cf. Nat'l Consumers League v. Gen. Mills, Inc.*, 680 F. Supp. 2d 132, 136 (D.D.C. 2010) ("Challenging conduct like [cereal manufacturer's] alleged mislabeling is the very purpose of consumer advocacy organizations. As such, [manufacturer's] alleged conduct does not hamper NCL's advocacy effort; if anything it gives NCL an opportunity to carry out its mission.").

Plaintiff therefore lacks a "particularized" injury-in-fact as an organization purportedly harmed by the EO.

**B.      Plaintiff's Speculative Future Harm Based On Conjecture About Actions Not Yet Taken By Nonparty Government Agencies Is Not "Certainly Impending"**

*Second*, Plaintiff's asserted injury-in-fact is not "actual or imminent" because it is based

on speculation, and so it is "conjectural or hypothetical," and hence impermissible under Article

III.  *Summers*, 555 U.S. at 493.

"[T]hreatened injury must be certainly impending to constitute injury in fact."  *Whitmore*

*v. Arkansas*, 495 U.S. 149, 158 (1990); *see Pub. Citizen*, 489 F.3d at 1293-94.  But any purported

harm to Plaintiff predicated on speculation about how the EO will be implemented, and how that

implementation will affect private parties, is not "certainly impending."   Put another way, an

"allegation of future injury may suffice if the threatened injury is 'certainly impending,' or there

is a 'substantial risk' that the harm will occur.''  *Susan B. Anthony List v. Driehaus*, 134 S. Ct.

2334, 2340 (2014) (quoting *Clapper*, 568 U.S. at 414-15 n.5) (cleaned up).  Plaintiff's allegations

satisfy neither of those formulations ("certainly impending" or "substantial risk"), because even

the latter formulation is unsatisfied "in light of the attenuated chain of inferences necessary to find

harm here."  *See Clapper*, 568 U.S. at 414-15 n.5; *see also Rizzo v. Goode*, 423 U.S. 362, 372

(1976).  (We refer below to the "certainly impending" formulation for convenience.)

Glaringly, Plaintiff's assertions hinge on impermissible conjecture about future events and

future actions by officials not before the Court, and how those events and actions could affect

online platforms—not Plaintiff (which does not allege that it is an online platform, *see* note 1,

*supra*).  The outcomes of all of the processes initiated by the EO, but whose outcomes are not

controlled by the EO, are unknown.  Consequently, Plaintiff is simply speculating that those

outcomes will be contrary to the First Amendment—speculation that requires ignoring the EO's

explicit mandate in Section 8(b) that the entire EO be implemented "consistent with applicable

law." 85 Fed. Reg. at 34,082.   But Plaintiff does not offer any allegations supporting the conclusion that those outcomes will be adverse to Plaintiff.

For example, the Complaint does not describe any basis for Plaintiff's presuppositions that the FCC or the FTC will decide the questions the EO would eventually put before those commissions in a manner harmful to Plaintiff.   The Complaint likewise does not allege any basis for Plaintiff's assumption it will be unable to protect the interests of the online platforms Plaintiff purports to share by participating, where allowed by law, in any FCC proceedings resulting from Section 2(b), or FTC proceedings resulting from Section 4(c).   By assuming outcomes of those proceedings, Plaintiff's presuppositions lack any foundation in the EO.   For example, the EO recognizes and does not "rob the FCC of the discretion with which Congress has clearly entrusted it" to rule on the petition for rulemaking submitted under Section 2(b) of the EO.   *Office of Commc'n of United Church of Christ v. FCC*, 911 F.2d 813, 818 (D.C. Cir. 1990).   Similarly, the EO recognizes and does not deprive the FTC of its discretion to initiate or a decline a proceeding under 15 U.S.C. § 45 in response to complaints directed to the FTC under Section 4 of the EO.

As a result, Plaintiff offers nothing more than a theory of standing that "require[s] guesswork as to how independent decisionmakers will exercise their judgment."   *Clapper*, 568 U.S. at 413.   Indeed, the D.C. Circuit has repeatedly rejected that sort of "guesswork" about "future legal proceedings" as a ground for injury-in-fact.   "Allegations of injury based on predictions regarding future legal proceedings are . . . too speculative" to support showing of "current or even impending injury[.]" *Perciasepe*, 714 F.3d at 1325 (quoting *Platte River Whooping Crane Critical Habitat Maint. Trust v. FERC*, 962 F.2d 27, 35 (D.C. Cir. 1992)).   That is, "Article III standing requires more than the possibility of potentially adverse regulation."   *See id.*, 714 F.3d at 1324-25 (where consent decree between Environmental Protection Agency ("EPA") and plaintiff "merely

requires that EPA conduct a rulemaking and then decide whether to promulgate a new rule—the content of which is not in any way dictated by the consent decree—using a specific timeline," proposed intervenor opposed to consent decree lacked injury-in-fact).

Because the EO does not impose obligations on any private party—but rather simply initiates government processes that may or may not result in regulations or other agency actions that could affect private parties—the speculation required to accept Plaintiff's allegation of injury-in-fact is even more imaginative than the conjecture that the Supreme Court and the D.C. Circuit have found inadequate.  For example, in *Summers*, the Supreme Court rejected a challenge by environmental groups to the Forest Service's adoption of regulations setting out general (non-project-specific) rules governing administrative review of some future projects.  555 U.S. at 490-491.  The groups challenged the regulations themselves and a particular application of the regulations to a timber sale called the Burnt Ridge Project.  *Id.* at 491.  By the time the case reached the Supreme Court, the parties had settled the Burnt Ridge Project dispute, leaving only the challenge to the regulations in the abstract.  *Id.* at 491-492, 494.  The Court held that the groups did not have standing to challenge the regulations after the settlement because they failed to demonstrate that the Government had applied the regulations to any other particular project that would imminently harm one of the plaintiffs' members.  *Id.* at 492-496.

Similarly, the D.C. Circuit has held that an association lacked standing to challenge a determination by the Environmental Protection Agency ("EPA") that two reaches of the Santa Cruz River were traditional navigable waterways subject to regulation under the Clean Water Act ("CWA"), 33 U.S.C. § 1251 *et seq.*  *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6 (D.C. Cir. 2011) ("*NAHB*").  Noting that EPA had not designated any particular "watercourse" in the Santa Cruz River watershed as subject to CWA jurisdiction, the D.C. Circuit concluded that the

association's members "face[d] only the *possibility* of regulation, as they did before the [challenged] determination." *NAHB*, 667 F.3d at 13 (emphasis original).  That increased risk of regulation was insufficient to confer standing because the association had not asserted that any of its members planned to discharge contaminants into a watercourse likely to be subject to the CWA "anytime soon." *Id.* at 14-15.  Here, Plaintiff has alleged at most the "*possibility* of regulation" that could result from the EO, and certainly not a concrete application of any actual regulation.

Furthermore, given that Plaintiff does not face "certainly impending" harm from the EO, Plaintiff cannot choose to spend resources in response to its subjective fear of harm, and then point to the expenditure as injury-in-fact.  After all, litigants "cannot manufacture standing merely by inflicting harm on themselves based on their fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416; *see Cal. Cattlemen's Ass'n v. U.S. Fish & Wildlife Serv.*, 369 F. Supp. 3d 141, 146 (D.D.C. 2019) (plaintiff lacked injury-in-fact from "prudent" but "voluntary" participation in agency consultations).  For example, "[a]llegations of a subjective 'chill' are not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm" (*Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)), and allegations that a litigant has voluntarily expended its own resources to alleviate such a subjective chill are likewise inadequate under Article III.

Plaintiff therefore lacks an "actual or imminent" injury-in-fact based on purported future harm from the EO.

## C. Plaintiff Lacks Standing To Assert Purported Injuries-in-Fact Allegedly Sustained By Nonparty Online Platforms

Anticipated injury to online platforms not before the Court also cannot not supply Article III jurisdiction over the claim asserted in Plaintiff's Complaint.

The Complaint certainly depicts Plaintiff as concerned about how the EO could affect online platforms.  To that end, the Complaint includes repeated allegations about the purported harms the EO will have on such platforms.  *See, e.g.*, Compl. ¶ 8 ("the First Amendment bars the government from trying to censor lawful speech—such as the online speech of ordinary Americans—through the threat of liability or reprisals directed at intermediaries, the companies that provide the platform for Americans' online speech"); Compl. ¶ 11 ("Order clouds the legal landscape in which the hosts of third-party content operate"); Compl. ¶ 45 ("intermediaries will be chilled in exercising their own First Amendment right to comment upon and to moderate the online content that they host"); Compl. ¶ 52 ("Order will increase the chance that social media services decide not to address hateful or harassing speech"); Compl. ¶ 79 (Order "issued . . . to pressure [Twitter] into removing its constitutionally protected speech from its online platform and to coerce other Internet intermediaries into refraining from similar constitutionally protected speech on their own platforms, and into prohibiting such speech by their users, in the future").

Those repeated allegations omit any facts showing that Plaintiff has refrained from any speech because of the EO, or that the EO has directed any government power (retaliatory or otherwise) against Plaintiff.  Instead, the Complaint seeks to portray Plaintiff as poised to expend resources to protect the third-party online platforms against which the EO purportedly retaliates.  That is, Plaintiff appears to presuppose that it can assert the rights of online platforms, and not just itself.  *But see Gill*, 138 S. Ct. at 1934 ("standing is not dispensed in gross," so a "plaintiff's remedy must be tailored to redress the plaintiff's particular injury") (quoting *Cuno*, 547 U.S. at 353).

In particular, Plaintiff's attempt to seek relief based on allegations about the effect the EO will have on online platforms is prohibited under the rule against third party standing.  A "plaintiff generally must assert his own legal rights and interests, and cannot rest his claim to relief on the

legal rights or interests of [other] parties." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (citing *Tileston v. Ullman*, 318 U.S. 44 (1943) (*per curiam*)).  Although this "general prohibition on a litigant's raising another person's legal rights" is distinct from Article III's requirement that the plaintiff suffer a concrete and particularized injury, it serves many of the same important purposes. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004) (citation omitted).  In general, only the party afforded a given constitutional right "has the appropriate incentive to challenge (or not challenge) governmental action" in a way that genuinely furthers the right-holder's interests, "and to do so with the necessary zeal and appropriate presentation." *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004).  Moreover, adjudicating rights at the request of third parties could force courts to consider "questions of wide public significance" in an "abstract" setting removed from the concrete circumstances of the right-holders.  *Id.* (citation omitted).

The Supreme Court therefore "ha[s] not looked favorably upon third-party standing," but it has recognized a "limited . . . exception" to the general rule when the third party can "make two additional showings" *beyond* an Article III injury of its own:  that it has "a 'close' relationship with the person who possesses the right," and that "there is a 'hindrance' to the possessor's ability to protect his own interests." *Kowalski*, 543 U.S. at 129-30 (citation omitted); *see also Thole*, 140 S. Ct. at 1620 ("to claim 'the interests of others, the litigants themselves still must have suffered an injury in fact, thus giving' them 'a sufficiently concrete interest in the outcome of the issue in dispute.'") (quoting *Hollingsworth*, 570 U.S. at 708).  Those "additional showings" typically are (and should be) difficult to make; it is not common both that right-holders are unable to sue and that another can be trusted to press their interests.  Importantly, courts have applied the prudential doctrine of third party standing to dispose of a variety of claims alleging retaliation in violation of the First Amendment. *See Moody v. Mich. Gaming Control Bd.*, 847 F.3d 399, 402-04 (6th Cir.

2017); *Huth v. Haslun*, 598 F.3d 70, 75 (2d Cir. 2010); *Hodak v. City of St. Peters*, 535 F.3d 899, 903-06 (8th Cir. 2008); *Wasson v. Sonoma Cty. Junior College*, 203 F.3d 659, 663 (9th Cir. 2000); *see also Duran v. City of Corpus Christi*, 240 F. App'x 639, 643 (5th Cir. 2007) (*per curiam*).

Here—in addition to failing to allege injury-in-fact to Plaintiff (Point I.A & I.B, *supra*)—the Complaint does not contain factual allegations describing a "close" relationship between the Plaintiff organization and Twitter or any other online platform.  The Complaint does not actually describe such a relationship between Plaintiff and an online platform at all, other than to assert that Plaintiff and Twitter and other well-known online platforms share policy goals or views.  Plaintiff's allegations show that it is even further removed from the online platforms than the attorneys in *Kowalski* were from their potential clients, whose rights they unsuccessfully sought to assert.  543 U.S. at 131.

Moreover, the Complaint describes no facts (other than the bald conclusions of hindrance in Paragraphs 63 and 64) indicating that Twitter is hindered—that is, Plaintiff has not shown that Twitter is unable (rather than merely unwilling) to seek to enforce its own purported First Amendment rights by itself bringing suit.  "[N]o obvious barrier exists that would prevent" any online platform "from asserting" its "own rights."  *Renne v. Geary*, 501 U.S. 312, 320 (1991); *see, e.g.*, *Am. Immigration Lawyers Ass'n v. Reno*, 199 F.3d 1352, 1362 (D.C. Cir. 2000) (noncitizens subject to expedited removal lacked "the type of impediment, the 'hindrance' or 'obstacle,' the [Supreme] Court had in mind" for third party standing); *United States v. TDC Mgmt. Corp.*, 263 F. Supp. 3d 257, 273-74 (D.D.C. 2017).

The very purposes of limiting third-party standing are to prevent courts from "decid[ing] abstract questions of wide public significance" in cases where "judicial intervention may be unnecessary," and to ensure that when courts do decide such questions, their decisions are based

24

on "appropriate presentation" of the right-holders' interests.  *Kowalski*, 543 U.S. at 129 (citation omitted).  Those purposes are squarely implicated here, where Plaintiff seeks to have this Court decide a constitutional question of broad public significance, based on purported—and impermissibly conjectural or hypothetical—harms to online platforms not before the Court.

## II.   ARTICLE III REDRESSABILITY IS LACKING BECAUSE INJUNCTIVE AND DECLARATORY RELIEF AGAINST THE PRESIDENT IS UNAVAILABLE.

Additionally, Plaintiff fails the redressability requirement of Article III standing, which mandates a showing that the asserted injury-in-fact is "likely to be redressed by the requested relief.'"  *Cuno*, 547 U.S. at 342.  Plaintiff cannot make that showing here because the requested equitable and declaratory relief is categorically unavailable against the sole Defendant, the President.

Because a federal court "is not the proper forum to press general complaints about the way in which government goes about its business," the "[c]ase-or-controversy considerations . . . 'obviously shade into those determining whether the complaint states a sound basis for equitable relief,'" so those equitable relief requirements "should therefore inform our judgment about whether [challengers] have standing."  *Allen v. Wright*, 468 U.S. 737, 760-61 (1984) (quoting, *inter alia*, *O'Shea v. Littleton*, 414 U. S. 488, 499 (1974)).  The *Allen* Court went on to admonish that the constitutional separation of powers "counsels against recognizing standing in a case brought, not to enforce specific legal obligations whose violation works a direct harm, but to seek a *restructuring of the apparatus* established by the Executive Branch to fulfill its legal duties."  *Id.* at 761 (citing, *inter alia*, *Rizzo*, 423 U.S. at 378-79).  The sole Defendant named in this action is the President, and the "requested relief" is an injunction or declaration that would not simply "restructur[e]," but actually shut down, "the apparatus" the President has set up to inquire into the conduct of online platforms that unquestionably possess vast economic resources and influence.

The *Allen* Court's admonition therefore "counsels against" granting Plaintiff standing here.  *See id.*

That admonition is especially salient here because the constitutional separation of powers precludes this Court from assuming control over the President's discretionary official conduct in the form of an equitable injunction or a declaration that would invalidate the EO.  The Complaint's Prayer for Relief chiefly seeks an injunction preventing the President and his nonparty subordinates "from implementing or enforcing any part of the Executive Order," but that relief is unavailable.

Although courts of equity may in some circumstances permit suits to "enjoin unconstitutional actions by . . . federal officers" (Compl. ¶ 75 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015))), the availability of such relief depends on whether it "was traditionally accorded by courts of equity" (*Grupo Mexicano De Desarrollo S.A. v. All. Bond Fund*, 527 U.S. 308, 319 (1999)).  There is no such tradition of equitable relief against the President.  To the contrary, federal courts have "no jurisdiction of a bill to enjoin the President in the performance of his official duties." *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866).[7] The Supreme Court reaffirmed that principle more recently in *Franklin*, 505 U.S. at 800-01, where

---

[7]     Rejection of the demand for injunctive and declaratory relief against the President is correct whether viewed as a jurisdictional or merits determination.  To be sure, D.C. Circuit and Supreme Court precedent indicates that the restriction in *Mississippi* is jurisdictional.  The Supreme Court has repeatedly described the bar against suing the President for his official duties as jurisdictional in character.  *See Franklin v. Massachusetts*, 505 U.S. 788, 802-03 (1992) (quoting *Mississippi*, 71 U.S. (4 Wall) at 501).  And the D.C. Circuit has noted that "[w]ith regard to the President, *courts do not have jurisdiction to enjoin him*, and have never submitted the President to declaratory relief." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (emphasis added).  Moreover, even if that bar were to be classified as non-jurisdictional, it still would be a "threshold" basis for ending the case without further inquiry into the merits. *Cf. Tenet v. Doe*, 544 U.S. 1, 6 n.4 (2005) ("unique and categorical" rule of *Totten v. United States*, 92 U.S. 105 (1876), prohibiting suits based on covert espionage agreements, is sort of ''threshold question'' court may "resolve[] *before* addressing jurisdiction") (emphasis added).

the Court declined to construe the APA to supply a cause of action against the President "[o]ut of respect for the separation of powers and the unique constitutional position of the President."  That tradition properly respects the President's "unique position in the constitutional scheme."  *See Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749-50 (1982) (declining to assume that implied damages "cause[s] of action run[] against the President of the United States").  On that point, Justice Scalia's separate opinion in *Franklin* is instructive:  "The apparently unbroken historical tradition supports the view, which I think implicit in the separation of powers established by the Constitution, that the principals in whom the executive and legislative powers are ultimately vested—*viz.*, the President and the Congress (as opposed to their agents)—may not be ordered to perform particular executive or legislative acts at the behest of the Judiciary.  For similar reasons, I think we cannot issue a declaratory judgment against the President."  *See id.* at 827 (Scalia, J., concurring in part and concurring in the judgment).

In this case, similarly, the "reasons why courts should be hesitant to grant" injunctive relief "are painfully obvious" given the President's unique constitutional role and the potential tension with the separation of powers.  *Swan v. Clinton*, 100 F.3d 973, 978 (D.C. Cir. 1996).  Furthermore, because Plaintiff has named only the President as Defendant, allowing the suit to proceed against other officials is not an available detour around the constitutional problem.  *See id.* ("In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials."); *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) (dismissing "the President as a party").

The narrow exception potentially left open by *Mississippi* for injunctions seeking to direct the Executive to perform "ministerial" functions does not apply here.  Left unresolved by that

decision was "whether a court can compel the President to perform a ministerial act" (there, adjusting federal employee compensation under a statute). *Nat'l Treasury Employees Union v. Nixon*, 492 F.2d 587, 607 (D.C. Cir. 1974). "A ministerial duty . . . is one in respect to which nothing is left to discretion." *Mississippi*, 71 U.S. at 498. "It is a simple, definite duty, arising under conditions admitted or proved to exist, and imposed by law." Id. Such a duty must be "so plainly prescribed as to be free from doubt and equivalent to a positive command." *Wilbur v. U.S. ex rel. Kadrie*, 281 U.S. 206, 218 (1930); *see also U.S. ex rel. McLennan v. Wilbur*, 283 U.S. 414, 420 (1931) ("The law must not only authorize the demanded action, but require it; the duty must be clear and indisputable."). But the alleged acts of the President here in issuing the EO cannot be characterized, as a matter of law, as "ministerial." Rather, the EO entails an exercise of the President's discretion in supervising and directing the Executive Branch, and an injunction invalidating that order would countermand that discretion, not direct the President to carry out a "ministerial" task.

Nor could the Complaint's invocation of the Declaratory Judgment Act (Compl. ¶ 14) warrant issuance of a declaration in lieu of an injunction. The D.C. Circuit's observation that courts "have never submitted the President to declaratory relief" (*Newdow*, 603 F.3d at 1013), built on Justice Scalia's separate opinion in *Franklin*, which properly regarded declaratory relief as unavailable against the President under the same historical tradition denying injunctive relief against the President (505 U.S. at 827 (Scalia, J., concurring in part and concurring in the judgment)). Declaratory relief is therefore unavailable for essentially the same reasons that any injunction would be unavailable.

III.   **THE ASSERTED CLAIM IS UNRIPE BECAUSE THE EXECUTIVE ORDER DOES NOT IMPOSE ANY OBLIGATIONS ON PLAINTIFF AND HAS NOT BEEN APPLIED TO, NOR COULD ITSELF BE APPLIED TO, ANY PRIVATE PARTY**

Alternatively, the Complaint should be dismissed under Rule 12(b)(1) because Plaintiff's claim lacks constitutional or prudential ripeness.  "Ripeness is a justiciability doctrine designed 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'"  *Nat'l Park Hospitality Ass'n v. U.S. Dep't of Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Abbott Laboratories v. Gardner*, 387 U.S. 136, 148-49 (1967)).

*First*, Plaintiff's claim is not ripe under Article III because Plaintiff fails to show injury-in-fact, as explained in Point I above.  "Ripeness . . . shares the constitutional requirement of standing that an injury in fact be certainly impending."  *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427-28 (D.C. Cir. 1996).

*Second*, Plaintiff's claim is not ripe under the prudential component of the ripeness doctrine.  In *Renne*, 501 U.S. at 321-22, the Supreme Court rejected a constitutional challenge to a state statute as unripe because of the absence of a "factual record of an actual or imminent application of [the challenged state statute] sufficient to present the constitutional issues in 'clean-cut and concrete form.'"  The Supreme Court has also reasoned that a "claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (internal quotation marks omitted).  Here, because the EO neither imposes any obligations on private parties nor even requires any agency to adopt a regulation or take other action that would impose an obligation on

private parties, Plaintiff lacks an "actual or imminent application" of the EO, and its claim "rests upon contingent future events," so the ripeness problem warrants dismissal without further inquiry.

In any event, even if the two-part test for prudential ripeness used for more conventional challenges to agency regulations were to apply, Plaintiff fails it because the issues presented in the Complaint are not "fit for judicial decision" now, and because "withholding a decision" will not cause cognizable "hardship" to Plaintiff. *See Nat'l Park Hospitality*, 538 U.S. at 808.

As for hardship to the parties:  The EO does not direct Plaintiff, a private party, to do anything.  Plaintiff "is not required to engage in, or to refrain from, any conduct" under the plain terms of the EO. *Texas*, 523 U.S. at 301.  Rather, the EO directs certain specified officials within the Executive Branch to take steps that at most could lead to future legal proceedings in which Plaintiff could become involved, depending on how events unfold.  The EO therefore "does not create 'adverse effects of a strictly legal kind,'" which are required to show that postponement of adjudication would result in hardship. *See Nat'l Park Hospitality*, 538 U.S. at 809 (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998)).  That is, the EO "do[es] not command anyone" outside the Government "to do anything or to refrain from doing anything; [it] do[es] not grant, withhold, or modify any formal legal license, power, or authority; [it] do[es] not subject anyone to any civil or criminal liability; [and it] create[s] no legal rights or obligations." *Id*.

As to fitness of the issues:  The "operation of" the EO, like the operation of the statute challenged in *Texas v. United States*, "is better grasped when viewed in light of a particular application."  523 U.S. at 301.  The fitness of a challenge to a federal agency regulation typically requires "'final agency action' within the meaning of § 10 of the [Administrative Procedure Act], 5 U.S.C. § 704." *Nat'l Park Hospitality*, 538 U.S. at 812.  The EO itself cannot be "final agency

action," because the President is not an "agency" subject to suit under the APA, so it would be anomalous to conclude that the EO is sufficiently "final" as to support a fitness determination. *Franklin*, 505 U.S. at 800-01. And even apart from that obstacle to fitness here, the value of deferring review is clear, because some of the actions of agencies taken in response to the EO *could* yield final agency action subject to judicial review by private parties injured by such final agency action.

For example, if the FCC were to take a final, reviewable action, such as by enacting a final rule after completing rulemaking proceedings in response to the petition for rulemaking the Secretary of Commerce is required to submit to the FCC under Section 2(b) of the EO, then that FCC final action would be subject to judicial review in a proper case. Similarly, if the FTC were to take a final, reviewable action in response after it has "consider[ed] taking action . . . pursuant to" 15 U.S.C. § 45 as specified in Section 4(c) of the EO, then that FTC final action would be subject to judicial review in a proper case. But none of those proceedings, or other proceedings that could result from implementation of the EO, have yet occurred. It remains "particularly speculative" to project what actions the FCC, the FTC, or other agencies will take in response to the EO. *See Conference of State Bank Supervisors v. OCC*, 313 F. Supp. 3d 285, 301 (D.D.C. 2018) (citing *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012)).

Also instructive here is *Center for Biological Diversity v. U.S. Department of Interior*, 563 F.3d 466, 480-81 (D.C. Cir. 2009), where the court rejected as unripe certain claims challenging the Department of Interior's leasing program for 2007-2012 under the Outer Continental Shelf Lands Act ("OCSLA"), 43 U.S.C. §§ 1331-1356a. Before Interior authorizes leasing at the second stage of the gradual four-stage OCSLA process, "no harm will yet have occurred to the animals or their environment." *Id.* at 481. The D.C. Circuit thus rejected the challengers' claim that the five-

year program would lead to additional seismic surveying, reasoning that the program itself did not authorize this surveying, and the surveying required a separate permit from Interior.  *Id.* at 481 n.1.  Likewise, here, the Executive Order authorizes no regulation or action imposing an obligation on a private party, and any claims challenging it on that basis are not ripe.

In short, the "impact of" the EO cannot 'be said to be felt immediately by" any private party (let alone Plaintiff) "in conducting . . . day-to-day affairs," and so a court challenge to the EO "would not be ripe before" the EO's "application to" private challengers "in some more acute fashion."  *Reno v. Catholic Social Servs., Inc.*, 509 U.S. 43, 58 (1993) (citing *Toilet Goods Ass'n., Inc. v. Gardner*, 387 U.S. 158, 164 (1967)).  The Complaint should therefore be dismissed on that additional ground.

<u>**CONCLUSION**</u>

For the foregoing reasons, the Complaint should be dismissed in full under Rule 12(b)(1).

Dated:  August 3, 2020

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

ERIC WOMACK
Assistant Director

 /s/  ***INDRANEEL SUR***
INDRANEEL SUR
Trial Attorney
(D.C. Bar No. 978017)
Federal Programs Branch,
Civil Division
United States Department of Justice
P.O. Box 883
Washington, D.C. 20044
Telephone:  (202) 616-8448
E-mail:      Indraneel.Sur@usdoj.gov

Counsel for Defendant

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CENTER FOR DEMOCRACY & TECHNOLOGY, | ) ) ) |
| *Plaintiff*, | ) ) ) |
| v. | ) ) No. 1:20-cv-1456 (TNM) |
| DONALD J. TRUMP, | ) ) |
| *Defendant*. | ) ) ) ) |

**[PROPOSED] ORDER**

Upon consideration of the Defendant's Motion to Dismiss under Federal Rule of Civil Procedure 12(b)(1), and of the pleadings, relevant law, related legal memoranda in opposition and in support, and attached affidavits and exhibits, for the reasons set forth in the accompanying Memorandum Opinion, it is hereby

**ORDERED** that the Defendant's Motion to Dismiss is **GRANTED**.

This case is **DISMISSED** under Federal Rule of Civil Procedure 12(b)(1), and is closed. This Order is a final appealable Order.

**SO ORDERED.**

Dated: _____

_____
TREVOR N. MCFADDEN
United States District Judge