# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CENTER FOR DEMOCRACY & TECHNOLOGY,

          Plaintiff,

   v.

DONALD J. TRUMP, in his official capacity as
President of the United States of America,

         Defendant.

Case No. 1:20-cv-1456 (TNM)

---

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF
## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 5

I.     PRESIDENT TRUMP ISSUED THE "EXECUTIVE ORDER ON
       PREVENTING ONLINE CENSORSHIP" TO RETALIATE AGAINST
       TWITTER'S SPEECH COMMENTING ON THE PRESIDENT'S TWEETS
       ABOUT MAIL-IN VOTING ....................................................................................... 5

II.    THE EXECUTIVE ORDER CONTAINS SEVERAL DIRECTIVES THAT ARE
       IN "DIRECT CONFLICT" WITH CDT'S MISSION, REQUIRING CDT TO
       DIVERT RESOURCES AWAY FROM OTHER FUNCTIONS ................................... 7

       A.     CDT's Mission of Promoting and Protecting Free Speech Online ...................... 7

       B.     The Executive Order's Directives .................................................................... 8

       C.     The Executive Order's Impact On CDT ........................................................... 9

ARGUMENT .................................................................................................................... 11

III.   CDT HAS ALLEGED INJURY-IN-FACT SUFFICIENT FOR ARTICLE III
       STANDING ............................................................................................................. 11

       A.     CDT Has Alleged The Two Injury-In-Fact Requirements For
              Organizational Standing ............................................................................... 12

              1.     The Executive Order Injures CDT's Interest In Ensuring Open And
                     Free Discourse On The Internet ............................................................ 13

              2.     CDT Will Use Its Resources To Counteract The Harm Wrought By
                     The Order ............................................................................................ 18

       B.     CDT's Alleged Injury-in-Fact Is Not Speculative ........................................... 20

       C.     CDT Independently Has Third-Party Standing To Assert The First
              Amendment Rights Of Platforms That Host User-Generated Content ................ 22

IV.    REDRESSABILITY IS "EASILY SATISFIED" BECAUSE A DECLARATION
       WOULD REDRESS CDT'S ALLEGED INJURY, AND SUCH RELIEF
       AGAINST THE PRESIDENT IS NOT "CATEGORICALLY UNAVAILABLE." ...... 25

V.     CDT'S CLAIMS ARE RIPE ..................................................................................... 29

CONCLUSION .................................................................................................................. 31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)........................................................................................30

*Abigail All. for Better Access to Developmental Drugs v. Eschenbach*,
   469 F.3d 129 (D.C. Cir. 2006)....................................................................14, 15

*Action All. of Senior Citizens of Greater Phila. v. Heckler*,
   789 F.2d 931 (D.C. Cir. 1986)........................................................................14

*Animal Legal Def. Fund v. Reynolds*,
   297 F. Supp. 3d 901 (S.D. Iowa 2018) ...........................................................26

*Associated Builders & Contractors of Se. Texas v. Rung*,
   No. 1:16-CV-425, 2016 WL 8188655 (E.D. Tex. Oct. 24, 2016) ....................31

*Atl. States Legal Found. v. E.P.A.*,
   325 F.3d 281 (D.C. Cir. 2003)........................................................................30

*Backpage.com, L.L.C., v. Dart*,
   807 F.3d 229 (7th Cir. 2016) ............................................................................7

*Belmont Abbey Coll. v. Sebelius*,
   878 F. Supp. 2d 25 (D.D.C. 2012)...................................................................30

*Borum v. Brentwood Vill., LLC*,
   218 F. Supp. 3d 1 (D.D.C. 2016).....................................................................18

*Camacho v. Brandon*,
   317 F.3d 153 (2d Cir. 2003)............................................................................24

*Capital Area Immigrants' Rights Coalition v. Trump*,
   ---F. Supp. 3d ---, 2020 WL 3542481 (D.D.C. June 30, 2020) ......................13

*CDT v. Pappert*,
   337 F. Supp. 2d 606 (E.D. Pa. 2004) ................................................................7

*Chamber of Commerce of U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996)......................................................................4, 27

*Citizens for Responsibility & Ethics in Washington v. U.S. Office of Special
   Counsel*,
   No. CV 19-3757 (JEB), 2020 WL 4530647 (D.D.C. Aug. 6, 2020) ................25

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Clinton v. City of New York*,
   524 U.S. 417 (1998) ................................................................................25, 26

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*,
   No. 14-CV-953 (GK), 2016 WL 7376847 (D.D.C. Dec. 19, 2016) .......................................17

*Coal. for Econ. Equity v. Wilson*,
   122 F.3d 692 (9th Cir. 1997) ................................................................................26

*Common Cause Indiana v. Lawson*,
   937 F.3d 944 (7th Cir. 2019) ................................................................................20

*Consolidation Coal Co. v. Fed. Mine Safety & Health Review Comm'n*,
   824 F.2d 1071 (D.C. Cir. 1987) ................................................................................31

*Ctr. for Responsible Sci. v. Gottlieb*,
   311 F. Supp. 3d 5 (D.D.C. 2018), and CDT ...............................................................32

*Ctr. for Responsible Sci. v. Hahn*,
   809 F. App'x 10 (D.C. Cir. 2020) ................................................................................17

*Dalton v. Specter*,
   511 U.S. 462 (1994) (Blackmun, J., concurring in part and concurring in the
   judgment) ................................................................................27

*Doe 2 v. Trump*,
   319 F. Supp. 3d 539 (D.D.C. 2018) ................................................................................28

*Double R Ranch Tr. v. Nedd*,
   284 F. Supp. 3d 21 (D.D.C. 2018) ................................................................................20

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*,
   48 F. Supp. 3d 1 (D.D.C. 2014) ................................................................................17

*Envtl. Working Grp. v. United States Food & Drug Admin.*,
   301 F. Supp. 3d 165 (D.D.C. 2018) ................................................................................17, 18

*Erby v. United States*,
   424 F. Supp. 2d 180 (D.D.C. 2006) ................................................................................11

*Exodus Refugee Immigration, Inc. v. Pence*,
   165 F. Supp. 3d 718 (S.D. Ind. 2016), *aff'd*, 838 F.3d 902 (7th Cir. 2016) ...........................23

*Fla. Audubon Soc'y v. Bentsen*,
   94 F.3d 658 (D.C. Cir. 1996) (en banc) ................................................................................25

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Franklin v. Massachusetts,*
    505 U.S. 788 (1992)......................................................................................27, 28, 29

*Havens Realty Corp. v. Coleman,*
    455 U.S. 363 (1982)........................................................................................11, 13, 14

*Hawaii v. Trump,*
    878 F.3d 662 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018)......................27

*Knight First Amend. Inst. at Columbia Univ. v. Trump,*
    302 F. Supp. 3d 541 (S.D.N.Y. 2018), *aff'd,* 928 F.3d 226 (2d Cir. 2019)..................... *passim*

*La Clinica De La Raza v. Trump,*
    No. 19-CV-04980-PJH, 2020 WL 4569462 (N.D. Cal. Aug. 7, 2020) ..................................29

*Law v. City of Berkeley,*
    No. 15-CV-05343-JSC, 2016 WL 4191645 (N.D. Cal. Aug. 9, 2016)...................................12

*Lepelletier v. F.D.I.C.,*
    164 F.3d 37 (D.C. Cir.1999).................................................................................22

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992).....................................................................................11, 12, 20

*Mountain States Legal Foundation v. Bush,*
    306 F.3d 1132 (D.C. Cir. 2002)..............................................................................27

*Nat'l Ass'n of Home Builders v. EPA,*
    667 F.3d 6 (D.C. Cir. 2011) ................................................................................18

*Nat'l Ass'n of Home Builders v. U.S. Army Corp. of Eng'rs,*
    539 F. Supp. 2d 331 (D.D.C. 2008).........................................................................12

*Nat'l Consumers League v. Gen. Mills, Inc.,*
    680 F. Supp. 2d 132 (D.D.C. 2010).........................................................................17

*Nat'l Council of La Raza v. Cegavske,*
    800 F.3d 1032 (9th Cir. 2015) .......................................................................16, 17, 20

*Nat'l Fair Housing All. v. Travelers Indem. Co.,*
    261 F. Supp. 3d 20 (D.D.C. 2017)..........................................................................18

*Nat'l Org. for Marriage, Inc. v. Walsh,*
    714 F.3d 682 (2d Cir. 2013)................................................................................29

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Nat'l Treasury Emps. Union v. Nixon*,
  492 F.2d 587 (D.C. Cir. 1974) .......................................................................................26, 28

*Newdow v. Roberts*,
  603 F.3d 1002,1013 (D.C. Cir. 2010) ...........................................................................28

*Nixon v. Fitzgerald*,
  457 U.S. 731 (1982) ........................................................................................................28

*OET Biorefining, LLC v. Envtl. Prot. Agency*,
  No. 19-1139, 2020 WL 4745274 (D.C. Cir. Aug. 14, 2020) ..................................29

*Oregonians for Floodplain Prot. v. U.S. Dep't of Commerce*,
  334 F. Supp. 3d 66 (D.D.C. 2018) ................................................................................29

*NB ex rel. Peacock v. Dist. of Columbia*,
  682 F.3d 77 (D.C. Cir. 2012) ........................................................................................12

*People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*,
  797 F.3d 1087 (D.C. Cir. 2015) ............................................................................. *passim*

*Powers v. Ohio*,
  499 U.S. 400 (1991) ........................................................................................................22

*Reno v. ACLU*,
  521 U.S. 844 (1997) ..........................................................................................................7

*S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*,
  No. 18-760 (CKK), 2020 WL 3265533 (D.D.C. June 17, 2020).......................23, 24

*Sanchez v. Office of the State Superintendent of Educ.*,
  959 F.3d 1121 (D.C. Cir. 2020) ....................................................................................30

*Scenic Am., Inc. v. U.S. Dep't of Transp.*,
  983 F. Supp. 2d 170 (D.D.C. 2013) ..............................................................................16

*Singleton v. Wulff*,
  428 U.S. 106 (1976) ........................................................................................................22

*Suitum v. Tahoe Reg'l Planning Agency*,
  520 U.S. 725 (1997) ........................................................................................................31

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ................................................................................................13, 25

**TABLE OF AUTHORITIES**
**(Continued)**

**Page(s)**

*Susan B. Anthony List v. Driehaus*,
    573 U.S. 149 (2014)................................................................13, 20, 30

*Swan v. Clinton*,
    100 F.3d 973 (D.C. Cir. 1996) ....................................................26, 28

*Tyndale House Publishers, Inc. v. Sebelius*,
    904 F. Supp. 2d 106 (D.D.C. 2012) ..................................................23

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952)..........................................................................27

**Statutes**

Communications Decency Act Section 230, 47 U.S.C. § 230.............................. *passim*

**Other Authorities**

85 Fed. Reg. at 34,079 ...............................................................................20

85 Fed. Reg. 34,079, 34,081 (June 2, 2020) ..............................................8

85 Fed. Reg. at 34,079, 34,082 ................................................................10

85 Fed. Reg. at 34,080 ...............................................................................20

85 Fed. Reg. at 34,081 ............................................................................9, 21

85 Fed. Reg. at 34,081-82 ......................................................................9, 10

85 Fed. Reg. at 34,082 .........................................................................10, 21

28, 2020, "Executive Order on Preventing Online Censorship" ("Order").....................1

Amazon Washington Post..............................................................................6

First Amendment ...................................................................................... *passim*

EXECUTIVE ORDER CONTAINS SEVERAL DIRECTIVES THAT ARE IN
    "DIRECT CONFLICT"......................................................................7

Executive Order No. 13925 .........................................................................31

Rule 12(b)(1)...........................................................................................2, 12

## INTRODUCTION

President Trump's motion to dismiss is most notable for what it does *not* say: The motion does not argue that Plaintiff has failed to allege facts establishing that the President violated the First Amendment when he issued the May 28, 2020, "Executive Order on Preventing Online Censorship" ("Order").  As the complaint demonstrates, the Order flouts the First Amendment's bar against the use of government power to retaliate against private parties for engaging in speech protected by the First Amendment: the President issued the Order in immediate and direct response to Twitter's commentary on the President's tweets about mail-in voting for the upcoming election. According to the President, online platforms have "points of view," and Twitter's exercise of free speech "clearly reflects political bias"; the purpose of the Order was to punish Twitter for its speech and preclude it from expressing its point of view.

Unable to argue that the complaint fails to state a claim, the President asserts only that Plaintiff Center for Democracy & Technology ("CDT") lacks Article III standing.  But CDT plainly has standing to challenge the Order.  CDT is a federally tax-exempt, nonprofit organization headquartered in Washington, D.C., whose mission is to strengthen individual rights and freedoms by defining, promoting, and influencing technology policy and the architecture of the Internet that impacts people's daily lives.  For more than 25 years, CDT has put democracy and individual rights at the center of the digital revolution, and ensured that the constitutional and democratic values of free expression and privacy are protected in the digital age.  The political expression that the Order targets lies at the core of the speech protected by the First Amendment, and at the core of the online free speech that CDT for 25 years has promoted and protected.

The Order's directives are intended to curtail and chill the free speech of all online platforms and the millions of individuals who rely daily on those platforms for information, and to express themselves, promote their viewpoints, and share in the exchange of ideas, including

1

about the statements made by public officials.  Throughout its history, CDT has fought against efforts that restrict free expression online.  Because the Order strikes at the heart of online platforms' ability to provide forums for speech free of government coercion, the Order is a critical focus of CDT's advocacy efforts and expenditures, requiring a significant reallocation of CDT's resources and diverting its attention from other priorities in order to address the Order's threat to its core mission.

The President does not dispute these facts.  He contends instead that, assuming the complaint's allegations are true, (1) CDT has not suffered an "injury in fact" and lacks standing to assert the injuries of nonparty online platforms; (2) CDT's injury-in-fact would not be redressed by this Court declaring the Order unconstitutional or enjoining its implementation; and (3) CDT's claim is not ripe for review.  Taking CDT's allegations as true—as the Court must in adjudicating a facial attack under Rule 12(b)(1) for lack of subject matter jurisdiction—each of these arguments fails.

*First*, CDT has alleged the "injury-in-fact" required for organizational standing, which here requires CDT to allege that the Order will "injure its interest" and that CDT will "use its resources to counteract that harm."  The Order injures CDT in particular by directly undermining and counteracting its long-standing mission of enhancing freedom of expression, preserving the unique nature of the Internet, and limiting government surveillance.  To protect decades of advocacy and other work furthering that mission, CDT's longstanding commitment to free expression requires it to devote considerable additional resources to combatting the Order's adverse effects on free expression.

To begin with, the Order directs the Secretary of Commerce to file a rulemaking petition with the Federal Communications Commission ("FCC") to fundamentally redefine Section 230 of

the Communications Decency Act, 47 U.S.C. § 230, which shields online intermediaries from liability for content posted on their platforms and for moderating that content; CDT's mission will require it to provide comments and solicit comments from other stakeholders to submit to the FCC in connection with that process.

CDT also must monitor and respond to the other agency activities resulting from the Order: federal legislative proposals regarding Section 230, state legislative proposals regarding online platforms, and reports by federal administrative agencies detailing their advertising and marketing spending on online platforms and the statutory authorities available to restrict an online platform's receipt of advertising dollars.  Finally, CDT will need to monitor and review the actions of the Department of Justice ("DOJ"), which the Order directs to review the viewpoint-based speech restrictions imposed by each online platform identified as receiving federal funding in order to assess "whether any online platforms are problematic vehicles for government speech due to viewpoint discrimination, deception to consumers, or other bad practices."  CDT also must track and participate in any DOJ or Federal Trade Commission ("FTC") action because the Order indicates that the White House will submit the purportedly more than 16,000 complaints of online platforms censoring or otherwise taking action against users based on their political viewpoints to the DOJ, and to the FTC who shall consider taking action under its authority to prohibit unfair or deceptive acts or practices.

All of these activities will, of course, require CDT to divert staff time and money away from other priorities in furtherance of its core mission and to redeploy them in a full-blown campaign against the Order so as to safeguard the principles underlying the First Amendment, Section 230, and the free speech rights of online content platforms and individuals that the Order has placed under attack.  This injury is not speculative, hypothetical, or conjectural, but instead

certainly impending: the Order on its face directly attacks the fundamental principles that stand at

the heart of CDT's mission, and regardless of the ultimate outcome of legislative proposals and

administrative agency action taken pursuant to the Order, CDT will need to undertake efforts to

combat the Order to guard against and prevent outcomes adverse to its mission.

*Second*, as to Article III's redressability requirement, the President asserts that CDT cannot

satisfy redressability because declaratory or injunctive relief is "categorically unavailable" against

a President who has acted unconstitutionally.  That argument is wrong on the merits.  *See Chamber*

*of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts ultra

vires, courts are normally available to reestablish the limits on his authority."); *Knight First*

*Amend. Inst. at Columbia Univ. v. Trump,* 302 F. Supp. 3d 541, 549 (S.D.N.Y. 2018), *aff'd,* 928

F.3d 226 (2d Cir. 2019*)* (rejecting the "categorical assertion that injunctive relief cannot ever be

awarded against the President" and entering a declaratory judgment against the President on the

assumption that it would suffice because "no government official—including the President—is

above the law").

Redressability is easily satisfied here.  CDT's alleged injury—having to engage in and

expend money on the above-described activities to ensure that the Order does not negatively affect

free speech online—will necessarily be redressed if the Order is declared void *ab initio* or enjoined,

which is the relief sought in the complaint.  And the Order's chilling effect on speech will also be

redressed if the Order is declared unconstitutional.

*Third*, contrary to the President's assertion, CDT's ultra vires claim is constitutionally ripe

and prudentially ripe.  Article III standing and constitutional ripeness raise the same issue: injury-

in-fact, which CDT has plausibly alleged.  Further, putting aside that the Supreme Court has called

into question the continuing vitality of the prudential ripeness doctrine, CDT's ultra vires claim is

prudentially ripe because CDT is not challenging any forthcoming administrative action or administrative decision that might be taken in response to the Order, as the President contends. Rather, CDT is challenging whether the Order, when issued, violates the First Amendment as a retaliatory action against Twitter's free speech expressing a political viewpoint, and whether the Order's existing directives, on their face, are designed to curtail and chill the free speech of online platforms and deprive millions of individuals of access to information and open platforms for their speech, in violation of the First Amendment.   The Court can make those constitutional determinations because neither depends on future developments.   CDT's claim is therefore ripe for review.

For these reasons and the additional reasons stated below, the Court should deny the President's motion to dismiss.

## BACKGROUND

I.      **PRESIDENT TRUMP ISSUED THE "EXECUTIVE ORDER ON PREVENTING ONLINE CENSORSHIP" TO RETALIATE AGAINST TWITTER'S SPEECH COMMENTING ON THE PRESIDENT'S TWEETS ABOUT MAIL-IN VOTING.**

Since April 2019, it has been against Twitter's terms of use to use Twitter platform to interfere with elections, including posting or spreading content that is "[m]isleading information about how to vote or register to vote (for example, that you can vote by Tweet, text message, email, or phone call)." (Compl. ¶ 26 & n.10.)

"On May 11, 2020, Twitter announced that it would begin applying labels and warning messages to disputed or misleading tweets about the COVID-19 pandemic, with links to further context and factual information." (Compl. ¶ 25.)  It also stated that it would "introduce new labels to provide context around different types of unverified claims and rumors as needed." (Compl. ¶ 25 & n.9.)

In response to public health concerns raised by COVID-19, several states took steps to

"modify their voting protocols, including expanded mail-in voting options," in anticipation of the November 2020 election.  (Compl. ¶ 29 & n.13.)  On May 26, 2020, the President tweeted: "There is NO WAY (ZERO!) that Mail-In Ballots will be anything less than substantially fraudulent.  Mail boxes will be robbed, ballots will be forged & even illegally printed out & fraudulently signed." (Compl. ¶ 32 n.16.)  He later tweeted: "The Governor of California is sending Ballots to millions of people, anyone . . . living in the state, no matter who they are or how they got there, will get one.  That will be followed up with professionals telling all of these people, many of whom have never even thought of voting before, how, and for whom, to vote.  This will be a Rigged Election. No way!"  (Compl. ¶ 33 & n.17.)

Later on May 26, 2020, Twitter appended the President's tweet about California's mail-in ballots, stating that viewers could "Get the facts" about California's mail-in ballot plans and providing a link to that information that readers could access if they wanted to.  (Compl. ¶¶ 10, 34 & n.18.)  Twitter did not remove the President's tweet, but rather provided viewers with an opportunity to become more informed about the mail-in process, *if they chose to do so*.  (Compl. ¶ 35.)  In response, on the same day, the President tweeted: "@Twitter is now interfering in the 2020 Presidential Election. They are saying my statement on Mail-In Ballots, which will lead to massive corruption and fraud, is incorrect, based on fact-checking by Fake News CNN and the Amazon Washington Post . . . ."  (Compl. ¶ 36 & n.19.)  "Twitter is completely stifling FREE SPEECH, and I, as President, will not allow it to happen!"  (Compl. ¶ 36 & n.20.)

Beginning the next day, the President released a flurry of tweets stating that "We will strongly regulate, or close [media platforms] down[]" (Compl. ¶ 38 n.22), and alleging that "Big Tech is doing everything in their very considerable power to CENSOR in advance of the 2020 Election."  (Compl. ¶ 39 & n.24.)  Within two days, President Trump acted on those threats.  On

May 28, 2020, he signed and issued an "Executive Order on Preventing Online Censorship." (Compl. ¶ 79.)

## II.   THE EXECUTIVE ORDER CONTAINS SEVERAL DIRECTIVES THAT ARE IN "DIRECT CONFLICT" WITH CDT'S MISSION, REQUIRING CDT TO DIVERT RESOURCES AWAY FROM OTHER FUNCTIONS.

### A.   CDT's Mission of Promoting and Protecting Free Speech Online

CDT's mission is to ensure that the human rights people enjoy, such as freedom of speech, are realized online and that technology serves to empower people worldwide.  (Compl. ¶¶ 16, 68.) Central to this mission is CDT's work to further "the public interest in the creation of an open, innovative, and decentralized Internet that promotes the constitutional and democratic values of free expression, privacy, and individual liberty."  (Compl. ¶ 68.)  CDT does so in part by "advocating in favor of First Amendment protection for speech on the Internet."  (Compl. ¶ 69.)

Pursuant to its critical function of defending the First Amendment, CDT participates in lawsuits addressing First Amendment rights and the Internet;[1] engages in law and policy advocacy regarding intermediary liability, free speech, and content moderation; and expends resources advocating in favor of individuals' online free expression and the legal frameworks that support them, including evaluating proposals to amend the proposed laws on free speech online and "challenging legislation that burdens individuals' fundamental rights, holding public events, and

---

[1] *See, e.g.*, *CDT v. Pappert*, 337 F. Supp. 2d 606, 646, 649-63 (E.D. Pa. 2004) (striking down as unconstitutional a statute that imposed criminal liability on Internet service providers who failed to comply with requests issued by the Pennsylvania Attorney General to block access to websites containing child pornography); *Reno v. ACLU*, 521 U.S. 844 (1997) (striking down portions of the Communications Decency Act prohibiting transmission of obscene or indecent communications to persons under Age 18 as a content-based blanket restrictions on speech and facially overbroad in violation of the First Amendment).  CDT has also filed amicus curiae briefs in First Amendment challenges, including *Backpage.com, L.L.C., v. Dart*, 807 F.3d 229 (7th Cir. 2016) (holding campaign by sheriff's office to pressure pressuring financial intermediaries to cease payment processing for online classified advertising website to be an unconstitutional prior restraint).

communicating with policy makers in the Executive and Legislative Branches."  (Compl. ¶¶ 69-71.)

**B.     The Executive Order's Directives**

The Executive Order contains several directives, some of which have been implemented since CDT filed suit, that are in direct conflict with CDT's mission.

*First*, the Order directs the "Secretary of Commerce in consultation with the Attorney General, and acting through the National Telecommunications and Information Administration (NTIA)" to file with the FCC a rulemaking petition urging the FCC to issue a rule that would restrict significantly Section 230's liability protection by imposing new limitations on that protection.  (Compl. ¶ 47; *see also* Preventing Online Censorship, 85 Fed. Reg. 34,079, 34,081 (June 2, 2020).)  Internet intermediaries—Twitter and other companies that provide platforms for third parties' speech— facilitate access to content primarily created by others, and face substantial pressure to control or police user content and activity that are either unlawful or otherwise objectionable.  Recognizing that those pressures, if unchecked, would restrict the free flow of information, Congress enacted Section 230 in 1996 to shield intermediaries from liability for third-party content and to enable "interactive service providers, such as social media companies, to moderate the content they host without fear of liability."  (Compl. ¶ 21.)  "Section 230 expressly exempts an interactive computer service from publisher liability for the exercise of its editorial and self-regulatory functions."  (*Id.*)  By shielding online platforms from the threat of litigation, Section 230 enables them to combat misinformation and disinformation and to remove or flag content that violates their policies—just as Twitter did when it commented on the President's tweets regarding mail-in voting.  (Compl. ¶ 22.)  Since CDT filed suit, the Secretary of Commerce—consistent with the 60-day deadline under the Order—has submitted a rulemaking petition to the FCC, and the FCC has opened a docket for public comment.

*Second*, the Order encourages officials in the Executive Branch to allocate taxpayer funds to online platforms based on those officials' subjective assessment of the free speech practices of those platforms.  (*See* 85 Fed. Reg. at 34,081.)  The Order directs "each executive department and agency" to review its "spending on advertising and marketing paid to online platforms," the statutory authority to "restrict [those online platforms'] receipt of advertising dollars," and to provide this information in a report to the Office of Management and Budget.  (*Id.*)

*Third*, the Order provides that the White House "will submit" reports of alleged "online censorship" received through its "Tech Bias Reporting Tool" to the Department of Justice and FTC so that those agencies can "consider taking action" under applicable law.  (85 Fed. Reg. at 34,081-82)

*Fourth*, the Order directs the Attorney General to establish a working group "regarding the potential enforcement of State statutes that prohibit online platforms from engaging in unfair or deceptive acts or practices" and "develop model legislation" if need to address online platforms' actions of moderating and posting content on their own platforms as "unfair and deceptive acts and practices."  (85 Fed. Reg. at 34,082.)  It also orders the Attorney General to "develop a proposal for Federal legislation."  (*Id.*)

### C.    The Executive Order's Impact On CDT

The Order's efforts to dramatically limit and chill free speech online inflict a particularized injury on CDT.  The Order will require CDT to devote substantially more resources than it otherwise would devote to its mission of protecting free speech online.  It will also consume CDT's resources and dominate the attention of CDT's staff by causing it to divert resources from other initiatives, because of the important to CDT's overall mission of effectively combating the Order and the agency actions that it directs.

Specifically, the Order explicitly calls into question the essential liability protection that

makes it possible for intermediaries to host third-party content, requiring CDT to participate in the on-going FCC notice and comment proceeding responding to the petition filed by the Secretary of Commerce pursuant to the Order.  (*See* Compl. ¶¶ 68-73.)

The Order threatens to impose punitive measures on content hosts that upset or otherwise challenge the President's and government's actions or statements—"including withdrawal of federal advertising funds, prosecution by state attorneys general, and adverse action by the FTC." (*Id.* ¶ 51; *see also* 85 Fed. Reg. at 34,081-82.)  CDT therefore must monitor and track the federal agency reporting that the Order requires and participate in proceedings instituted by the FTC or DOJ.  (Compl. ¶ 73.)

CDT will have to engage with federal and state policymakers with respect to the "model legislation" that the Order requires the Attorney General's "working group" to develop.  (*Id.*; 85 Fed. Reg. at 34,082.)  Responding to fifty potential state legislative proposals will result in a particular diversion of and drain on CDT's resources, because while CDT sometimes engages at the state level, it focuses predominately on responding to federal legislative proposals rather than a multitude of state proposals.  Because of the current broad preemption of state law in Section 230, CDT does not typically need to expend resources at the state-level in furtherance of its free speech mission.  However, where there are particularly salient threats and destructive emerging trends among the state legislatures, CDT will respond accordingly.  An Attorney General-endorsed model bill would constitute a salient threat and destructive emerging trend sufficient to require CDT to engage more at the state-level and subsequently would require CDT to expend resources it would not have—but for the Order.

CDT will also need to mount public informational and educational campaigns about the Order and the actions it mandates, in an attempt to sway public opinion against the Order's

expressed "policy objectives."  (85 Fed. Reg. at 34,079, 34,082; Compl. ¶¶ 69, 73.)  In particular, the educational campaign will educate the public regarding the Order's threat to the free speech of all Americans by requiring online platforms to moderate posted content according to the government's preferences; how the directives may cause online platforms to refrain from moderating in accordance with their policies, including addressing hateful speech or inaccurate information; how the directives may  increase the chance that social media services will decide not to address hateful speech, combat disinformation, or correct inaccurate information about voting, which in turn will have a chilling effect on the willingness of individuals and groups to engage and contribute their speech to the dialogue occurring on online platforms.  (Compl. ¶¶ 51-52.)

## ARGUMENT

### III.    CDT HAS ALLEGED INJURY-IN-FACT SUFFICIENT FOR ARTICLE III STANDING.

"[O]rganizations are entitled to sue on their own behalf for injuries they have sustained." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982).   CDT can establish organizational standing precisely the same way an individual plaintiff can satisfy Article III:  by alleging (1) an "'injury-in-fact'—harm that is (a) concrete and particularized and (b) 'actual or imminent, not 'conjectural' or 'hypothetical'"; (2) a "causal connection between the injury and the conduct complained of" that is "fairly . . . trace[able] to the challenged action of the defendant," here the Order; and (3) that the injury will "likely" be "redressed by a favorable [court] decision" granting CDT its requested declaration or injunction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (internal citations omitted); *accord People for the Ethical Treatment of Animals v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015) (*PETA*).

Because the President asserts only a facial challenge to CDT's standing allegations, "the court must accept as true the allegations in the complaint and consider the factual allegations of

the complaint in the light most favorable" to CDT. *Erby v. United States*, 424 F. Supp. 2d 180, 182 (D.D.C. 2006).[2]  Moreover, because the case is "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss", the court "presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted).

In sum, the Court must determine, taking as true CDT's allegations along with all of the inferences that may be drawn from those allegations, whether CDT has alleged "general factual allegations" sufficient to satisfy the low threshold necessary to open the courthouse doors. *NB ex rel. Peacock v. Dist. of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) ("[T]he burden imposed on plaintiffs [at the pleading stage] to establish standing is not onerous and general factual allegations of injury resulting from the defendant's conduct may suffice.")) (internal quotation marks omitted); *see also Nat'l Ass'n of Home Builders v. U.S. Army Corp. of Eng'rs*, 539 F. Supp. 2d 331, 338 (D.D.C. 2008).

### A.   CDT Has Alleged The Two Injury-In-Fact Requirements For Organizational Standing.

Although the President contends that the Court should engage in an "especially rigorous" standing inquiry here because CDT's ultra vires claim is predicated on a constitutional challenge

---

[2]    The President, in a footnote, provides a website link to a document and mentions that under Rule 12(b)(1) a court "may consider documents outside the pleadings to assure itself that it has jurisdiction," but his motion focuses on the adequacy of CDT's allegations, does not otherwise cite any evidence, and nowhere states that he is bringing a factual attack to CDT's standing.  His standing challenge is therefore a facial attack, and he may not attempt to convert his motion into a factual attack by introducing evidence for the first time in reply.  *Law v. City of Berkeley*, No. 15-CV-05343-JSC, 2016 WL 4191645, at *4 n.2 (N.D. Cal. Aug. 9, 2016) ("Defendants' opening brief focused on the adequacy of Plaintiffs' factual allegations and was thus a facial attack; Defendants thus cannot now convert their attack into a factual attack and ask the Court to review new evidence and arguments not presented in their moving papers.").

to the Order (Mot. at 11), there is no heightened standing requirement for constitutional claims. *See, e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157-59 (2014) (applying general Article III standard).

The President also asserts (Mot. at 11-12) that, because CDT was not the entity targeted by the President's order, it is "substantially more difficult" for CDT to establish standing, citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 493-94 (2009). But the Supreme Court in *Earth Island* was referring to organizational standing based on injury to the organization's members, which CDT does not assert here. And the Court stated that the plaintiffs in *Earth Island* could establish standing "only if" the challenged government action "will affect *them*" by inflicting or threatening an injury in fact. *Id.* at 494. That is precisely what CDT has done here.

For an organization to satisfy the injury-in-fact requirement, it must allege a "concrete and demonstrable injury to [its] activities." *Havens Realty Corp.*, 455 U.S. at 379. The D.C. Circuit has established a two-part test for satisfying this requirement: First, the organization must allege that the challenged action—here the issuance and implementation of the Executive Order—will "injure[] [its] interest." *PETA*, 797 F.3d at 1094 (internal citation omitted). Second, the organization must allege that it will "use[] its resources to counteract that harm." *Id.* CDT satisfies that standard here because the Order itself, as well as the initiation of agency actions that the Order directs, inflict a particularized injury to CDT's mission that CDT must expend significant resources to combat—in order to preserve the progress it has achieved in promoting free speech online over the past 25 years.

> **1.     The Executive Order Injures CDT's Interest In Ensuring Open And Free Discourse On The Internet.**

To allege an injury to its interest, an organization must allege that the defendant's conduct "'perceptibly impaired' the organization's ability to provide services." *Capital Area Immigrants'*

*Rights Coalition v. Trump*, ---F. Supp. 3d ---, 2020 WL 3542481, a*7 (D.D.C. June 30, 2020); *see also Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982) ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired [the organization's] ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact.").  An organization's ability to provide services has been perceptibly impaired when the defendant's conduct causes an "inhibition of [the organization's] daily operations." *PETA*, 797 F.3d at 1094 (quoting *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986)).  A necessary aspect of this requirement is a "direct conflict between the defendant's conduct and the organization's mission." *Abigail All. for Better Access to Developmental Drugs v. Eschenbach,* 469 F.3d 129, 133 (D.C. Cir. 2006).

The President asserts that there is no "direct conflict" between the Order and CDT's mission.  (Mot. at 14.)  Specifically, the President contends that the Order does not infringe on "any individual rights or freedoms" with respect to the First Amendment because it "does not impose any obligations on any private entities" and thus "no provision of the [Order] restricts the speech of any private party."  (*Id.*)   But that assertion is inconsistent with the complaint's allegations—which the Court at this stage must accept as true.  CDT alleges that the Order was issued by a government official to retaliate against Twitter's constitutionally protected speech; that the issuance of the Order was intended to, and does, threaten to chill other platforms from exercising their free speech rights; and that the Order's directives threaten to chill the constitutionally protected speech of *all* online platforms and individuals both as a result of the mere initiation of the administrative activity directed by the Order and because of the ultimate administrative decisions that the directive seeks.  (Compl. ¶¶  1, 46, 81.)  The retaliatory nature of

the Order and its harmful effects on free speech online is precisely the type of threat to freedom of expression online that CDT has long combatted.

The President next contends that CDT has not alleged a "perceptible impairment" to its advocacy services because mere increased expense to "an organization's government lobbying and issue advocacy programs" may not "be used to manufacture standing." (Mot. at 16 (quoting *Envtl. Working Grp.*, 301 F. Supp. 3d at 172)).  This is *not* a case where CDT is attempting to invoke expenses resulting from entering into a new area of advocacy to "manufacture" or "fabricate" injury for purposes of standing.  Advocating for free speech online before legislatures and administrative agencies and combating government efforts antithetical to free speech online has been a critical part of CDT's mission and activities for more than 25 years.  It is not an issue that CDT is addressing for the first time, or sua sponte, in an attempt to "manufacture" standing for the sole purpose of mounting a challenge to the Order.  Rather, CDT's efforts will be reactionary to the President's Order.  *See PETA*, 797 F.3d at 1094, 1096-97 (finding organizational standing where the organization's expenditures were not "self-inflicted" for the purpose of establishing standing, but rather undertaken consistent with its mission and in "response to, and to counteract, the effects of the defendants' . . . unlawful acts").

To deny standing to CDT here would mean that issue-advocacy organizations could never allege injury-in-fact sufficient to bring suit.  But that is not what the governing precedents hold, nor what the Constitution's "case or controversy" requirement underlying the Article III standing requirement contemplates.  *See, e.g.*, *PETA*, 797 F.3d at 1095 (finding that denial of access to bird-related information and a means to seek redress for bird abuse "are concrete and specific to the work in which [PETA is] engaged.") (internal citation omitted); *Abigail All. for Better Access to Developmental Drugs*, 469 F.3d at 132-33 (a public interest group dedicated to ensuring access to

potentially life-saving drugs had standing to challenge the FDA's policies barring the sale of investigational drugs to the group's terminally ill members where the group alleged that the FDA "frustrated Abigail Alliance's efforts to assist its members and the public in accessing potentially life-saving drugs and its other activities, including counseling, referral, advocacy, and education services."); *Scenic Am., Inc. v. U.S. Dep't of Transp.*, 983 F. Supp. 2d 170, 176 (D.D.C. 2013) (standing adequately alleged injury when it "had to divert funds from its other scenic-conservation programs"); *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1036-37 (9th Cir. 2015) (allegations that a voting rights organization had to "expend additional resources in performing its voter registration mission '[d]ue to defendants' ongoing violations of the [National Voter Registration Act]'" are sufficient to allege injury where the organization alleges it would have expended resources on "any other activity that advances [the organization's] goals.").)

Indeed in *Scenic America, Inc.*, the organization alleged that it would have to undertake several activities in response to the challenged government action paving the way for the construction of digital billboards, including representing individuals and groups before local zoning boards to contest the construction of specific billboards, providing "legal, policy, safety and procedural information" in response to requests from members and other interested parties, creating and managing websites and email-alert systems, lobbying for local moratoriums on new billboard construction, educating local officials about regulations, and coordinating a letter-writing and petition campaign.  *Scenic America, Inc.* 983 F. Supp. 2d at 178.  The court held that only "some of the above-listed activities can be categorized as 'pure issue-advocacy' that would not suffice to confer organizational standing."  *Id.*  The same is true here.  CDT will have to inform the public about any actions taken by the FCC, FTC, or DOJ; CDT will have to engage with local and federal officials to develop proposed legislation; and CDT will have to appear before the FCC

in the form of "participating in the planned rulemaking proceeding." (Compl. ¶73.)   This is not

"pure issue-advocacy" unadulterated by any action of the defendant, because CDT is engaging in

reactionary measures to the Order as opposed to affirmatively undertaking its normal advocacy

efforts.

Moreover, CDT has more than satisfied the requirement of a concrete and particularized

injury by alleging that the Order strikes directly at the heart of CDT's mission of promoting free

speech online and presents an existential threat to its decades of issue-advocacy work—which is

why CDT brought suit within days of the Order's issuance.   The Order will more than inhibit

CDT's normal, daily operations.   Absent its requested relief, CDT will have to call "all hands to

deck," augment and redeploy resources, and wage a full-blown attack to the Order's multitude of

directives.   Business will not be "as usual."   *See Nat'l Council of La Raza*, 800 F.3d at 1040-41

(finding organizational standing where plaintiffs were not "simply going about their 'business as

usual,' unaffected by [defendant's] conduct").

The President contends that CDT's injury is not "particularized" and that "'winning or

losing this suit' will not meaningfully change" CDT's operations (Mot. at 17)—but, as just

explained, that is simply not true and is squarely contradicted by the complaint's allegations.[3]   CDT

has not suffered a generalized harm for which lobbyists on either side of the content moderation

issue could take the President to court; rather, it stands apart from other organizations out there

---

[3] For this reason, the President errs in relying (Mot. at 16-17) on *Envtl. Working Grp. v. United States Food & Drug Admin.*, 301 F. Supp. 3d 165 (D.D.C. 2018), *Ctr. for Responsible Sci. v. Hahn*, 809 F. App'x 10 (D.C. Cir. 2020), *Elec. Privacy Info. Ctr. v. U.S. Dep't of Educ.*, 48 F. Supp. 3d 1 (D.D.C. 2014), *Cmty. Fin. Servs. Ass'n of Am., Ltd. v. Fed. Deposit Ins. Corp.*, No. 14-CV-953 (GK), 2016 WL 7376847, at *1 (D.D.C. Dec. 19, 2016), and *Nat'l Consumers League v. Gen. Mills, Inc.*, 680 F. Supp. 2d 132 (D.D.C. 2010)—and of which involve situations in which the challenged government action did not intrude on the organization's longstanding mission and activities.

who may care about the issue because it faces a particularized injury given its mission focusing specifically on free speech online and its work furthering that mission during the past 25 years. CDT has standing to bring suit to prevent that harm from occurring.

### 2. CDT Will Use Its Resources To Counteract The Harm Wrought By The Order.

A plaintiff satisfies the second organizational injury requirement—showing that the organization will "use[] its resources to counteract [the] harm" caused by a defendant's conduct—when it alleges "operational costs" to address the defendant's action "beyond those normally expended to carry out its mission." *Envtl. Working Grp. v. United States Food & Drug Admin.*, 301 F. Supp. 3d 165 (D.D.C. 2018); *Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011) (internal citation omitted). And the reallocation of resources as a result of the defendant's action satisfies this requirement. *PETA*, 797 F.3d at 1097.

Indeed, courts in this District have repeatedly upheld organization's standing on that basis. *See Borum v. Brentwood Vill., LLC*, 218 F. Supp. 3d 1, 20 (D.D.C. 2016) (acknowledging that an organization's own budgetary choices does not "automatically mean that [a party diverting resources] cannot suffer an injury[,]" and holding that if defendants' "alleged actions frustrated [the organization's] mission and [the organization] used resources to counteract that harm, it has standing to maintain the action."); *Nat'l Fair Housing All. v. Travelers Indem. Co.*, 261 F. Supp. 3d 20, 26-27 (D.D.C. 2017) (rejecting defendant's argument that organizational plaintiff had no standing because its expenditures, including creating new educational material, purchasing newspapers advertisements and paying for an email blast to the newspapers' readers, and diverting resources to provide trading for staff and developing tracking and intake procedures, were "voluntary and self-inflicted," because the organization's expenditures were to counteract defendant's harm).

CDT has alleged the necessary reallocation of resources.  The complaint states that CDT will need to "devote substantial resources" to participating in the planned FCC rulemaking; monitoring federal agencies' reports regarding online advertising expenditures to identify any retaliation against protected speech; tracking any action by the Department of Justice pursuant to the Order; tracing any FTC action regarding online speech, and participating in any proceedings that the FTC institutes; engaging with policymakers with respect to the development of proposed legislation; and educating the public about these activities and "the potential consequences for protection of free speech online."  (Compl. ¶73.)  These activities—required as a result of the retaliatory Order—"will be time-consuming and resource-intensive, and will require CDT to reallocate resources that it planned to use for other activities furthering its mission."  (*Id.*).

The President argues (Mot. 15-17) that amounts spent on advocacy cannot provide the requisite harm. But that misunderstands Plaintiff's argument.  The complaint alleges that CDT will be forced to divert resources from other areas to engage in advocacy with respect to the Order and the agency activities it initiated.  The injury suffered by CDT is the inability to devote those resources to the purposes originally designated, which include public education, holding public events, and communicating with policy makers regarding proposed legislation.  (Compl. ¶¶ 71, 73.)

The President's also argues that CDT did not describe the precise resources it will have to reallocate and the "other activities" it would have otherwise funded.  (*See* Mot. at 15 ("Plaintiff does not describe the resources it will voluntarily 'divert' and does not describe the 'other activities' that it would otherwise have funded." (citations omitted).)  But the governing principles do not require that level of detail at the pleading stage—particularly when CDT has alleged a future injury.  "[A] diversion-of-resources injury is sufficient to establish organizational standing at the

pleading stage, even when it is 'broadly alleged.'" *Nat'l Council of La Raza*, 800 F.3d at 1040

(quoting *Havens*, 455 U.S. at 379); *see also Common Cause Indiana v. Lawson*, 937 F.3d 944, 952

(7th Cir. 2019) ("[O]rganizations demonstrated the necessary injury in fact in the form of the

unwanted demands on their resources.").

### B.    CDT's Alleged Injury-in-Fact Is Not Speculative

CDT's alleged injury-in-fact is not "speculative"  (*see* Mot. at 18-21).  A plaintiff may

bring suit based on the "substantial probability" of an "imminent" injury—it need not wait for the

injury to occur.  *Double R Ranch Tr. v. Nedd,* 284 F. Supp. 3d 21, 31 (D.D.C. 2018); *Susan B.*

*Anthony List*, 573 U.S. at 158; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992).  And CDT has

more than satisfied that standard here.

CDT's complaint explains in detail the ways in which the Order will cause CDT to devote

substantial resources to defending the application of First Amendment principles to online

speech—resources that the organization had planned to use for other activities furthering its

mission.  And it explains how and why the organization will have to reallocate its limited resources

to address the Order's various threats to online free speech.  (Compl. ¶¶ 72-73.)

This injury was "certainly impending" at the time CDT filed suit, because the Order on its

face places in motion immediate agency action, as well as rulemaking and legislative processes—

involving potential outcomes that are squarely contrary to the free speech principles that CDT has

long advocated.[4]  The Order also sets 30- and 60-day deadlines for the implementation of certain

---

[4] *See, e.g.*, 85 Fed. Reg. at 34,079 ("When large, powerful social media companies censor opinions
with which they disagree, they exercise a dangerous power.  They cease functioning as passive
bulletin boards, and ought to be viewed and treated as content creators[]" and thus eliminate their
liability under Section 230); 85 Fed. Reg. at 34,080 ("It is the policy of the United States that the
scope of that immunity should be clarified: the immunity should not extend beyond its text and
purpose to provide protection for those who purport to provide users a forum for free and open
speech . . . ."); *id.* ("It is the policy of the United States that such a provider should properly lose
the limited liability shield of subparagraph (c)(2)(A) and be exposed to liability like any traditional

directives; mandates, rather than recommends, agency action; and expressly requires that action be taken "expeditiously."[5]  Thus, far from "impermissible conjecture" (Mot. at 18), CDT's injury was "certainly impending" when it filed suit and it is occurring now.  Indeed, CDT has diverted resources to track the advertising policy reports through FOIA requests and preparing its NTIA response to the NTIA rulemaking petition.

The President nevertheless argues that CDT's injuries are speculative because CDT cannot allege at this time that the FCC or FTC will act in a manner harmful to CDT's mission.  (*See* Mot. at 18-19.)  This misses the point.  *Regardless* of how the FTC or FCC ultimately decide to exercise their discretion in response to the Order's directives, CDT is injured by the ongoing expenditure of resources to combat the Order's overall attempt to chill intermediaries' willingness to provide, and to host on behalf of third parties, accurate information about voting and other efforts to combat

---

editor and publisher that is not an online provider."); 85 Fed. Reg. at 34,081 ("To advance the policy . . .  all executive departments and agencies should ensure that their application of section 230(c) properly reflects the narrow purpose of the section and take all appropriate actions in this regard."); *see also* supra Background, Part II.

[5] *See* 85 Fed. Reg. at 34,081 ("The head of each executive department and agency . . . *shall* review its agency's Federal spending on advertising and marketing paid to online platforms[]" and "[w]ithin 30 days" "the head of each agency *shall* report its findings to the Director of the Office of Management and Budget." (emphasis added)); *id.* ("[W]ithin 60 days of the date of this order, the Secretary of Commerce . . . *shall* file a petition for rulemaking with the Federal Communications Commission (FCC) requesting that the FCC *expeditiously* propose regulations . . . ." (emphasis added)); *id.* ("The Department of Justice *shall* review the viewpoint-based speech restrictions imposed by each online platform . . . and assess whether any online platforms are problematic vehicles for government speech . . . ." (emphasis added); 85 Fed. Reg. at 34,082 ("The Attorney General *shall* establish a working group regarding the potential enforcement of State statutes that prohibit online platforms from engaging in unfair or deceptive acts or practices.  . . . .  The working group *shall* also develop model legislation . . . for consideration by legislatures in States . . . .") (emphasis added); *id.* ("The Attorney General *shall* develop a proposal for Federal legislation that would be useful to promote the policy objectives of this order." (emphasis added)).

disinformation.  It will also need to expend resources in an attempt to ensure that the outcomes the

FCC or FTC reaches are not harmful to its mission and unravel decades of its advocacy work.

### C.  CDT Independently Has Third-Party Standing To Assert The First Amendment Rights Of Platforms That Host User-Generated Content.

For the reasons set forth above, CDT has established organizational standing, and the

President's motion should be denied on that basis alone.  But there is an alternative basis for Article

III standing here: CDT is asserting the rights of third parties—specifically, the hosts of user-

generated content, social media companies, and other online actors whose speech will be restricted

or chilled by the Order.

A litigant can establish third-party standing by showing that it has suffered an injury-in-

fact, has a close relationship with the third party, and that "some hindrance" prevents the third

party from asserting its own rights.  *Powers v. Ohio*, 499 U.S. 400, 411 (1991); *Singleton v. Wulff*,

428 U.S. 106, 114-16 (1976).  CDT has alleged all three elements here.

*First*, CDT has plausibly alleged that it has suffered an injury-in-fact, for the reasons

explained above.  *See supra* Argument Part I.A. & B.

*Second*, the complaint's allegations establish a "close relationship" between CDT and

third-party hosts of user-generated content, such as Twitter and Facebook.  A "close relationship"

requirement is satisfied by alleging an "identity of interests between the parties such that the

plaintiff will act as an effective advocate of the third party's interests."  *Lepelletier v. F.D.I.C.*,

164 F.3d 37, 44 (D.C. Cir.1999) ("The Supreme Court "has only required a 'close relation' in the

sense that there must be an identity of interests between the parties such that the plaintiff will act

as an effective advocate of the third party's interests.").

Courts have found that this requirement is satisfied when two entities share a common

mission, or the mission of one entity is designed to advance the interests of the other entity.

*Tyndale House Publishers, Inc. v. Sebelius*, 904 F. Supp. 2d 106, 118 (D.D.C. 2012) (finding, in part, that the "religious missions" of two entities "are largely overlapping and mutually reinforcing."); *S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*, No. 18-760 (CKK), 2020 WL 3265533, at *13 (D.D.C. June 17, 2020) ("The mission of their organization and initiative is to provide representation to these clients.  This relationship is therefore sufficient to satisfy this requirement."); *Exodus Refugee Immigration, Inc. v. Pence*, 165 F. Supp. 3d 718, 732 (S.D. Ind. 2016), *aff'd,* 838 F.3d 902 (7th Cir. 2016) (finding that organization "certainly ha[d] a close relationship with its Syrian refugee clients" because "[i]ts entire purpose and mission [was] to resettle refugees escaping dire circumstances").

The President contends that CDT does not allege facts "describing a 'close' relationship" between CDT and "Twitter or any other online platform."  (Mot. at 24.)  To the contrary, as CDT's very name makes clear, the organization's mission is to "strengthen individual rights and freedoms by defining, promoting, and influencing *technology* policy and the architecture of the Internet that impacts people's daily lives." (Compl. ¶ 16) (emphasis added).  CDT has long advocated for an open Internet that enables a broad diversity of online services and approaches to content moderation as the best guarantor of people's ability to access information and find places to speak. It has also fought for the rights of content hosts in the United States and around the world precisely because it sees the risk to free expression of government coercion of content moderation and homogenization of content policies. (Compl. ¶¶ 45, 68-70.)  Accordingly, when the First Amendment rights of hosts of user-generated content come under attack, whether because of the content they post or the content they moderate, CDT shares an identity of interest with, and therefore will be an effective advocate, for the free speech rights of those hosts.

*Third*, the complaint adequately alleges that the Order has hindered these companies from asserting their rights.  The "hindrance" requirement "presents a relatively low threshold."  *S. Poverty Law Ctr.*, 2020 WL 3265533, at *14.  It does not require CDT to allege "an absolute bar" or an "insurmountable hurdle[]" to online platforms bringing suit, but rather "some hindrance to the [online platform's] ability to protect its own interests."  *Id.*  Courts have held that "fear of future retribution" is sufficient to indicate that the third-party may be "hindered in vindicating [their] own alleged rights."  *Camacho v. Brandon*, 317 F.3d 153, 160 (2d Cir. 2003) (noting "the possibility that instituting litigation on [one's] own behalf may only incur further retribution").

The President contends that CDT alleged "no facts" indicating that Twitter and others would be "hindered."  (Mot. at 24.)  Not so.  CDT detailed the President's history of retaliatory action, which often causes companies to reverse course on policy and conduct.  (Compl. ¶ 64; *see also* Compl ¶¶ 31-34, 36, 38-40, 42-44, 46, 53-55, 59-63.)  For example, Carrier reversed its plans to move some jobs abroad after the President threatened consequences for companies that relocated jobs offshore.  (Compl. ¶ 61.)  In addition, General Motors announced that "it would invest at least $1 billion in US factories, and committed to creating or retaining 7,000 jobs in the coming years[]" after the President tweeted that "General Motors is sending Mexican made model of Chevy Cruze to U.S. car dealers-tax free across border.  Make in U.S.A. or pay big border tax!"  (Compl. ¶ 61.)  Company stock prices drop—and sometimes significantly—when the President lashes out at them.  (Compl. ¶ 62.)

And in the tweets preceding the Order, the President called out by name Twitter's head of Site Integrity, a tactic that could dissuade a company from opposing the government so as to prevent retaliation against its staff.  (*See* Compl. ¶¶ 40, 53.)  Accordingly, given President Trump's alleged history of retaliating against companies that he disagrees with, it is plausible that online

platforms' "fear of future retribution" hinders their ability to vindicate their own rights by bringing

suit.  (*See* Compl. ¶ 64.)

## IV.    REDRESSABILITY IS "EASILY SATISFIED" BECAUSE A DECLARATION WOULD REDRESS CDT'S ALLEGED INJURY, AND SUCH RELIEF AGAINST THE PRESIDENT IS NOT "CATEGORICALLY UNAVAILABLE."

Redressability is satisfied here because CDT's alleged injury—engaging in and expending

resources to ensure that the Order does not negatively affect free speech online—will necessarily

be redressed if the Order is declared unconstitutional.  The President's claim that declaratory relief

against the President is "categorically unavailable" does not defeat CDT's standing.

"Redressability examines whether the relief sought, assuming that the court chooses to

grant it, will likely alleviate the particularized injury alleged by the plaintiff."  *Fla. Audubon Soc'y*

*v. Bentsen*, 94 F.3d 658, 663–64 (D.C. Cir. 1996) (en banc); *see also Summers v. Earth Island*

*Inst.*, 555 U.S. 488, 493 (2009) ("[I]t must be likely that a favorable judicial decision will prevent

or redress the injury").[6]  "The key word is 'likely.'"  *Id.*  CDT's alleged injury is not merely "likely"

to be alleviated by its requested declaratory and injunctive relief, it most certainly will be.

Redressability is easily satisfied where a plaintiff seeks to declare unlawful and enjoin

defendant's acts—including that of the President—that are the direct cause of plaintiff's alleged

injury.  For example, in *Clinton v. City of New York*, 524 U.S. 417 (1998), the plaintiffs claimed

injury from President Clinton "exercis[ing] his authority" pursuant to the Line Item Veto Act to

cancel three provisions in acts passed by Congress; they challenged the Line Item Veto Act as

unconstitutional.  *Id.* at 421.   After finding that plaintiffs were "actually injured" by the

---

[6] For organizational standing, the "redressability" test "mirror[s], with little added gloss, the requirements for a non-organizational plaintiff."  *Citizens for Responsibility & Ethics in Washington v. U.S. Office of Special Counsel*, No. CV 19-3757 (JEB), 2020 WL 4530647, at *5-6 (D.D.C. Aug. 6, 2020).

cancellations, the Supreme Court found that "redressability" was "easily satisfied" because the injury would be "redressed by a declaratory judgment that the cancellations are invalid." *Id*. at 433 n.22.

The same result follows here. Similar to the claim of injury from the President's unconstitutional cancellations in *Clinton*, CDT claims injury from the President's unconstitutional act of issuing the Order. As in *Clinton*, it easily follows that if the Order is declared unlawful, CDT's injury will be redressed because it will not have to engage in any of the advocacy activities that form the basis of its alleged injury and can use the reallocated funds for their original purposes. *See also Swan v. Clinton*, 100 F.3d 973, 980 (D.C. Cir. 1996) ("Injunctive relief . . . could on balance substantially redress [plaintiff's] injury and is sufficient to satisfy the redressability requirement of standing"); *Animal Legal Def. Fund v. Reynolds*, 297 F. Supp. 3d 901, 917 (S.D. Iowa 2018) ("[T]he relief requested—a declaration that § 717A.3A is unconstitutional, and an injunction prohibiting Defendants from enforcing it—would redress the alleged injuries in fact by removing the threat [posed by the law] . . . and allowing Plaintiffs to reallocate their advocacy resources away from the repeal of § 717A.3A."); *Coal. for Econ. Equity v. Wilson*, 122 F.3d 692, 699 n.6 (9th Cir. 1997) (noting the district court's finding unchallenged on appeal that "a declaration that Proposition 209 is unconstitutional and an injunction against its enforcement would redress the plaintiffs' alleged injuries."). CDT has therefore sufficiently alleged redressability.

The President argues that CDT has failed to allege redressability because "equitable and declaratory relief [are] *categorically unavailable*" against the President of the United States. (Mot. at 25 (emphasis added).) But that contention is wrong as a matter of law. *See Nat'l Treasury Emps. Union v. Nixon*, 492 F.2d 587, 616 (D.C. Cir. 1974) (entering a declaratory judgment and

stating that the President had a constitutional duty to effectuate a pay raise passed by Congress); *Knight First Amendment Inst. at Columbia Univ. v. Trump,* 302 F. Supp. 3d 541, 549 (S.D.N.Y. 2018), *aff'd*, 928 F.3d 226 (2d Cir. 2019) (rejecting Defendant Trump's "categorical assertion that injunctive relief cannot ever be awarded against the President").

The Supreme Court has reviewed, and declared unlawful, actions by the President that violate the Constitution. *See Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 583 (1952) (striking down the President's ultra vires executive order seizing certain steels mills, which "was not authorized by an act of Congress or by any constitutional provisions); *see also Dalton v. Specter*, 511 U.S. 462, 478 (1994) (noting "a challenge to ultra vires exercise of the President's statutory authority" is permissible) (Blackmun, J., concurring in part and concurring in the judgment).

The D.C. Circuit and other courts of appeals have as well. *See Chamber of Commerce of U.S. v. Reich*, 74 F.3d 1322, 1328 (D.C. Cir. 1996) ("When an executive acts ultra vires, courts are normally available to reestablish the limits on his authority.") (internal citation omitted); *see also Mountain States Legal Found. v. Bush*, 306 F.3d 1132, 1136 (D.C. Cir. 2002) (noting that ultra vires review is available "to ensure that [the President's actions] are consistent with constitutional principles and that the President has not exceeded his statutory authority"); *Hawaii v. Trump*, 878 F.3d 662, 682 (9th Cir. 2017), *rev'd on other grounds*, 138 S. Ct. 2392 (2018) (an equitable cause of action "allows courts to review ultra vires actions by the President that go beyond the scope of the President's statutory authority").

The President cites (Mot. at 27) Justice Scalia's concurring opinion in *Franklin v. Massachusetts*, 505 U.S. 788 (1992), but the other Members of the Court expressly declined to

reach that issue. *See id*. at 802-03 (plurality).[7]  In *Newdow v. Roberts*, 603 F.3d 1002,1013 (D.C. Cir. 2010), the court of appeals did not reach a conclusion regarding the availability of a declaratory judgment in an action against the President—the President was not even named as a party in that case.  *Swan v. Clinton,* 100 F.3d 973, 978 (D.C. Cir. 1996), similarly did not resolve the issue—the court held that the plaintiff could obtain relief against subordinate executive officials, which sufficed for purposes of redressability.  *Id*. at 980-81.

Moreover, contrary to the President's assertion, CDT does not seek to "restructure or shut down the apparatus established by the Executive Branch to fulfill its legal duties."  (*See* Mot. at 25) (citing *Allen v. Wright*, 468 U.S. 737, 760-61 (1984)).[8]  CDT has alleged facts showing that the Order violates the First Amendment because it is retaliatory and seeks to curtail and chill the constitutionally protected speech of online platforms and individuals.  (*See* Compl. ¶¶ 1-9, 12.)  It seeks relief only for the President's unconstitutional actions.  (*See* Compl. ¶¶ 75-76, 83, Prayer for Relief.)  Such relief is well within this Court's power under the Declaratory Judgment Act and the All Writs Act.

No Circuit precedent bars the issuance of a declaratory judgment in an action against the President and the Second Circuit recently affirmed the issuance of such relief in the *Knight First*

---

[7] *Nixon v. Fitzgerald*, 457 U.S. 731, 748 n.27, 749-50 (1982), on which the President relies, has no bearing here.  *Nixon* addressed whether a former president may assert immunity from civil damages for actions taken in the former president's official capacity.  *Id*. at 732.

[8] President Trump's citation to *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 542 (D.D.C. 2018), is also inapposite.  (*See* Mot. at 27.)  In *Doe 2,* the court dismissed the President before summary judgment because dismissal "will have little or no substantive effect on [the] litigation" since "Plaintiffs [could] still obtain all of the relief that they [sought] from the other Defendants."  Here, the President is the sole defendant and the injury at issue can only be rectified by declaratory relief against the President because he issued the Executive Order—as in the other cases, discussed above, in which courts issued declaratory relief holding presidential actions invalid.

*Amendment Inst.* case.  Under the President's logic, the judiciary would be essentially prohibited from checking or curbing all Presidential abuses of power, except for certain discrete ministerial functions.  (Mot. at 27-28.)  But no one, not even the President, is above the law and exempt from the obligation to confirm his conduct to the limitations imposed by the Constitution.  The Court should hold that Plaintiff's claim is redressable and allow this action to proceed.[9]

## V.   CDT'S CLAIMS ARE RIPE

The President argues that CDT's claim fails to satisfy the Constitution's ripeness requirement.  (Mot. at 29.)  But that is merely a reformulation of the President's Article III standing argument, because "constitutional ripeness is subsumed into the Article III requirement of standing," which requires a plaintiff to allege "an injury-in-fact that is 'imminent' or 'certainly impending.'"  *OET Biorefining, LLC v. Envtl. Prot. Agency*, No. 19-1139, 2020 WL 4745274, at *6 (D.C. Cir. Aug. 14, 2020) (quotation omitted)); *Oregonians for Floodplain Prot. v. U.S. Dep't of Commerce*, 334 F. Supp. 3d 66, 73 (D.D.C. 2018) ("For a claim to be ripe under Article III, the plaintiff must establish constitutional minima akin to that of standing by showing an injury-in-fact."); *accord Nat'l Org. for Marriage, Inc. v. Walsh*, 714 F.3d 682, 688 (2d Cir. 2013) ("[C]onstitutional ripeness . . . is really just about" the injury-in-fact requirement).

Because CDT has sufficiently alleged Article III injury-in-fact—as explained above—its claim is constitutionally ripe.  *See La Clinica De La Raza v. Trump*, No. 19-CV-04980-PJH, 2020 WL 4569462, at *6 (N.D. Cal. Aug. 7, 2020) ("[I]f plaintiffs satisfy the Article III standing requirements . . . the action here is [constitutionally] ripe.").

The President also argues that CDT's claim fails a prudential element of the ripeness

---

[9] If the Court concludes that declaratory relief is not available against the President, CDT requests an opportunity to file an amended complaint naming as defendants other federal officials against whom declaratory relief would redress its injury.  *See Franklin*, 505 U.S. at 803; *see supra* note 8.

requirement.  (Mot. at 29.)  As the D.C. Circuit has recognized, however, the Supreme Court has "rais[ed] questions regarding 'the continuing vitality of the prudential ripeness doctrine.'"  *Sanchez v. Office of the State Superintendent of Educ.*, 959 F.3d 1121, 1124 (D.C. Cir. 2020) (quoting *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 167 (2014)).  That is because a "federal court's obligation to hear and decide' cases within its jurisdiction 'is virtually unflagging.'"  *Driehaus*, 573 U.S. at 167.  Because CDT's claim presents a case or controversy that is properly within the federal courts' Article III jurisdiction, the Court should hear and decide the case regardless of whether CDT meets the test for prudential ripeness.

Even if the prudential doctrine applied, it is satisfied here.  The ripeness inquiry requires an evaluation of "both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration."  *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967).  "[T]he fitness of an issue for judicial decision depends on whether it is 'purely legal, whether consideration of the issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'"  *Atl. States Legal Found. v. E.P.A.*, 325 F.3d 281, 284 (D.C. Cir. 2003) (citation omitted).  "If a court determines that a claim is fit for judicial resolution, the '[lack of] hardship cannot tip the balance against judicial review.'"  *Belmont Abbey Coll. v. Sebelius*, 878 F. Supp. 2d 25, 38 (D.D.C. 2012) (quoting *Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 440 F.3d 459, 465 (D.C.Cir.2006) (citation omitted)).

The President argues that CDT's claim is unripe because it challenges an "administrative action" or "administrative decision" that the FCC or DOJ *might* take as result of the Order.  That is not true.  As discussed above (*supra* Argument Part I), CDT's injuries flow from the Order itself, which is not subject to further administrative review.  Moreover, CDT is challenging the Order as a retaliatory measure in violation of the First Amendment *when issued*, because its very issuance

is a threat intended to inflict an immediate chill on online speakers and content hosts, and because the agency actions specified in its directives further violate the First Amendment by curtailing and chilling free speech.  The success of CDT's ultra vires challenge is therefore not contingent on any future events, or on events that may not occur at all.  Rather, it is based on events that have already occurred and the directives on the face of the Order itself.

The President all but admits that CDT's claim is prudentially ripe by acknowledging that CDT has brought a "facial" challenge to the Order.  (Mot. at 1 ("Plaintiff attempts to raise a facial constitutional challenge to Executive Order No. 13925."); *id.* ("Plaintiff's facial challenge . . . .").  Facial challenges, by definition, "are generally ripe the moment the challenged [order] is passed." *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 736 n.10 (1997); *Associated Builders & Contractors of Se. Texas v. Rung*, No. 1:16-CV-425, 2016 WL 8188655, at *6 (E.D. Tex. Oct. 24, 2016) ("Plaintiffs' challenges to the Executive Order [is] ripe for review, as these are final government actions presenting purely legal issues in this facial challenge . . . .").  That is true here where the facts relevant to whether the Executive is ultra vires have already occurred.

Because CDT has sufficiently alleged a claim "fit" for review, it need not allege hardship should the Court decline to hear its claim.  *See Consolidation Coal Co. v. Fed. Mine Safety & Health Review Comm'n*, 824 F.2d 1071, 1082 (D.C. Cir. 1987) ("[W]hen there are no interests favoring postponement of review, there can be no prudential reason to require the petitioner to demonstrate an additional quantum of injury caused by deferring review.").  The Court should reject the President's prudential ripeness challenge.

## CONCLUSION

For the foregoing reasons, the Court should deny the President's motion to dismiss.  Should the Court nonetheless find that CDT has not adequately alleged Article III standing, CDT requests leave to amend.  As the D.C. Circuit has acknowledged, its organizational standing doctrine is "not

31

a model of clarity," *Ctr. for Responsible Sci. v. Gottlieb*, 311 F. Supp. 3d 5, 9 (D.D.C. 2018), and CDT therefore should be given an opportunity to amend based on this Court's interpretation of that doctrine.

Dated:  August 31, 2020

Respectfully submitted,

MAYER BROWN LLP

By:  /s/  Andrew J. Pincus

Avery Gardiner (D.C. Bar No. 481404,
*D.D.C.* (*admission application
pending*)
Center for Democracy & Technology
1401 K Street NW, Suite 200
Washington, DC 20005
Telephone: (202) 407-8811
agardiner@cdt.org

Andrew J. Pincus (D.D.C. Bar No. 370762)
MAYER BROWN LLP
1999 K St., NW
Washington, DC 20006
Telephone: (202) 263-3000
apincus@mayerbrown.com

Lauren R. Goldman (*admitted pro hac vice*)
MAYER BROWN LLP
1221 Ave. of the Americas
New York, New York 1002
Telephone: (212) 506-2500
lgoldman@mayerbrown.com

John Nadolenco (*admitted pro hac vice*)
Douglas A. Smith (*admitted pro hac vice*)
Sandor A. Callahan (*admitted pro hac vice*)
MAYER BROWN LLP
350 S. Grand Ave.
Los Angeles, CA 90017
Telephone: (213) 229-9500
jnadolenco@mayerbrown.com
dougsmith@mayerbrown.com
scallahan@mayerbrown.com

*Attorneys for Plaintiff Center for Democracy &
Technology*