**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**CENTER FOR DEMOCRACY &**
**TECHNOLOGY**,

               Plaintiff,

               v.

**DONALD J. TRUMP**, *in his official capacity*
*as President of the United States of America*,

               Defendant.

---

Case No. 1:20-cv-01456 (TNM)

<u>**MEMORANDUM OPINION**</u>

This case concerns President Trump's "Executive Order on Preventing Online Censorship."  Exec. Order No. 13,925, 85 Fed. Reg. 34,079 (May 28, 2020) ("Order 13,925" or the "Order").  Plaintiff Center for Democracy & Technology ("CDT") has sued the President, claiming that Order 13,925 violates the First Amendment.  CDT asserts that Order 13,925 injures its interest in promoting free speech on the internet and claims that it has used its resources to counter the Order.  It asks the Court to declare Order 13,925 invalid and to enjoin the President from enforcing it.

But Order 13,925 is most notable at this point for what it does *not* do.  It imposes no obligation on CDT (or any other private party), but it merely directs government officials to take preliminary steps towards possible lawmaking.  CDT's claimed injury is not concrete or imminent and is thus insufficient to establish Article III standing.  Even if CDT managed to clear the standing hurdle, it faces redressability and ripeness problems too.  The Court will therefore dismiss this case for lack of jurisdiction.

## I.

Order 13,925 expresses the Trump Administration's policy that "[f]ree speech is the bedrock of American democracy" and that "large online platforms, such as Twitter and Facebook, as the critical means of promoting the free flow of speech and ideas today, should not restrict protected speech."  Order 13,925 §§ 1, 4(a).  The Order asserts that "[o]nline platforms are engaging in selective censorship."  *Id.* § 1.  It explains that § 230(c) of the Communications Decency Act—which, as relevant here, provides immunity from liability to online platforms for restricting some content on their sites—should be clarified.[1]  Order 13,925 § 2(a).

Some of Order 13,925's provisions implicate federal agencies.  For example, the Order directs the Secretary of Commerce to "file a petition for rulemaking with the Federal Communications Commission (FCC) requesting that the FCC expeditiously propose regulations to clarify" the scope of § 230(c).  *Id.* § 2(b).  It also instructs the Federal Trade Commission ("FTC") to "consider taking action, as appropriate and consistent with applicable law, to prohibit unfair or deceptive acts or practices in or affecting commerce," to "consider whether complaints [about online platform censorship] allege violations of law," and to "consider developing a report describing such complaints."  *Id.* § 4(b)–(d).

Order 13,925 includes other directives aimed at government officials.  It instructs "[t]he head of each executive department and agency" to "review its agency's Federal spending on advertising and marketing paid to online platforms" and then requires the Department of Justice

---

[1]  Section 230 states that "[n]o provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider"; it provides immunity from liability for "any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable."  47 U.S.C. § 230(c).

to "assess whether any online platforms are problematic vehicles for government speech due to viewpoint discrimination, deception to consumers, or other bad practices." *Id.* § 3(a), (c).  The Order also charges the Attorney General with "establish[ing] a working group regarding the potential enforcement of State statutes that prohibit online platforms from engaging in unfair or deceptive acts or practices" and "develop[ing] a proposal for Federal legislation that would be useful to promote the policy objectives of this order." *Id.* §§ 5(a), 6.

CDT describes itself as "a nonprofit advocacy organization" that represents "the public interest in the creation of an open, innovative, and decentralized Internet" and "promotes the constitutional and democratic values of free expression, privacy, and individual liberty." Compl. ⁋ 68, ECF No. 1.  It contends that "advocating in favor of First Amendment protection for speech on the Internet" is "[c]ritical to [its] mission." *Id.* ⁋ 69.  According to CDT, it "consistently urges courts to defend Americans' rights to express themselves online." *Id.* ⁋ 16.

Five days after President Trump issued Order 13,925, CDT sued the President in his official capacity, claiming that the Order violates the First Amendment.  *See, e.g.*, *id.* ⁋⁋ 17, 77, 81–82.  It asserts that Order 13,925 "constitutes retaliatory action" in violation of the First Amendment and "chill[s] the constitutionally protected speech of online content platforms." *Id.* ⁋⁋ 77–78, 81.  CDT cites the President's tweets in response to Twitter adding an "addendum"— a large exclamation point with a link to more news sources—to two of the President's tweets about mail-in ballots. *Id.* ⁋⁋ 32–34, 37.  CDT also argues that Order 13,925 "injures" its "First Amendment interest and causes it to divert resources to safeguarding the First Amendment rights of individuals and Internet intermediaries that the Executive Order places under attack." *Id.* ⁋ 82. For relief, CDT seeks a declaration that Order 13,925 is invalid and asks the Court to enjoin the President from implementing or enforcing it.  *Id.* at 26.

The President moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1).  Def.'s Mot. to Dismiss ("Def.'s Mot.") at 1, ECF No. 17.[2]  The motion is ripe for disposition.

## II.

To survive a motion to dismiss under Rule 12(b)(1), a plaintiff has the burden to establish the predicates to jurisdiction, including "the irreducible constitutional minimum of standing." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992).  The Court "assume[s] the truth of all material factual allegations in the complaint and construe[s] the complaint liberally, granting plaintiff the benefit of all inferences that can be derived from the facts alleged."  *Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011) (cleaned up).  Thus, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice."  *Lujan*, 504 U.S. at 561.

Because "a Rule 12(b)(1) motion imposes on the court an affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority," though, a plaintiff's factual allegations "will bear closer scrutiny in resolving a 12(b)(1) motion than in resolving a 12(b)(6) motion for failure to state a claim."  *Grand Lodge of Fraternal Ord. of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001) (cleaned up).  If a court determines that it lacks jurisdiction for any claim, it must dismiss that claim.  Fed. R. Civ. P. 12(b)(1), (h)(3).

## III.

The President argues that CDT's complaint must be dismissed because (A) CDT has not established Article III standing and (B) its claim is not prudentially ripe.  The Court agrees.

---

[2]  All page citations are to the page numbers that the CM/ECF system generates.

**A.**

"The Constitution confers limited authority on each branch of the Federal Government," including the judiciary.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1546–47 (2016).  Article III "limit[s] the judicial power to 'Cases' and 'Controversies'" and so "restricts it to the traditional role of Anglo-American courts, which is to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009); *see also* The Federalist No. 83, at 432 (Alexander Hamilton) (Carey & McClellan eds., 2001) ("[T]he authority of the federal judicatures, is declared by the constitution to comprehend certain cases particularly specified.  The expression of those cases, marks the precise limits beyond which the federal courts cannot extend their jurisdiction . . . .").  Constitutional standing "is built on separation-of-powers principles" and "serves to prevent the judicial process from being used to usurp the powers of the political branches."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013); *see also Carney v. Adams*, No. 19-309, 2020 WL 7250101, at *4 (U.S. Dec. 10, 2020) (stating that "a plaintiff cannot establish standing by asserting an abstract general interest common to all members of the public" because "to find standing based upon that kind of interest would significantly alter the allocation of power at the national level, with a shift away from a democratic form of government" (cleaned up)).

"To establish Article III standing, an injury must be concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable ruling."  *Clapper*, 568 U.S. at 409 (cleaned up).  Organizations, like individuals, must satisfy these elements.  *PETA v. U.S. Dep't of Agric.*, 797 F.3d 1087, 1093 (D.C. Cir. 2015).  The Court

considers (1) whether CDT has asserted an injury in fact that is sufficiently concrete and imminent, and (2) whether CDT's alleged harm is redressable.[3]

## 1.

### a.

First, concreteness. When determining the concreteness of an organization's injury in particular, courts consider: (1) "whether the agency's action or omission to act injured the organization's interest" and (2) "whether the organization used its resources to counteract that harm." *Id.* at 1094 (cleaned up). The Court "need not address the second prong of this inquiry" if "it is clear" that the organization "has not sufficiently alleged an injury to its interest." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015). "The key issue" when considering organizational standing "is whether [the organization] has suffered a concrete and demonstrable injury to [its] activities," rather than "a mere setback to . . . abstract social interests," which "is not sufficient." *Id.* at 1093 (cleaned up).[4]

For the first consideration, there must be "a direct conflict between the defendant's conduct and the organization's mission." *Id.* at 1095 (cleaned up). Additionally, "an organization must allege that the defendant's conduct 'perceptibly impaired' the organization's ability to provide services in order to establish injury in fact." *Turlock Irrigation Dist. v. FERC*, 786 F.3d 18, 24 (D.C. Cir. 2015) (quoting *Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1138–39 (D.C. Cir. 2011)). Perceptible impairment occurs "when the defendant's conduct

---

[3] The parties focus their briefing on the injury-in-fact and redressability prongs of the standing inquiry, so the Court likewise homes in there. Finding that CDT does not meet these two prongs, the Court need not address traceability.

[4] An organization can also assert standing "on behalf of its members," *PETA*, 797 F.3d at 1093 (cleaned up), but CDT does not do so here, *see* Pl.'s Opp'n at 20.

causes an inhibition of the organization's daily operations." *Food & Water Watch*, 808 F.3d at 919 (cleaned up).

 If an organization alleges "only impairment of its advocacy," that "will not suffice" to show standing. *Turlock*, 786 F.3d at 24; *see also Food & Water Watch*, 808 F.3d at 919 ("Our precedent makes clear that an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury."). "This is true whether the advocacy takes place through litigation or administrative proceedings." *Turlock*, 786 F.3d at 24.  More, "an organization does not suffer an injury in fact where it expends resources to educate its members and others unless doing so subjects the organization to operational costs beyond those normally expended." *Food & Water Watch*, 808 F.3d at 920 (cleaned up).

CDT has not met its burden to show an injury to its interests.  To begin, there does not appear to be a "direct conflict" between Order 13,925 and CDT's stated mission.  The Order expresses "the policy of the United States to foster clear ground rules promoting free and open debate on the internet."  Order 13,925 § 2(a).  CDT asserts a similar mission—to "advocat[e] in favor of First Amendment protection for speech on the Internet."  Compl. ⁋ 69.  One would think that CDT would applaud the President's desire to prevent online censorship.  But no matter.  The Court will take CDT at its word and assume that Order 13,925 directly conflicts with its interests. *See* Pl.'s Mem. in Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n") at 21–22, ECF No. 19.  It still has not established an Article III injury.

CDT has not alleged that Order 13,925 has "perceptibly impaired" its "ability to provide services." *Turlock*, 786 F.3d at 24 (cleaned up).  It claims that because of the Order it will have to "devote substantial resources to": "participating in the planned FCC rulemaking proceeding,"

"monitoring federal agencies' reports," "tracking any FTC action," "participating in any

proceedings that the Commission institutes," and "engaging with federal and state

policymakers."  Compl. ¶ 73.

This is plainly deficient.  Circuit precedent is "clear that an organization's use of

resources for . . . advocacy is not sufficient to give rise to an Article III injury," *Food & Water*

*Watch*, 808 F.3d at 919, "whether the advocacy takes place through litigation or administrative

proceedings," *Turlock*, 786 F.3d at 24.  CDT's alleged injury—resources spent monitoring

federal agencies, participating in their proceedings, and working with lawmakers—is one to its

advocacy work, which is not a cognizable injury.  *Env't Working Grp. v. U.S. Food & Drug*

*Admin.*, 301 F. Supp. 3d 165, 172 (D.D.C. 2018) ("*EWG*") ("[I]njuries to an organization's . . .

issue advocacy programs cannot be used to manufacture standing, because that would allow

lobbyists on either side of virtually any issue to take the Government to court." (citing *Ctr. for*

*Law & Educ. v. Dep't of Educ.*, 396 F.3d 1152, 1161 (D.C. Cir. 2005))).  In other words, CDT

has shown that it is engaging in business as usual, not that Order 13,925 "causes an inhibition of

[its] daily operations."  *Food & Water Watch*, 808 F.3d at 919 (cleaned up).

CDT alleges that these measures are "reactionary" and not part of its "normal advocacy

efforts."  Pl.'s Opp'n at 24.  But its statements elsewhere suggest otherwise.  *See, e.g.*, Compl.

¶ 71 ("The organization devotes significant resources to advocating in favor of individuals'

online free expression rights and the legal frameworks that support them, including evaluating

proposals to amend the proposed laws on free speech online and challenging legislation that

burdens individuals' fundamental rights, holding public events, and communicating with policy

makers in the Executive and Legislative Branches."); Pl.'s Opp'n at 22 ("Advocating for free

speech online before legislatures and administrative agencies and combating government efforts

antithetical to free speech online has been a critical part of CDT's mission and activities for more than 25 years." (cleaned up)).  CDT cannot assert Article III standing by claiming the activities that it would otherwise engage in now injure it.

CDT also says that it will have to devote resources to "informing the public" about its advocacy activities and "the potential consequences for protection of free speech online." Compl. ¶ 73.  Again, though, there is no recognizable injury where the organization does not expend resources "beyond those normally expended."  *Food & Water Watch*, 808 F.3d at 920 (cleaned up); *accord EWG*, 301 F. Supp. 3d at 172 ("Neither do the Plaintiffs' educational efforts suffice, because this type of work is exactly what these organizations always do.").  And that does not appear to be the case here.  *See* Compl. ¶ 71 (claiming that CDT "devotes significant resources to," among other things, "holding public events"); Pl.'s Opp'n at 26 (explaining that Order 13,925 has caused CDT's resources to be diverted from activities it would otherwise engage in, such as "public education" and "holding public events").

*PETA* does not save CDT's complaint.  There, the D.C. Circuit held that PETA had met the organizational standing requirements to challenge "the USDA's allegedly unlawful failure to apply the [Animal Welfare Act's] general animal welfare regulations to birds."  797 F.3d at 1095.  The court held that PETA's alleged injuries—the denial of (1) "access to bird-related" information and (2) "a means by which to seek redress for bird abuse"—were "concrete and specific to the work in which they are engaged."  *Id.* (cleaned up).  It reasoned that the USDA's inaction "impair[ed] PETA's activities in a non-speculative manner by requiring PETA to divert and redirect its limited resources to counteract and offset" the agency's conduct.  *Id.* (cleaned up).  For example, the court pointed to PETA's allegations that it "ha[d] expended financial resources to investigate and respond to complaints about birds subjected to inhumane treatment"

and that the USDA's failure to regulate "deprive[d] PETA of information on which it routinely relie[d] in its efforts to educate the public," which required PETA "to expend resources to obtain information about the conditions of birds" on its own. *Id.* at 1095–96 (cleaned up).

CDT's allegations are unlike PETA's. PETA showed real expenditures—in particular, resources spent making up for the USDA's failure to issue "AWA inspection reports" on birds, "the primary source of information relied on by PETA," *id.* at 1096 (cleaned up)—apart from mere advocacy. Not so here. CDT has not alleged that Order 13,925 denied it a crucial data set or a means to seek redress. *Cf. Elec. Priv. Info. Ctr. v. Fed. Aviation Admin.*, 892 F.3d 1249, 1256 (D.C. Cir. 2018) (distinguishing the case from *PETA* for this reason). Rather, CDT vaguely alleges that it will have to divert resources to respond to the Order, which, as explained, is a non-cognizable injury.

*PETA* marks the outer bounds of the Circuit's highly permissive organizational standing doctrine, yet the complaint here goes well beyond that line.[5] The Court will not follow CDT into territory so foreign to Article III. *Cf. Clapper*, 568 U.S. at 408–09 (stating that "[r]elaxation of standing requirements is directly related to the expansion of judicial power" and the usurpation of "the powers of the political branches" (cleaned up)).

*Turlock* is more applicable here. In that case, conservation groups challenged a federal agency's decision to require a hydroelectric river project to be licensed as a single unit, rather than as part of another project. *Turlock*, 786 F.3d at 21, 23. The groups alleged that they suffered injury, in part, because they would incur costs in "actively participat[ing] in both

---

[5] Judge Millet noted that the majority's decision in *PETA* was "in grave tension with Article III precedent and principles." *PETA*, 797 F.3d at 1099 (Millett, J., dubitante); *see also id.* ("If circuit precedent has brought us to the point where organizations get standing on terms that the Supreme Court has said individuals cannot, then it may be time, in an appropriate case, to revisit the proper metes and bounds of 'organizational standing.'").

licensing proceedings." *Id.* at 23.  The D.C. Circuit held that the groups' "decision to expend more of its resources by participating in both . . . licensing proceedings is the type of alleged harm that we have repeatedly held does not qualify as an injury in fact." *Id.* at 24.  Just so here. As in *Turlock*, CDT has "not allege[d] impairment of its ability to provide services, only impairment of its advocacy." *Id.*

Thus, CDT has not shown a concrete injury.  *Cf. Carney*, 2020 WL 7250101, at *6 (explaining that relaxing the injury-in-fact requirement "would significantly weaken the longstanding legal doctrine preventing this Court from providing advisory opinions at the request of one who, without other concrete injury, believes that the government is not following the law").

**b.**

Additionally, CDT's allegations fail to show Article III standing because the injury it claims is not "actual or imminent" but "conjectural or hypothetical."  *Lujan*, 504 U.S. at 560 (cleaned up).  While "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur," *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (cleaned up), "allegations of *possible* future injury are not sufficient," *Clapper*, 568 U.S. at 409 (cleaned up).

Recall that Order 13,925 does not apply to private parties (including CDT).  It only sets a course of government processes into motion.  *Cf. Rock the Vote v. Trump*, No. 20-cv-06021-WHO, 2020 WL 6342927, at *7 (N.D. Cal. Oct. 29, 2020) ("None of these actions [directed by Order 13,925] proscribe any constitutional right because they do not restrict or regulate the platforms directly; they are simply steps that may or may not lead to additional regulations, restrictions, or liability at some uncertain point in the future, largely dependent on the actions of

independent agencies and branches of government.").  For example, it directs various government actors to "file *a petition* for rulemaking . . . requesting that the FCC expeditiously *propose* regulations," to "*review* . . . Federal spending," to "*consider* taking action," to "*consider* developing a report," to "establish a *working group*," and to "develop a *proposal* for Federal legislation."  Order 13,925 §§ 2(b), 3(a), 4(c)–(d), 5(a), 6 (emphasis added).  CDT is correct that it need not wait for an injury to occur to sue.  *See* Pl.'s Opp'n at 27.  But a future injury cannot be "speculative."  It must be "certainly impending" or there must be a "substantial risk" that it will occur.

To be sure, the government might issue regulations that CDT does not like.  But it is just as possible that it will not.  "Article III standing requires more than *the possibility* of potentially adverse regulation," *Defs. of Wildlife v. Perciasepe*, 714 F.3d 1317, 1324–25 (D.C. Cir. 2013) (emphasis added), put into place by third-party actors not before the Court, *see Clapper*, 568 U.S. at 414 ("We decline to abandon our usual reluctance to endorse standing theories that rest on speculation about the decisions of independent actors.").  CDT provides no support for its suggestion that it will be injured by laws resulting from Order 13,925.  *See* Pl.'s Opp'n at 27 (arguing that "the Order on its face *places in motion* immediate agency action, as well as rulemaking and legislative processes—involving *potential outcomes* that are squarely contrary" to CDT's principles (emphasis added)); *cf. Perciasepe*, 714 F.3d at 1324–25 (holding that an intervenor lacked standing to challenge a consent decree that did "not *require* EPA to promulgate a new, stricter rule" but only "require[d] that EPA conduct a rulemaking and then decide whether to promulgate a new rule"); *Rock the Vote*, 2020 WL 6342927, at *7 ("Any potential enforcement based on these possible future regulations is far too speculative to give rise to a concrete or particularized injury at this point in time.").

CDT seems to acknowledge as much, arguing that "*[r]egardless* of how the FTC or FCC ultimately decide to exercise their discretion in response to the Order's directives, CDT is injured by the ongoing expenditure of resources to combat" the Order.  Pl.'s Opp'n at 28 (emphasis in original).  But that argument runs headlong into the Supreme Court's decision in *Clapper*, in which the Court rejected as "unavailing" the plaintiffs' "contention that they have standing because they incurred certain costs as a reasonable reaction to a risk of harm."  *Clapper*, 568 U.S. at 416.  Ditto here.  CDT "cannot manufacture standing merely by inflicting harm on [itself] based on [its] fears of hypothetical future harm that is not certainly impending."  *Id.*

If such speculative future government action could support an injury in fact, it is hard to imagine what would *not* satisfy that requirement.  Article III demands more.  The exercise of the judicial power is limited to "redress[ing] or prevent[ing] *actual or imminently threatened* injury." *Summers*, 555 U.S. at 492 (emphasis added); *cf. Carney*, 2020 WL 7250101, at *3 (explaining that the Supreme Court has "long understood" Article III "to require that a case embody *a genuine, live dispute* between adverse parties, thereby preventing the federal courts from issuing advisory opinions" (emphasis added)).

*        *        *

CDT seeks to overcome the shortcomings in its complaint by arguing that it can assert standing on behalf of third-party platforms injured by Order 13,925.  *See* Pl.'s Opp'n at 29.  The Court is not convinced.

In general, "a party generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties."  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (cleaned up).  With that said, a litigant can bring an action on behalf of third parties if "three important criteria are satisfied": (1) "[t]he litigant must have suffered an

injury in fact, thus giving him or her a sufficiently concrete interest in the outcome of the issue in dispute"; (2) "the litigant must have a close relation to the third party"; and (3) "there must exist some hindrance to the third party's ability to protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991) (cleaned up). "Because third-party standing is the exception rather than the norm, the burden is on the party attempting to assert third-party rights to establish that [it] has third-party standing." *United States v. TDC Mgmt. Corp.*, 263 F. Supp. 3d 257, 272 (D.D.C. 2017) (cleaned up).

To start, third-party standing is not an "*alternative* basis for Article III standing here." Pl.'s Opp'n at 29 (emphasis added). It does not absolve CDT from proving *its own* Article III injury—as shown by the requirements from *Powers* above. Instead, it is a prudential limit on whether a litigant can assert the rights of others not before the Court. *Cf. Am. Immigr. Laws. Ass'n v. Reno*, 199 F.3d 1352, 1361 n.13 (D.C. Cir. 2000) ("Prudential standing aside, if the litigant has not suffered injury there is no constitutional standing."). As already explained, CDT has not shown that it suffered an Article III injury, which prevents it from asserting the rights of third-party platforms.

And even if CDT has alleged a close relationship between it and third-party online platforms, *see, e.g.*, Compl. ¶ 72 (stating that CDT must safeguard "the free speech rights of online content platforms"), it fails to show that the platforms cannot protect their own interests. The Court must consider "the likelihood and ability of the third parties . . . to assert their own rights." *Powers*, 499 U.S. at 414. As the President points out, "online platforms are sophisticated, well-counseled businesses." Def.'s Reply in Supp. of Mot. to Dismiss ("Def.'s Reply") at 22, ECF No. 20. Online behemoths like Twitter and Facebook command armies of attorneys and lobbyists. They do not need CDT to carry their water for them.

Still, CDT points to the platforms' possible "fear of future retribution," which allegedly "hinders their ability to vindicate their own rights by bringing suit." Pl.'s Opp'n at 31–32 (citing Compl. ₱ 64). But this is undermined by CDT's other allegations—specifically, that *after* some of the President's responses to Twitter's warning labels, Twitter proceeded undeterred. It added further "explanation[s]" for its labels, and a Twitter executive took personal responsibility for the decision to label the President's tweets. *See, e.g.*, Compl. ₱₱ 37, 41; *cf. Rock the Vote*, 2020 WL 6342927, at *8 (citing "additional public and judicially noticeable tweets indicating that Twitter ha[d] placed fact-check notices and links on several other election-related tweets from the President" after Order 13,925 was issued).

CDT has thus not met its burden to assert third-party rights.

**2.**

CDT also lacks standing because any purported injury is not redressable through the injunctive or declaratory relief it seeks here. *See* Compl. at 27. The Court considers each form of relief in turn.

**a.**

The injunctive relief that CDT seeks against the President is unavailable. Long ago, the Supreme Court addressed whether the President can "be restrained by injunction from carrying into effect an act of Congress alleged to be unconstitutional." *Mississippi v. Johnson*, 71 U.S. 475, 498 (1866). The Court held that it was "fully satisfied" that it had "no jurisdiction of a bill to enjoin the President in the performance of his official duties; and that no such bill ought to be received by" the Court. *Id.* at 501.

The Supreme Court reiterated this rule in *Franklin v. Massachusetts*, 505 U.S. 788, 802–03 (1992) (plurality opinion). The plurality acknowledged that *Mississippi v. Johnson* "left open

the question whether the President might be subject to a judicial injunction requiring the performance of a purely 'ministerial' duty." *Id.* at 802. But it reiterated that "in general," the Court lacked jurisdiction to issue an injunction against the President "in the performance of his official duties"—calling this relief "extraordinary" such that it should "raise[] judicial eyebrows." *Id.* at 802–03 (cleaned up). Justice Scalia's concurrence agreed with this rule, signaling that it was supported by a majority of the Justices. *Id.* at 826 (Scalia, J., concurring in part and concurring in the judgment) ("I think it clear that no court has authority to direct the President to take an official act."); *id.* at 827 (describing *Mississippi* as "emphatically disclaim[ing] the authority" to "issue an injunction requiring the President to take specified executive acts").

The D.C. Circuit has also unequivocally stated that, "[w]ith regard to the President, courts do not have jurisdiction to enjoin him." *Newdow v. Roberts*, 603 F.3d 1002, 1013 (D.C. Cir. 2010) (citing *Mississippi*, 71 U.S. at 501). And it has taken *Franklin*'s admonition seriously. As one example, in *Swan v. Clinton*, the Circuit addressed whether the President could be enjoined to perform a ministerial duty—the question that *Mississippi* and *Franklin* left open. *Swan v. Clinton*, 100 F.3d 973, 976–77 (D.C. Cir. 1996). But the court took great pains to acknowledge that the Supreme Court "issued a stern admonition [in *Franklin*] that injunctive relief against the President personally is an extraordinary measure not lightly to be undertaken." *Id.* at 978. It explained that "[t]he reasons why courts should be hesitant to grant such relief are painfully obvious," including that an Article III court ordering the President to perform executive acts "at best creates an unseemly appearance of constitutional tension and at worst risks a violation of the constitutional separation of powers." *Id.*

The President is the only defendant in this case.  Compl. ¶ 17.  Order 13,925 represents

an exercise of the President's official duties, rather than a ministerial act.  *See Mississippi*, 71

U.S. at 498–99 (contrasting a "ministerial duty" in which "nothing is left to discretion" with "the

duty of the President in the exercise of the power to see that the laws are faithfully executed"—a

duty that is "purely executive and political").  CDT does not appear to challenge this point.  *See*

Def.'s Mot. at 37; Pl.'s Opp'n 32–36.  Under *Mississippi v. Johnson*, then, this Court lacks the

authority to issue the injunctive relief that CDT seeks against the only defendant that it chose to

sue.

**b.**

CDT focuses its efforts instead on obtaining declaratory relief.  It argues that its alleged

injury "will necessarily be redressed if the Order is *declared* unconstitutional."  Pl.'s Opp'n at 32

(emphasis added).  Even if declaratory relief alone would redress CDT's injury, the Court finds

that this relief—like an injunction—is also unavailable against the President.

CDT may be correct that "[n]o Circuit precedent *bars* the issuance of a declaratory

judgment in an action against the President," Pl.'s Opp'n at 35 (emphasis added), but caselaw

strongly suggests that such relief is inappropriate.  In *Swan*, the Circuit recognized that although

its discussion was "couched in terms of [its] ability to grant injunctive relief against the

President, similar considerations regarding a court's power to issue relief against the President

himself apply to [the plaintiff's] request for a declaratory judgment."  100 F.3d at 976 n.1.  In

*Newdow*, the Circuit was even clearer: "A court—whether via injunctive *or declaratory* relief—

does not sit in judgment of a President's executive decisions."  603 F.3d at 1012 (emphasis

added) (citing *Mississippi*, 71 U.S. at 475, 499 and *Swan*, 100 F.3d at 976 n.1); *see also id.* at

1013 (stating that courts "have never submitted the President to declaratory relief").[6]

There are powerful reasons why courts should refrain from subjecting the President to

declaratory relief.  As Justice Scalia explained in *Franklin* about injunctive relief:

"The apparently unbroken historical tradition supports the view, which I think implicit in the

separation of powers established by the Constitution, that the principals in whom the executive

and legislative powers are ultimately vested—viz., the President and the Congress (as opposed to

their agents)—may not be ordered to perform particular executive or legislative acts at the behest

of the Judiciary."  *Franklin*, 505 U.S. at 827 (Scalia, J., concurring in part and concurring in the

judgment).  He then stated that declaratory relief is problematic "[f]or similar reasons": "It

is incompatible with [the President's] constitutional position that he be compelled personally to

defend his executive actions before a court."  *Id.*  To hold otherwise "would produce needless

head-on confrontations between district judges and the Chief Executive."  *Id.* at 828; *cf. Doe 2 v.

Trump*, 319 F. Supp. 3d 539, 541 (D.D.C. 2018) ("Sound separation-of-power principles counsel

the Court against granting these forms of relief [*i.e.*, injunctive and declaratory] against the

President directly.").

---

[6]  To be sure, the D.C. Circuit granted declaratory relief against the President in *National Treasury Employees Union v. Nixon*, 492 F.2d 587 (D.C. Cir. 1974) ("*NTEU*").  *See Citizens for Resp. & Ethics in Wash. v. Trump*, 302 F. Supp. 3d 127, 139 (D.D.C. 2018) (citing *NTEU* and explaining that, in that case, the Circuit declared "that the President had a constitutional duty" to implement "a pay raise passed by Congress").  But this seems to be the exception, not the rule. As the D.C. Circuit explained in *Swan*, it is not clear that *NTEU* remains good law after *Franklin*.  *Swan*, 100 F.3d at 978.  And in any event, *NTEU* is distinguishable from this case for at least two reasons: (1) the President was the only party the plaintiffs could sue in *NTEU*, and (2) the *NTEU* plaintiffs sought to compel the President to perform a *ministerial* act.  *Doe 2 v. Trump*, 319 F. Supp. 3d 539, 543–44 (D.D.C. 2018) (distinguishing *NTEU* on these grounds).

All this is not to say that there is *no one* that CDT could hypothetically sue.  *See* Def.'s Reply at 26–27.  "In most cases, any conflict between the desire to avoid confronting the elected head of a coequal branch of government and to ensure the rule of law can be successfully bypassed, because the injury at issue can be rectified by injunctive relief against subordinate officials."  *Swan*, 100 F.3d at 978; *see also Chamber of Com. v. Reich*, 74 F.3d 1322, 1331 n.4 (D.C. Cir. 1996) (acknowledging "a reluctance to bring judicial power to bear directly on the President" but noting that the case was instead "concerned with the long established non-statutory review of a claim directed at a subordinate executive official").  But as CDT has presented its case to the Court—a complaint against the President and only the President—the relief it seeks is unavailable.[7]

*        *        *

Seeking relief against the President is not the only redressability issue that CDT faces.  As explained, Order 13,925's operative provisions set several events into motion.  *See, e.g.*, Order 13,925 § 2(b) (directing the Secretary of Commerce to "file *a petition* for rulemaking . . . requesting that the FCC expeditiously *propose* regulations"); *id.* § 6 (directing the Attorney General to "develop *a proposal* for Federal legislation").  "Enjoining or invalidating the Executive Order now will not halt or reverse any possible new rules and regulations that the FCC and Congress might adopt as a result of these processes."  *Rock the Vote*, 2020 WL 6342927, at *10.  The arrow has already flown from the bow.  To enjoin Order 13,925 would defy Article

---

[7]  Some cases that CDT relies on serve only to underline the point that it has sued the wrong defendant.  *See, e.g.*, *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 584 (1952) (reviewing a district court's injunction "restraining the Secretary [of Commerce] from . . . acting under the purported authority of" an executive order (cleaned up)); *Chamber of Com.*, 74 F.3d at 1331 n.4 (explicitly noting that the case involved a claim "directed at a subordinate executive official").

III's requirement that courts exercise jurisdiction only when a party asserts an injury that can be redressed.  *See Summers*, 555 U.S. at 492.

**B.**

CDT's failure to satisfy Article III's standing requirement is enough to dismiss its complaint under Rule 12(b)(1).  But even if it had satisfied Article III, its claim would be prudentially unripe.

In considering whether a claim is ripe for judicial review, courts evaluate "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) ("*NPHA*").  The ripeness doctrine "prevent[s] the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and "protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Id.* at 807–08 (cleaned up).  "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998) (cleaned up).

The Court rejects CDT's invitation to disregard this ripeness issue.  CDT argues that the Supreme Court has questioned the prudential ripeness doctrine.  *See* Pl.'s Opp'n at 37.  Perhaps, but the Court has also explicitly declined to "resolve the continuing vitality of" the doctrine. *Susan B. Anthony List*, 573 U.S. at 167.  And lower courts must apply the law as it stands, "leaving to [the Supreme] Court the prerogative of overruling its own decisions."  *Rodriguez de Quijas v. Shearson/Am. Express, Inc.*, 490 U.S. 477, 484 (1989); *see also Agostini v. Felton*, 521

20

U.S. 203, 237 (1997) (rejecting the idea "that other courts should conclude [that the Supreme Court's] more recent cases have, by implication, overruled an earlier precedent").

CDT's claim is unripe.  First, the issues are not fit for judicial decision.  CDT contends that its First Amendment claim is ripe because its "injuries flow from the Order itself" in the form of a threatened "chill on online speakers and content hosts."  Pl.'s Opp'n at 37–38.  But Order 13,925 places no obligations on any private party.  It merely directs government officials to take *initial* steps in government processes that might (but may not) *eventually* lead to law governing private parties.  *Cf. Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 480 (D.C. Cir. 2009) (holding that the plaintiffs' "claims are not ripe due to the multiple stage nature of the" Department of the Interior program at issue).  To CDT's point that "the agency actions specified in [Order 13,925's] directives further violate the First Amendment by curtailing and chilling free speech," Pl.'s Opp'n at 38, those agency actions are only preliminary, *cf. Texas*, 523 U.S. at 301 ("[D]etermination of the scope of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." (cleaned up)).

The parties will also not suffer hardship as a result of any delayed consideration of CDT's claim.  CDT, as well as the third-party online platforms that it contends are harmed, are under no obligation to take (or not take) any action as a result of Order 13,925.  *Cf. NPHA*, 538 U.S. at 809 (explaining that there was no hardship because the relevant regulation "does not command anyone to do anything or to refrain from doing anything; it does not grant, withhold, or modify any formal legal license, power, or authority; it does not subject anyone to any civil or criminal liability; and it creates no legal rights or obligations" (cleaned up)).  There *could* be legal consequences flowing from Order 13,925 down the road: the FCC *could* issue regulations

adopting the Order's interpretation of the "narrow purpose" of § 230; the FTC *might* "prohibit unfair or deceptive acts or practices" of some online platforms; or the Attorney General *might* "propos[e]" federal legislation that eventually becomes law.  Order 13,925 §§ 2(b), 4(c), 6.  But it is not the Court's role to decide a case based on such hypotheticals.

## IV.

In sum, CDT has not alleged a concrete and imminent injury to its interests that is likely to be redressed by a favorable decision.  It thus has not met its burden to show that it has Article III standing to challenge Order 13,925.  *Accord Rock the Vote*, 2020 WL 6342927, at *6 ("Plaintiffs' allegations are insufficient to establish Article III standing to challenge the Executive Order.").  Further, it is an inappropriate time for judicial intervention, as CDT's claim is not prudentially ripe.

For these reasons, the President's motion to dismiss will be granted, and CDT's complaint will be dismissed.  A separate Order will issue.


Dated: December 11, 2020                          _____
                                                  TREVOR N. McFADDEN, U.S.D.J.